## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

SALADWORKS, LLC,[1]

        Debtor.

Chapter 11

Case No. 15-_10327_ (____)

## DECLARATION OF PAUL STECK IN SUPPORT OF
## CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, Paul Steck, hereby declare as follows:

1.      I am the President and member of the board of directors of Saladworks, LLC ("Saladworks"), the above-captioned debtor and debtor-in-possession (the "Debtor"). In this capacity, I am familiar with the Debtor's business, day-to-day operations, and financial affairs.

2.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 (the "Chapter 11 Case") of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Court"), and filed various motions described herein requesting certain relief (collectively, the "First Day Pleadings"). I submit this declaration (the "Declaration") in support of the Debtor's Chapter 11 Case and the First Day Pleadings.

3.      Except as otherwise indicated, all statements set forth in this Declaration are based upon (i) my personal knowledge as President and as a director, (ii) information supplied to me by other members of Saladworks management or the Debtor's professionals, (iii) my review of relevant documents, and/or (iv) my experience and knowledge of the Debtor's operations and

---

[1] The last four digits of the Debtor's tax identification number are (7282). The Debtor's corporate office and the mailing address is 161 Washington Street, Suite 300, Conshohocken, PA 19428.

financial affairs.  If called upon to testify, I could and would testify to the facts set forth in this Declaration.  I am authorized by the Debtor to submit this Declaration.

4.      Part I of this Declaration describes the Debtor's business, Part II describes the circumstances giving rise to the commencement of this Chapter 11 Case, Part III describes the Debtor's proposed course for this Chapter 11 Case, and Part IV sets forth certain facts in support of the First Day Pleadings.

## I.

### Overview of the Debtor's Business

5.      Celebrating its 28th year in operation, Saladworks is the nation's first and largest fresh-salad franchise concept.  Saladworks was developed in 1986, with the idea to provide its customers with fresh, healthy, made to order entrée-sized salads as an alternative food on the go option.  From its beginnings in the Cherry Hill Mall, Saladworks quickly expanded to twelve (12) additional locations in area malls and soon thereafter began franchising.

6.      The Debtor is a limited liability company formed on March 7, 2008 when its predecessor Saladworks, Inc. assigned to the Debtor all of its existing franchise agreements and intellectual property.   The Debtor owns all of Saladworks intellectual property, including trademarks and grants franchises for the establishment, development and operation of unique Saladworks restaurants offering a variety of salads, sandwiches, wraps, panini, soups and other breads and beverages as designated by the Debtor and prepared in accordance with specified recipes and procedures (the "System").  In addition, the Debtor owns and operates a Saladworks in Paoli, Pennsylvania (the "Store").

**The Franchises**

7.       The Debtor currently is a party to approximately one hundred and forty-nine (149) franchise agreements (collectively, the "Franchise Agreements") with approximately one hundred and sixty-two (162) different franchisees (the "Franchisees"). In addition, the Debtor is a party to an additional one hundred and forty-one (141) Franchise Agreements where the Franchisee has not yet opened up its Saladworks franchise.   Pursuant to the Franchise Agreements, the Debtor provides Franchisees the use of the System, including its intellectual property and operating systems, operational support and coaching, training and centralization of purchasing. In return, the Franchisees pay certain fees, including initial fees and related start-up fees, a royalty fee equal to five percent (5%) of the Franchisee's net sales[2] (the "Royalty Fees"), and either one and half percent (1.5%)[3] or three percent (3%) of net sales for marketing and other brand development costs (the "Marketing Fees,[4] together with the Royalty Fees, the "Franchise Fees"). Although the Franchise Fees vary from year to year, they account for approximately seventy percent (70%) of the Debtor's revenue on an annual basis.   Generally speaking, as set forth in the Franchise Agreements, all of the Franchisees record their net sales on centralized point-of-sale systems ("POS").   Generally, the Debtor has access to each Franchisee's POS system and on a weekly basis, each Franchisee provides its net sales data to the Debtor through the POS system.   Through the electronic funds transfer program established in the Franchise Agreements, the Debtor then transfers the Franchise Fees from the Franchisee's bank accounts into the Franchise Fee Account (defined below).   Based on the complex nature of the POS

---

[2] Net sales include all revenue generated from all business conducted by the Franchisee during the preceding weekly period, excluding all applicable sales tax or other related taxes, discounts and coupons.
[3] This applies only to Franchisees operating in a mall food court.
[4] The Marketing Fees are used as part of a national advertising fund for the common benefit of the Franchisees. The Debtor has the authority to use these funds in its sole discretion and such funds have historically been used to develop, produce and distribute national, regional and/or local advertising.

system and the regulations related to electronic transfers, it took approximately seven (7) weeks for the Debtor to get the Franchise Fee Account operational and to enable the withdraw of the Franchise Fees from the Franchisee's bank accounts.

8.      In addition, the Debtor generates revenue from the Franchisees' purchase of certain foodstuffs and required products, such as private label products, including purchases from designated or approved suppliers. The Debtor has established a prime supplier program with US Foods, Inc. ("US Foods") which is the exclusive supplier of the Debtor's proprietary food products and trademarked products, as well as an authorized food supply. The Debtor receives an administrative fee equal to three and half percent (3.5%) of the total sales by U.S. Foods to the Franchisees, as well as other administrative fees from various manufacturers. The Debtor also receives an administrative fee ranging from two percent (2%) to six percent (6%) of the total purchases from the Debtor's prime equipment vendor. These administrative fees account for approximately twenty-seven percent (27%) of the Debtor's annual revenue. The Debtor's other revenue is derived from the initial franchise fees, additional fees and expenses related to services provided by the Debtor, and the transfer and/or sale of existing franchises.

9.      Finally, the Debtor owns and operates a Saladworks in Paoli, Pennsylvania (the "Company Store").

**Capital Structure**

10.      The Debtor's equity owners are J Scar Holdings, Inc. ("JS")[5] and JVSW LLC ("VH").[6] Pursuant to the Amended and Restated Limited Liability Company Agreement of Saladworks, LLC (the "Operating Agreement"), dated March 9, 2008, and that certain Contribution Agreement, dated March 9, 2008, JS owns a seventy (70%) interest in the Debtor

---

[5] JS is wholly-owned by John M. Scardapane, who is the Chairman and member of the Debtor's board of directors.
[6] Upon information and belief, VH is wholly-owned or controlled by Vernon W. Hill, II, ("Hill") who is a former director and chairman of executive committee.

through 700 Class A Membership Shares and VH owns a thirty (30%) interest in the Debtor through 300 Class C Membership Shares. As further described below, on March 25, 2013, VH sent the Put Notice (defined below) exercising its purported Put Right (defined below), which is subject to the Chancery Litigation (defined below).

11.    The Debtor has no secured bank debt. The Debtor has no other known properly perfected secured debt obligations.[7] The Debtor has approximately $8.02 million in outstanding unsecured debt obligations, which consist of (a) approximately $2.5 million in outstanding unsecured loan obligations to Metro Bank (now owed to WS Finance, an entity that upon information and belief may be owned or controlled by either VH or Hill), which is subject to the Pennsylvania Litigation (defined below) as further described below; (b) outstanding trade obligations of $870,000; (c) other obligations arising out of the Debtor's operations in the amount of $476,000; and (d) $3.1 million related to the Put Right (defined below) and $1,115,350 in outstanding Guaranteed Payments, which is subject to the Chancery Litigation (defined below) described below.

Pre-Petition Litigation

12.    As described above, JS and VH are the Debtor's equity owners. Pursuant to the Contribution Agreement, VH made a capital contribution to the Debtor in the amount of $7,750,000. In exchange, VH received 300 Class C membership shares. Pursuant to the Operating Agreement, VH was permitted to select two board members. Hill served as the sole

---

[7] One of the Debtor's creditors, Federal Realty Investment Trust ("Federal"), has filed a UCC-1 Financial Statement seeking to perfect a note (the "Note") that was executed by the Debtor under a settlement agreement wherein the Debtor was obligated to pay Federal $180,000. The Debtor and Federal also entered into a Security Agreement, which purported to secure the Debtor's obligations. The purported security interest was limited to the Debtor's right to receive Royalty Fees from two of its Franchisees in an amount equal to two times the amount of the monthly payments that are due under the Note or $15,000. As set forth above, the Royalty Fees are withdrawn from the Franchisee's account and the cash is placed in the Debtor's account. Thus, although Federal did file UCC-1 Financial Statement, Federal has never properly perfected its interest in the Debtor's cash and only has an unsecured claim for the remaining $70,000 outstanding under the Settlement Agreement.

VH director until his resignation on July 15, 2013.[8]  Hill subsequently appointed Damien Del Duca to serve on the board on July 24, 2013, and Michael Kadelski, on May 29, 2014.  Mssrs. Del Duca and Kadelski resigned on November 12, 2014.  VH has not filled the vacancies of the VH directors or participated in any board meetings since November 12th.

13.    On March 25, 2013, VH sent a written notice (the "Put Notice") to the Debtor pursuant to Section 6.3 of the Operating Agreement demanding that the Debtor repurchase all of VH's Class C Membership Shares (the "Put Right").  Pursuant to the Put Right, VH has demanded payment of $7.75 million, which is payable in 1/5 yearly installments commencing on May 25, 2013 following receipt of the Put Notice.  In addition, on or about July 26, 2013, VH demanded payment of a guaranteed payment equal to the product of 1.9625% and $7.75 million (the "Guaranteed Payments"), which were due on a quarterly basis.

14.    On October 20, 2014, VH filed an action in the Court of Chancery (the "Chancery Litigation") against the Debtor, JS and Mr. Scardapane.  In the Chancery Litigation, VH asserts six different counts: (a) failure to pay on the Put Right; (b) failure to make the Guaranteed Payments; (c) fraud against Mr. Scardapane; (d) waste of company assets against Mr. Scardapane, (e) breach of fiduciary duty against Mr. Scardapane; and (f) unjust enrichment against Mr. Scardapane.  VH has also filed an expedited motion for summary judgment, which is pending briefing.[9]  As set forth in the Debtor's motion to dismiss, the Debtor has numerous defenses to the claims asserted against it, JS and Mr. Scardapane, including but limited to, (i) the issues relating to the Put Right and Guaranteed Payments are subject to an arbitration provision, (ii) the claims of fraud and waste of corporate assets are derivative claims and VH has not made

---

[8] On June 4, 2014, Hill sent a letter resigning as Chairman of the Executive Committee retroactive to July 15, 2013.
[9] As its basis for need to be heard on an expedited basis, VH argues that the Debtor has two confessions of judgment against and expedited consideration is necessary to protect its ability to collect.  For reasons unknown to the Debtor, VH did not disclose to the Chancery Court that the judgment creditor seeking to collect is an affiliate owned or controlled by Hill.

the prerequisite pre-suit demand or established futility; (iii) VH has an adequate remedy at law to address its purported unjust enrichment claim; and (iv) under the Operating Agreement, VH has no right or ability to accelerate any obligations under the Put Right. In addition, the Debtor believes that it may have other numerous defenses or affirmative claims relating to the actions of VH and Hill, related to the Chancery Litigation, the Pennsylvania Litigation (as described below) and generally acts taken prior to filing bankruptcy (all of the foregoing, the "Claims and Defenses Against VH").

15.     On or about December 3, 2014, Metro Bank commenced three separate lawsuits in Pennsylvania, one civil action and two confession of judgments (the "Pennsylvania Litigation") against the Debtor seeking amounts allegedly due and owing under various term loan agreements and related documents in the aggregate amount of approximately $2.5 million (the "Metro Bank Obligations"). None of these amounts were secured by any of the Debtor's assets. In two of the cases, Metro Bank was able to obtain a confession of judgment against the Debtor in the amounts of $466,467.26 and $1,388,769.58, respectively (the "Confessed Judgments").[10] At some point during the Pennsylvania Litigation, WS Finance LLC ("WS Finance"), an entity that upon information and belief may be owned or controlled by either VH or Hill, purchased the Metro Bank Obligations. On January 15, 2015, Counsel for WS Finance sent a writ of garnishment to the Debtor's bank – TD Bank. Since service, TD Bank has frozen this account. The Debtor is seeking to overturn the Confessed Judgments.

---

[10] Counsel to WS Finance Writ of Execution (Confessed Judgment) Garnishment Only for Case No. 2014-33000 incorrectly states that the confessed judgment was $1,388,779.58, but the actual confessed judgment was for $466,467.26.

## II.

### Events Leading to this Chapter 11 Cases

16.     Following the exercise of the Put Right, in May, 2013, the Debtor began exploring its strategic and financial alternatives in order to satisfy this obligation.  On May 3, 2013, the Debtor's board of directors approved the engagement of Mufson, Howe and Hunter ("MHH") as financial advisor and investment banker to seek and execute a potential transaction to satisfy the Put obligation through a sale or purchase of VH's shares.  MHH was unsuccessful it its efforts prior to its termination in March 2014.  Although certain parties have indicated interest in pursuing a transaction with the Debtor, given the Chancery Litigation and uncertainty surrounding the collection efforts of VH and Hill regarding the Put Right obligations, the Guaranteed Payments and the Metro Bank Obligations, the Debtor has been unable to move forward with any potential transaction in a material way.  Interested parties have expressed concerns that the ongoing litigation would prevent a free and clear sale or otherwise subject to the purchaser to ongoing litigation or liability.  Thus, although the Debtor believes that a refinancing or sale transaction would enable it to satisfy valid claims asserted against it, it has been unable to maximize value and execute such a transaction outside the protections of a Chapter 11 proceeding.

17.     In addition, the Chancery Litigation and the Pennsylvania Litigation has had a negative impact on the Debtor's operations by impairing its ability to sell additional franchises and increase its footprint in the marketplace.  While the Debtor has executed a number of Franchise Agreements, those Franchisees have been unwilling to move forward with the opening of their Saladworks store until these issues are resolved.  This has resulted in the inability of the Debtor to capitalize on this additional revenue in the form of Franchise Fees or through its administrative fees.

## III.

## Proposed Course of the Chapter 11 Case

18.    In Chapter 11, the Debtor has an opportunity to effectuate its sale strategy to avoid further deterioration of its business and achieve maximum value of its assets for the benefit of all of its stakeholders.  Perhaps more importantly, the automatic stay of litigation effective upon the commencement of this case will enable the Debtor to refocus its energy on the restructuring process free from the value-destructive, distracting litigation in Pennsylvania and Delaware.  The Debtor has engaged SSG Advisors, LLC ("SSG") to assist in its marketing efforts.  With its refocused energy and assistance by SSG, the Debtor believes it will be able to execute a restructuring in Chapter 11 that provides its transaction partner with protections typical of Chapter 11 transactions (such as good faith findings and injunctive relief) that will cut off any potential litigation or liability at the closing of such transaction.

19.    On the Petition Date, the Debtor has filed a motion seeking to establish its bidding procedures in connection with its proposed sale and is hopeful that it may have a stalking horse bidder to set the floor price on a successful auction.  The Debtor intends to pursue a thorough and transparent process that will result in the sale or recapitalization of the Debtor, the distribution of net transaction proceeds to satisfy the valid claims against the Debtor, and potentially, the return of value to shareholders.

## IV.

## Facts in Support of First Day Pleadings[11]

20.    In connection with its Chapter 11 Petition, the Debtor has filed a number of First Day Pleadings seeking various forms of relief.   To the extent that they were not otherwise addressed above, the facts underlying the First Day Motions are stated below.

**A.    Application of the Debtor for Entry of an Order Appointing UpShot Services LLC as Claims and Noticing Agent *Nunc Pro Tunc* to the Petition Date**
**AND**
**Application of the Debtor for Entry of an Order Authorizing the Employment and Retention of UpShot Services LLC as Administrative Agent for the Debtor Nunc Pro Tunc to the Petition Date**

21.    Contemporaneously with the filing of this Declaration, the Debtor has also filed an *Application of the Debtor for Entry of an Order Appointing UpShot Services LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* (the "Section 156(c) Application") and an *Application of the Debtor for Entry of an Order Approving the Employment and Retention of UpShot Services LLC as Administrative Agent for the Debtor Nunc Pro Tunc to the Petition Date* (the "Section 327 Application" and together with the 156(c) Application, the "UpShot Applications").

22.    On February 16, 2015, the Debtor entered into an agreement with UpShot Services LLC ("UpShot"), whereby the latter would provide certain services in connection with claims and notices to be provided in this Chapter 11 Case, as well as other administrative services (the "Services Agreement"), a true and accurate copy of which is attached as **Exhibit B** to the Section 156(c) Application and the Section 327 Application.

---

[11] Capitalized terms not defined within this Section VI shall have the meaning ascribed to such terms in the respective First Day Motions.

23.    The Debtor retained UpShot because it is one of the nation's leading chapter 11 administrators, with extensive experience in claims and notice processing. I understand that UpShot has developed efficient and cost-effective methods to handle properly the voluminous mailings associated with the claims and noticing portions of chapter 11 cases to ensure the orderly and fair treatment of all stakeholders.

24.    I have also been informed, as also reflected in the *Declaration of Travis K. Vandell in Support of Application of the Debtor for Entry of an Order Appointing UpShot Services LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* (the "Vandell Declaration"), that UpShot is a disinterested entity and has no conflict of interests that would affect its impartiality in performing its duties and obligations under the Services Agreement.

25.    Accordingly for the foregoing reasons, I submit that the relief requested in the UpShot Applications are in the best interests of the Debtor's estate.

**B.    Motion of the Debtor for Entry of an Order Authorizing Debtor to Pay Prepetition Wages, Compensation, Employee Benefits, and Other Associated Obligations**

26.    Contemporaneously with the filing of this Declaration, the Debtor filed the *Motion of the Debtor for Entry of an Order Authorizing Debtor to Pay Prepetition Wages, Compensation, Employee Benefits, and Other Associated Obligations* (the "Employee Wage Motion"). Through the Employee Wage Motion, the Debtor seeks entry of an order (a) authorizing the Debtor to: (i) pay and/or perform, as applicable, prepetition obligations to current employees (the "Employees") including accrued prepetition wages, salaries, and other cash and non-cash compensation claims (collectively, the "Employee Wage Obligations"); (ii) maintain and continue to honor its practices, programs, and policies for its Employees that were in effect as of the Petition Date, as such may be modified, amended or supplemented from time-to-time in the ordinary course, including without limitation, the continuation and maintenance of the

Debtor's various employee benefit plans and programs (and to pay all fees and costs in connection therewith, including those that arose prepetition) (collectively, the "Employee Benefit Obligations"); (iii) reimburse Employees for prepetition expenses incurred on behalf of the Debtor in the ordinary course of business (the "Employee Expense Obligations"); (iv) continue to pay and/or contest in good faith all amounts related to worker's compensation claims that arose prepetition (the "Workers' Compensation Obligations") and (v) pay all related prepetition withholdings and payroll-related taxes (the "Employers Taxes" and, with the Employee Wage Obligations, the Employee Benefit Obligations, the Employee Expense Obligations and the Worker's Compensation Obligations, collectively, the "Prepetition Employee Obligations") associated with the Employee Wage Claims and the Employee Benefit Obligations (each, as described herein) and (b) authorizing and directing financial institutions to receive, process, honor, and pay all related checks and electronic payment requests for payment of the Prepetition Employee Obligations.

27.    I believe the relief requested in the Employee Wage Motion is necessary because any delay in paying any of the Prepetition Employee Obligations described therein could severely disrupt the Debtor's relationship with its Employees, and irreparably impair the Employees' morale at the very time their dedication, confidence, and cooperation are most critical.    Accordingly, I believe the Debtor faces the risk that its operations may be severely impaired if the Debtor is not immediately granted authority to pay the Prepetition Employee Obligations.    At this critical state, I believe the Debtor simply cannot risk the substantial disruption of its business operations that would attend any decline in workforce morale attributable to the Debtor's failure to pay the Prepetition Employee Obligations in the ordinary course of its business.

28.    If the relief requested in the Employee Wage Motion is not granted, I believe the Debtor's Employees would suffer hardship and, in many instances, financial difficulties, since these monies are needed to enable them to meet their personal obligations.   In addition, without the requested relief, I believe the Debtor's stability would be undermined by the potential threat that otherwise loyal Employees would seek other employment.   A result that I believe would undermine the Debtor's stability, and undoubtedly have an adverse effect on the Debtor, its customers, the value of its assets and business, and its ability to achieve its objectives in Chapter 11.

**Additional Background Regarding the Debtor's Employee Obligations**

*Overview of the Debtor's Workforce*

29.    The Debtor employs approximately thirty-one (31) Employees.   Twelve (12) Employees are part-time hourly wage earners (the "Hourly Employees") and nineteen (19) are salaried personnel (the "Salaried Employees").

30.    The Employees who work at the Debtor's corporate headquarters (the "Corporate HQ Employees") perform a variety of critical functions, including franchise sales, marketing, branding, accounting, billing and collection services, legal, finance, tax, information services, human resources, and other related tasks.   The Employees who work at the Company Store (the "Store Employees") also perform a number of vital functions, including operating the restaurant, providing customer service, managing store operations and accounting and other related tasks. The Employees' skills, knowledge, and understanding of the Debtor's infrastructure, operations, brand and business relations are essential to the effective operation of the Debtor's business.

31.     Just as the Debtor depends on the Employees to operate its business on a daily basis, these individuals also depend on the Debtor.  Indeed, the vast majority of these individuals rely exclusively on payments received from the Debtor for their basic living necessities.

*Wage Obligations*

32.     In the ordinary course of business, the Debtor incurs payroll obligations for base wages and overtime compensation owed to its Employees (the "Wage Obligations").    All Employees are paid on a weekly basis.  The average weekly payroll for the Debtor's Employees in a typical month is approximately $46,000 including payroll taxes.  The Debtor administers its payroll and the disbursements of payroll funds to Employees through Primepoint, LLC ("Primepoint").  Five (5) Store Employees receive a live check, while all other Employees are paid by direct deposit.

33.     As of the Petition Date, the Debtor estimates that it owes approximately $63,300.00 on account of compensation owed to Salaried Employees and Hourly Employees in the ordinary course of business and an additional $24,645.00 in deferred compensation[12] owed to certain Salaried Employees.

34.     By this Motion, the Debtor seeks the authority to pay and honor prepetition Wage Obligations in an amount not to exceed $12,475 per eligible Employee and not to exceed $65,000 in the aggregate, and to continue to honor the Wage Obligations on a postpetition basis in the ordinary course of business.

---

[12] The Debtor is not seeking authority to pay any deferred compensation at this time.  Pursuant to the terms of the agreements governing such deferred compensation, these amounts are not due until a sale or similar transaction closes.  Payment of deferred compensation will be authorized by separate order of the Court on notice to parties in interest.

Case 15-10327-LSS    Doc 3    Filed 02/17/15    Page 15 of 34

***Other Benefits: Vacation, Personal, Sick Time, and Reimbursable Expenses***[13]

35.     The Debtor offers its Employees other forms of compensation, including vacation time, paid holidays, other personal time off, and reimbursement of certain business expenses. These forms of compensation are usual, customary and necessary if the Debtor is to retain qualified employees to operate its business.

>    i.    *Paid Time Off*

36.     Employees are eligible to accrue paid vacation, sick and personal days (collectively, "Paid Time Off"). The amount of Paid Time Off available to an Employee is determined by the Employee's length of employment with the Company. When taking this factor into account, Employees generally receive twenty-three (23) days of Paid Time Off per year. As of February 15, 2015 the Debtor estimates that it is responsible for unused Paid Time Off totaling approximately $165,000.00 (the "Unpaid PTO"). This amount, however, is not a current cash pay obligation as Employees are only entitled to be paid for accrued but unused Paid Time Off related solely to vacation time and only upon termination.

37.     By this Motion, the Debtor seeks the authority to remit prepetition Unpaid PTO (if any) in a total amount not to exceed $170,000 on account of such prepetition amounts and to continue its Paid Time Off policies in the ordinary course of business on a postpetition basis.

>    ii.    *Expense Reimbursement*

38.     By this Motion, the Debtor seeks authority to pay all prepetition Reimbursable Expenses (as defined below) in the ordinary course of business. The Debtor routinely reimburses Employees for certain expenses within the scope of their employment, including

---

[13] In the ordinary course of business, the Debtor paid certain of its expenses and obligations in the days leading up to the bankruptcy filing. Because it is unclear whether such amounts cleared prior to the Petition Date, the Debtor has included such amounts in the estimates contained herein.

expenses for travel, cell phones, and out-of-pocket expenses (collectively, the "Reimbursable Expenses"). Certain Employees have not yet been reimbursed for Reimbursable Expenses previously incurred. The Debtor typically pays between $35,000 and $45,000 in Reimbursable Business Expenses per month. The Debtor processes expense reports on an ongoing basis. The Debtor estimates that it has approximately $45,000 in prepetition Reimbursable Expenses outstanding, although there may be certain additional Reimbursable Expenses where a reimbursement request has not yet been received (the "Unpaid Reimbursable Expenses").

39.     To avoid unnecessary disruption and due to the nature of delay sometimes associated with the timely submission of expense reports, the Debtor seeks the authority to pay the Unpaid Reimbursable Expenses in an amount not to exceed $50,000 on account of prepetition obligations and to continue to honor Reimbursable Expenses in the ordinary course of business postpetition.

### Employee Benefit Plans

40.     The Debtor provides its full-time Employees and their dependents with a number of employee benefit plans, including medical, dental, vision, short-term and long-term disability insurance, and life insurance plans (collectively, the "Employee Benefit Plans"). The Debtor utilizes the services of Vantage Point Benefit Strategies ("Vantage") for its insurance brokerage needs with respect to the Employee Benefit Plans. By this Motion, the Debtor seeks authority to remit all amounts owed under the Employee Benefit Plans in an amount not to exceed $40,000 on account of prepetition obligations and to continue its Employee Benefit Plans in the ordinary course of business on a postpetition basis.

i.   *Medical Plans*

41.    The Debtor provides a number of Employees and their dependents with medical, dental, and vision benefits (the "Medical, Dental and Vision Plan") under plans administered by Independent Blue Cross Blue Shield and Vision Service Plan. As of February 12, 2015, forty-eight (48) people, including Employees and Employee dependents, are covered under the Medical, Dental and Vision Plan.

42.    The Medical, Dental and Vision Plan is funded through contributions by participating Employees and by the Debtor. The cost of the Medical, Dental and Vision Plan is borne primarily by the Debtor, but Employees contribute a fixed amount of $22 weekly for single coverage and $50 weekly for all other coverages to the Medical, Dental and Vision Plan through payroll deductions. Employee Contributions are deducted from their paychecks to pay for that month's coverage.

43.    The Medical, Dental and Vision Plan costs the Debtor approximately $25,000 on average each month. This amount includes all payments for administrative fees that are paid to Vantage. As of the Petition Date, the Debtor estimates that its liability for premiums under the Medical, Dental and Vision Plan was approximately $26,000.

ii.   *Life, Short-Term Disability, Long-Term Disability Insurance and Employee Assistance Programs*

44.    The Debtor makes available short-term disability, long-term disability, basic term life, and accidental death and dismemberment insurance coverage, and certain voluntary benefits for all eligible Employees (collectively, the "Employee Insurance Coverage"). As of February 13, 2015, approximately twelve (12) Employees participate in the Employee Insurance Coverage. The Employee Insurance Coverage is provided by Assurant Employee Benefits.

45.    Certain costs of the Employee Insurance Coverage are borne by the Debtor while other costs are funded by Employee contributions made by participating Employees through payroll deductions.   The Debtor pays out approximately $1,750 each month for the Employee Insurance Coverage – $607 of which is funded by the Debtor and $1,143 is covered through Employee contributions.  As of the Petition Date, approximately $875 is owed on account of Employee Insurance Coverage for the current plan year (the "Unpaid Employee Insurance Coverage").  By this Motion, the Debtor seeks authority to remit the Unpaid Employee Insurance Coverage and continue offering Employee Insurance Coverage in the ordinary course of business.

*HSA and Retirement Plans*

46.    In the ordinary course of business, the Debtor maintains a 401(k) plan for the benefit of all eligible Employees (the "401(k) Plan").   The 401(k) Plan is administered by Benefits Consulting Corporation.   The 401(k) Plan generally provides for pre-tax salary deductions of eligible compensation, which amounts are generally deducted automatically from each participating Employee's paycheck.   Approximately nine (9)   Employees currently participate in the 401(k) Plan, and the approximate weekly amount withheld from Employee paychecks on account of such 401(k) Plan is $500.   The Debtor does not match any portion of the Employees' contributions to the 401(k) Plan.  As of the Petition Date, the Debtor holds in trust approximately $500 in Employee 401(k) Plan contributions (the "Unremitted 401(k) Contributions").

47.    In addition, the Debtor provides its Employees with the option of having specified amounts automatically deducted from their paycheck to fund certain healthcare costs (the "HSA Plan" and together with the 401(k) Plan as the "HSA & Retirement Plans").  Approximately four

(4) Employees currently participate in the HSA Plan. On a weekly basis, approximately $200 is withheld from Employee paychecks on account of the HSA Plan. The Debtor contributes $150 monthly to the HSA Plan on behalf of each participating Employee. As of the Petition Date, the Debtor holds $200 in trust with respect to the HSA Plan (together with the Unremitted 401(k) Contributions as the "Unremitted 401(k)/HSA Contributions").

48.     By this Motion, the Debtor seeks the authority to release the Unremitted 401(k)/HSA Contributions in an amount not to exceed $2,000 on account of prepetition obligations and to continue to operate the HSA & Retirement Plans in the ordinary course of business on a postpetition basis.

*Workers' Compensation*

49.     The Debtor is a participant in a workers' compensation insurance policy with Traveler's Insurance Company for its Employees at the mandated levels required by each state in the United States in which the Debtor has Employees (the "Workers' Compensation Program"). The policy is premium based. Payment of $6,823 was made for the first quarter of 2015. A payment of $2,275 is due on February 20, 2015 (the "Unpaid Workers' Compensation Obligations").

50.     By this Motion, the Debtor requests the authority to pay the Unpaid Workers' Compensation Obligations in an amount not to exceed $4,550 on account of prepetition obligations and to continue the Workers' Compensation Program in the ordinary course of business on a postpetition basis.

*Employer Taxes*

51.     The Debtor routinely withholds from Employee paychecks amounts that the Debtor is required to transmit to third parties (the "Employer Taxes and Deductions"). The

Employer Taxes and Deductions include deductions for garnishments and child support and withholdings related to social security, Medicare and Medicaid, federal, state, and local income taxes, and employment insurance. As noted above, the Debtor administers its payroll and the disbursements of payroll funds to Employees through Primepoint. In addition, Primepoint calculates and makes the necessary disbursements to the relevant taxing or other authorities for the Employer Taxes and Deductions. The Debtor does not believe it has any outstanding Employer Taxes and Deductions as such amounts have been transferred to Primepoint.

52.    Out of an abundance of caution, however, the Debtor seeks authority to remit any outstanding Employer Taxes and Deductions in an amount not to exceed $16,000 on account of prepetition obligations and to continue collecting the Employer Taxes and Deductions in the ordinary course of business on a postpetition basis.

53.    For the foregoing reasons, I submit that the relief requested in the Employee Wage Motion is in the best interests of the Debtor's estate.

**C.    Motion of the Debtor for Entry of an Order (A) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (B) Authorizing the Continued Use of Existing Cash Management System, and (C) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(B)**

54.    Contemporaneously with the filing of this Declaration, the Debtor also filed the *Motion of the Debtor for Entry of an Order (A) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (B) Authorizing the Continued Use of Existing Cash Management System, and (C) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(b)* (the "Cash Management Motion").

55.    Through the Cash Management Motion, the Debtor seeks entry of an order: (a) authorizing the maintenance of its Bank Accounts and continued use of existing Business Forms; (b) authorizing but not directing the continued use of existing Cash Management System; and (c)

providing any additional relief required in order to effectuate the foregoing. Additionally, the Debtor also requests the right, in its discretion, to (i) pay any Bank Account related fees, and (ii) to close or otherwise modify the terms of certain of the Bank Accounts and open new debtor-in-possession accounts as may be necessary to facilitate its chapter 11 case and operations, or as may otherwise be necessary to comply with the requirements of any debtor-in-possession financing and/or cash collateral order entered in this case.

56.     I believe the Debtor's Cash Management System is a customary and essential business practice that was created and implemented by the management of the Debtor in the exercise of its business judgment. Moreover, I believe the Cash Management System is similar to those commonly employed by corporate enterprises comparable to the Debtor in size and complexity.

57.     Indeed, I believe the Cash Management System is a practical mechanism that allows the Debtor to transfer its revenues to the payment of its obligations that decreases the burdens on the Debtor, and that provides several important benefits, including the ability to: (a) control and monitor corporate funds; (b) ensure cash availability; and (c) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information. Moreover, I believe continued operation of the Cash Management System is crucial to its ongoing business operations. I believe all of the benefits discussed with respect to maintaining the Debtor's existing Cash Management System will assist the Debtor in its effort to maintain its operations pending the confirmation of a chapter 11 plan or other disposition of its assets, making the relief requested herein appropriate under Bankruptcy Code section 105(a)

58.    For similar reasons, I believe the Debtor should be authorized to continue to fund its business and operations by payments made from the Bank Accounts and should be exempt from certain of the Guidelines[14] established by the United States Trustee for the District of Delaware.  Specifically, as part of the requested relief, the Debtor also seeks a waiver of the requirement to establish specific bank accounts for any tax payments.  I believe that tax obligations, if any, can be paid most efficiently out of the existing Bank Accounts, that the United States Trustee can adequately monitor the flow of funds into, among, and out of the Bank Accounts, and that the creation of new debtor-in-possession accounts designated solely for tax obligations would be unnecessary and inefficient.

59.    The Debtor also requests authority to maintain the Bank Accounts and utilize such accounts pursuant to the existing Cash Management System described in the Cash Management Motion.  I believe that allowing them to do so will not prejudice any party-in-interest or its estate.  If the relief requested herein is granted, the Debtor will not pay any debts incurred on its behalf before the Petition Date unless specifically authorized by this Court.

60.    Moreover, I believe that if the Debtor were forced to close its Bank Accounts, there would be disruption and confusion that would negatively impact the Debtor's operations. For instance, funds may be deposited into the wrong account, misapplied, held in limbo, or otherwise delayed, thus negatively affecting the Debtor's relationships with parties, who are

---

[14] The Guidelines were issued in order to assist the U.S. Trustee in supervising the administration of chapter 11 cases. Such Guidelines require chapter 11 debtors to, among other things, unless the Court requires otherwise:

    a.   Close all existing bank accounts and open new accounts which must be designated debtor-in-possession bank accounts;

    b.   Establish and maintain separate debtor-in-possession accounts for the payment of taxes and separate debtor-in-possession accounts for cash collateral; and

    c.   Obtain and utilize new checks for all debtor-in-possession accounts which bear the designation "Debtor-in-Possession" and contain certain other information related to the chapter 11 case.

necessary to the Debtor's efforts, and who already may be burdened by the filing of this case. As a result, I submit that maintenance of the existing Bank Accounts and Cash Management System is warranted.

61.     Additionally, the Debtor requests that the Court authorize it to use all correspondence and Business Forms existing immediately before the Petition Date without reference to the Debtor's status as "debtor-in-possession." As explained in the Cash Management Motion, as of the Petition Date, the Debtor had a large stock of Business Forms that it used in the ordinary course of business. I believe that reprinting its Business Forms to indicate that the Debtor is a "Debtor-in-Possession" would impose an unnecessary burden and expense on the Debtor. I have little doubt that the parties with whom the Debtor does business shortly will become aware that it is a chapter 11 debtor-in-possession. In any event, in accordance with the Guidelines and Local Rule 2015-2(a), the Debtor will add such "Debtor-in-Possession" designation to any checks that it obtains or creates postpetition.

62.     The Debtor also requests that the Court waive the requirements of Bankruptcy Code section 345(b) on an interim basis and permit the Debtor to maintain its deposits in the Bank Accounts in accordance with existing deposit practices until such time as it obtains this Court's approval to deviate from the guidelines imposed under Bankruptcy Code section 345(b) on a final basis. I believe the Debtor's existing deposit practices are significantly less burdensome and more appropriately tailored to its business needs than the practices otherwise required under the Bankruptcy Code and by the U.S. Trustee Guidelines. Accordingly, I submit that strict compliance with Bankruptcy Code section 345 and the U.S. Trustee Guidelines would be overly burdensome and restrict the Debtor's banking options to the detriment of its estate and creditors.

63.     Additionally, I believe it would be in the best interests of the estate's creditors to continue following the existing deposit practices, notwithstanding the requirements of Bankruptcy Code section 345(b) and the U.S. Trustee Guidelines.   I further submit that the Debtor's deposit practices are commercially reasonable and appropriate, consistent with the intent of Bankruptcy Code section 345.

### Additional Background Related to the Cash Management System

64.     The Bank Accounts are part of a carefully constructed cash management system (the "Cash Management System") that ensures the Debtor's ability to efficiently monitor and control its cash position, as is more fully described below.

65.     As explained more fully above, the Debtor generates revenue from the Franchise Fees.  Generally, the Debtor has access to each Franchisee's POS system and on a weekly basis, each Franchisee provides its net sales data to the Debtor through the POS system.  Through the electronic funds transfer program established in the Franchise Agreements, the Debtor then transfers the Franchise Fees from the Franchisee's bank accounts into the Franchise Fee Account. The Franchise Fees are then transferred from the Franchise Fee Account (as defined in the Cash Management Motion) into the MidCoast Operating Account (as defined in the Cash Management Motion).   Based on the complex nature of the POS system and the regulations related to electronic transfers, it took approximately seven (7) weeks for the Debtor to get the Franchise Fee Account operational and to enable the withdraw of the Franchise Fees from the Franchisee's bank accounts.

66.     Any revenue in connection with the Debtor's administrative fees, as described further above, are deposited directly into the MidCoast Operating Account (as defined in the Cash Management Motion).   The Debtor satisfies its day-to-day operations through the

MidCoast Operating Account. The day-to-day operations of the Company Store, including its payroll obligations are paid out of the BofA Operating Account. Likewise, all cash receipts of the Company Store are deposited into the BofA Operating Account.

67. Additionally, the Debtor maintains four (4) Bank Accounts in connection with its Brand Development Fund program (the "Development Program") at M&T Bank, MidCoast Community Bank, Metro Bank and TD Bank.

68. Finally, the Debtor maintains four (4) smaller operating accounts at the following banks: Republic Bank, Bank of America, Metro Bank and TD Bank. The Debtor conducts only minimal cash payments and deposits out of these accounts.

69. The Debtor performs a reconciliation of all of the deposits and debits in the Cash Management System which are reviewed daily and reconciled monthly. The Debtor also makes book entries at the time of each transfer between all accounts.

70. For the foregoing reasons, I submit that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate.

**D.    Motion of the Debtor for Entry of Interim and Final Orders (a) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (b) Deeming Utilities Adequately Assured of Future Performance, and (c) Establishing Procedures for Determining Adequate Assurance of Payment**

71. Contemporaneously with the filing of this Declaration, the Debtor also filed a *Motion of the Debtor and Debtor-in-Possession for Entry of Interim and Final Orders (a) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (b) Deeming Utilities Adequately Assured of Future Performance, and (c) Establishing Procedures for Determining Adequate Assurance of Payment* (the "Utilities Motion") requesting entry of interim and final orders: (a) determining that the Debtor's utility providers (as that term is used in Bankruptcy Code section 366, the "Utility Providers") have been provided with adequate assurance of

payment within the meaning of Bankruptcy Code section 366, (b) approving the Debtor's proposed adequate assurance, (c) prohibiting the Utility Providers from altering, refusing, or discontinuing service on account of amounts outstanding or on account of any perceived inadequacy of the Debtor's proposed adequate assurance, and (d) determining that the Debtor is not required to provide any additional adequate assurance beyond what is proposed by this Motion and the adequate assurance procedures described in the Utilities Motion and set forth in the Proposed Interim and Final Orders attached thereto.

72.     In the ordinary course of business, the Debtor obtains water, sewer, gas, heat, electricity, telephone, and similar utility products and services (collectively, the "Utility Services") from various utility providers (the "Utility Providers"). In 2014, the Debtor paid an average of approximately $10,450 per month on account of the Utility Services.

73.     Uninterrupted Utility Services are essential to the Debtor's ongoing operations. Indeed, any interruption in Utility Services – even for a brief period of time – would negatively affect the Debtor's operations, customer relationships, revenues, and profits.

74.     For the foregoing reasons, I submit that the relief requested in the Utilities Motion is in the best interests of the Debtor's estate.

**E.     Application of the Debtor for Entry of an Order Authorizing the Employment and Retention of Landis Rath & Cobb LLP as Counsel for the Debtor and Debtor-in-Possession, Nunc Pro Tunc to the Petition Date, Pursuant to Bankruptcy Code Section 327(a), Bankruptcy Rule 2014 and Local Rule 2014-1**

75.     Contemporaneously with the filing of this Declaration, the Debtor filed the *Application of the Debtor for Entry of an Order Authorizing the Employment and Retention of Landis Rath & Cobb LLP as Counsel for the Debtor and Debtor-in- Possession, Nunc Pro Tunc to the Petition Date, Pursuant to Bankruptcy Code Section 327(a), Bankruptcy Rule 2014 and Local Rule 2014-1* (the "LRC Retention Application") seeking authority to employ and retain

Landis Rath & Cobb LLP ("LRC") as its counsel in this case. By the LRC Retention Application, the Debtor requests the Court approve the employment and retention of LRC, *nunc pro tunc* to the Petition Date, pursuant to Bankruptcy Code section 327(a), under a general retainer as its counsel to perform the legal services that will be necessary during the Debtor's Chapter 11 Case.

76.     LRC has informed the Debtor that Adam G. Landis and Kerri K. Mumford, partners of LRC, and Kimberly A. Brown, an associate of LRC, as well as other partners and associates of LRC who will be involved in this case, are members in good standing of various state and federal bars.

77.     The Debtor has selected LRC as its counsel because of the firm's knowledge of the Debtor's business and financial affairs and its extensive experience and knowledge, with particular emphasis on its national expertise in the field of debtor and creditor law and business reorganizations under Chapter 11 of the Bankruptcy Code. LRC has a recognized reorganization practice and experience in aspects of the law that are expected to arise in the context of these cases.

78.     LRC's practice presently includes ten (10) attorneys many of whom regularly appear in bankruptcy cases in Delaware and other jurisdictions nationwide. LRC attorneys have represented debtors, creditors' committees, bank groups, and other significant parties in a multitude of bankruptcy cases.

79.     In assisting with the preparation of the Debtor's case, LRC has become extensively familiar with the Debtor's business affairs and capital structure, and will be able to immediately assist the Debtor in its efforts in this case. I believe LRC has the necessary background to deal effectively with many of the potential legal issues and problems that may

arise in the context of these cases.  Thus, in order to maximize the value of the Debtor's estate and because of LRC's recognized expertise in bankruptcy law, I desire that LRC represent the Debtor in this case.

80.    I submit that the Debtor's employment of LRC under a general retainer is appropriate and necessary to enable the Debtor to execute faithfully its duties as a debtor and to implement a successful reorganization.

81.    I have further been informed that LRC is a disinterested entity and has no conflict of interests that would affect its impartiality in performing its duties and obligations under LRC's Engagement Agreement.

82.    For the foregoing reasons, I submit that the relief requested in the LRC Retention Application is in the best interests of the Debtor's estate.

**F.    Application of the Debtor for Entry of an Order Authorizing the Employment and Retention of EisnerAmper LLP as Financial Advisor to the Debtor *Nunc Pro Tunc* to the Petition Date**

83.    Contemporaneously with the filing of this Declaration, the Debtor filed the *Application of the Debtor for Entry of an Order Authorizing the Employment and Retention of EisnerAmper LLP as Financial Advisor to the Debtor Nunc Pro Tunc to the Petition Date* (the "EA Retention Application") seeking authority to employ EisnerAmper LLP ("EA") to provide the Debtor's with certain financial advisory services.

84.    On February 9, 2015, the Debtor and EA entered into an engagement letter agreement (the "EA Engagement Agreement"), whereby EA would provide financial advisory services to the Debtor.  The Debtor selected EA as its financial advisor because of EA's extensive experience and knowledge of the Debtor's business, operations, and financial affairs and EA's expertise in business reorganizations under Chapter 11 of the Bankruptcy Code.  EA is

recognized for its expertise in providing financial advisory services to financially distressed companies, including advising debtors, creditors and other constituents in chapter 11 proceedings in numerous cases.

85.    I have further been informed that EA is a disinterested entity and has no conflict of interests that would affect its impartiality in performing its duties and obligations under the EA Engagement Agreement.

86.    For the foregoing reasons, I submit that the relief requested in the EA Retention Application is in the best interests of the Debtor's estate.

**G.    Application of the Debtor for Entry of an Order Authorizing the Employment and Retention of SSG Advisors, LLC as Investment Banker to the Debtor *Nunc Pro Tunc* to the Petition Date**

87.    Contemporaneously with the filing of this Declaration, the Debtor also filed the *Application of the Debtor for Entry of an Order Authorizing the Employment and Retention of SSG Advisors, LLC as Investment Banker to the Debtor Nunc Pro Tunc to the Petition Date* (the "SSG Retention Application") seeking to retain SSG as the Debtor's investment banker.

88.    By letter dated February 11, 2015 (the "SSG Engagement Letter"), the Debtor retained SSG as its investment banker.  SSG is a full-service global investment banking firm with expertise across a full range of products and services in investment banking, equities, fixed income, commodities, and wealth and asset management.

89.    The Debtor retained SSG because its professionals have extensive experience working with financially-distressed companies in and out of chapter 11.  As a result of rendering prepetition services to the Debtor, SSG is familiar with the Debtor's corporate and capital structure, management, operations, and various other aspects of their business, and, consequently, SSG is best-positioned to assist the Debtor in this Chapter 11 Case.

90.    I have further been informed that SSG is a disinterested entity and has no conflict of interests that would affect its impartiality in performing its duties and obligations under the SSG Engagement Agreement.

91.    For the foregoing reasons, I submit that the relief requested in the SSG Retention Application is in the best interests of the Debtor's estate.

**H.    Motion for Entry of an Order Extending the Automatic Stay Provisions of Bankruptcy Code Section 362**

92.    Contemporaneously with the filing of this Declaration, the Debtor also filed the *Motion for Entry of an Order Extending the Automatic Stay Provisions of Bankruptcy Code Section 362* (the "Stay Motion").

93.    Through the Stay Motion, the Debtor seeks entry of an order extending the automatic stay protections provided by Bankruptcy Code section 362 to the Debtor's Chief Executive Officer, Mr. Scardapane and JS (referred to together as the "Non-Debtor Defendants") until the effective date of a confirmed plan of reorganization.

94.    Extension of the automatic stay to the Non-Debtor Defendants is warranted because the Debtor is obligated under its Operating Agreement to indemnify the Non-Debtor Defendants to the fullest extent permitted under applicable law.  The Debtor is also responsible for advancing and paying the costs incurred by the Non-Debtor Defendants in litigating the actions explained above.  Accordingly, since the Debtor has an absolute duty to indemnify the Non-Debtor Defendants and fund their defense costs, the stay should be extended to the Non-Debtor Defendants.

95.    Additionally, extension of the automatic stay to the Non-Debtor Defendants is necessary under these circumstances to prevent the Debtor from suffering irreparable harm.  Mr. Scardapane's time, energy and resources are essential to the success of the Debtor's chapter 11

case and the ultimate recoveries for unsecured creditors. The Debtor is operating as a debtor-in-possession and is trying to restructure within a short period of time. Defending against any claims or litigation against either himself personally or against JS will prevent Mr. Scardapane from devoting his time and resources to the Debtor's business operations and reorganization efforts. In his role as CEO, he is very knowledgeable about the Company and will be closely involved in formulating, approving and executing the Debtor's postpetition initiatives. At this critical juncture, it is imperative that Mr. Scardapane be focused on achieving the Debtor's chapter 11 goals – operating in a manner that maximizes the Debtor's value, pursuing a thorough and transparent bidding process that will result in the sale or recapitalization of the Debtor, distributing net transaction proceeds to satisfy the valid claims against the Debtor, and potentially, returning value to shareholders.

96.     Accordingly, I believe that the relief requested in the Stay Motion is in the best interests of the Debtor, its estate, creditors and all parties in interest.

I.    **Motion of the Debtor and Debtor-In-Possession for Entry of an Order (I) Approving Stalking Horse Procedures and Bidding Procedures in Connection with a Transaction by Public Auction; (II) Scheduling a Hearing to Consider the Transaction; (III) Approving the Form and Manner of Notice Thereof and (IV) Approving Contract Procedures**

97.     Contemporaneous with the filing of this Declaration, the Debtor filed the *Motion of the Debtor and Debtor-In-Possession for Entry of an Order (I) Approving Stalking Horse Procedures and Bidding Procedures in Connection with a Transaction by Public Auction; (II) Scheduling a Hearing to Consider the Transaction; (III) Approving the Form and Manner of Notice Thereof and (IV) Approving Contract Procedures* (the "Procedures Motion"). Through the Procedures Motion, the Debtor seeks entry of an order (i) approving stalking horse and bidding procedures in connection with a transaction by public auction; (ii) scheduling a hearing

to consider the transaction; (iii) approving the form and manner of notice thereof; and (iv) approving contract procedures.

98.     As explained above, the Debtor has filed this Chapter 11 case so that it can engage in an open and transparent process wherein the Debtor will either recapitalize itself so that it can satisfy its valid outstanding obligations or sell substantially all of *its* Assets (the "Transaction").  As set forth above, prepetition the Debtor engaged in a process to find a potential transaction to satisfy the asserted Put Right through a sale or purchase of VH's shares. While MHH identified a number of interested parties, given concerns regarding the ongoing litigation, no transaction was completed prior to the end of MHH's engagement.

99.     Since the conclusion of MHH's engagement, the Debtor has continued to receive inquiries from potential acquirers.  SSG has recently been retained to assist the Debtor with various tasks, including marketing a Transaction.  SSG has worked closely with the Debtor's management to analyze its current financial position and business operations and to prepare diligence materials and has begun to preparations to populate a digital data room for prospective purchasers interested in pursuing a Transaction with the Debtor.

100.    Despite these efforts, as of the date hereof, the Debtor has not identified an initial or "stalking horse" bidder (the "Stalking Horse Bidder") for a Transaction.   The Debtor, nevertheless, is confident that it will identify and select a Stalking Horse Bidder within forty-five (45) days, and will further secure the interest of several potential buyers before the proposed auction date approximately ninety (90) days from now.  Accordingly, the Debtor has filed this Motion while the marketing process continues to ensure that the Transaction sale process can be completed expeditiously and maximum value can be achieved for the Debtor's stakeholders.

101.    Given the prepetition marketing efforts, the Debtor believes that it will be able to identify a stalking horse purchaser within forty-five (45) days from the Petition Date, conduct an auction forty-five (45) days thereafter and have a sale hearing following the auction for a sale process of approximately ninety (90) days.

102.    The Debtor believes that conducting a sale process according to this timeline will produce a fair and robust auction and will provide the estate with the best opportunity to maximize the value of its Assets.  At the same time, the Debtor will continue to evaluate any other strategic alternatives that may be identified.

103.    Accordingly, I believe that the relief requested in the Procedures Motion is in the best interests of the Debtor, its estate, creditors and all parties in interest.

**[Remainder of Page Intentionally Left Blank]**

## Declaration

Pursuant to section 1746 of title 28 of the United States Code, I declare under penalty of perjury that the foregoing is true and correct.

## Relief Requested

I respectfully request that the Court grant all relief requested in the First Day Pleadings and such other and further relief as may be just and proper.

Dated: February 17, 2015                    SALADWORKS, LLC

                                             _____
                                             Paul Steck
                                             President