## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

SALADWORKS, LLC,[1]

Debtor.

Chapter 11

Case No. 15-10327 (LSS)

---

### MOTION OF THE DEBTOR AND DEBTOR-IN-POSSESSION FOR ENTRY OF AN ORDER (I) APPROVING STALKING HORSE PROCEDURES AND BIDDING PROCEDURES IN CONNECTION WITH A TRANSACTION BY PUBLIC AUCTION; (II) SCHEDULING A HEARING TO CONSIDER THE TRANSACTION; (III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF AND (IV) APPROVING CONTRACT PROCEDURES

Saladworks, LLC ("Salaworks"), the above-captioned debtor and debtor-in-possession (the "Debtor") hereby files this motion (the "Motion") requesting entry of an order pursuant to sections 105, 363, 365, 503 and 507 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), rules 2002, 6003, 6004, 6006, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") (i) approving stalking horse and bidding procedures in connection with a transaction by public auction; (ii) scheduling a hearing to consider the transaction; (iii) approving the form and manner of notice thereof; and (iv) approving contract procedures. In further support of this Motion, the Debtor states as follows:

### JURISDICTION AND VENUE

1.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2.     This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

3.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

4.     On the date hereof, the Debtor commenced the above-captioned chapter 11 case (the "Chapter 11 Case") by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").

5.     The Debtor continues to operate its business and manage it properties as a debtor-in-possession, pursuant to Bankruptcy Code sections 1107(a) and 1108. As of the date of this Motion, no trustee, examiner or statutory committee has been appointed in the Chapter 11 Case.

6.     A detailed description of the Debtor's business and the reasons for filing the Chapter 11 Case are set forth in the *Declaration of Paul Steck in Support of Chapter 11 Petition and First Day Pleadings* (the "First Day Declaration"), which is incorporated herein by reference.[2]

## THE PROPOSED SALE OF THE ASSETS OR RECAPITALIZATION

7.     As described in the First Day Declaration, the Debtor commenced the Chapter 11 Case to pursue a thorough and transparent process that will result in the sale of substantially all of the Debtor's assets or recapitalization of the Debtor, the distribution of net transaction proceeds to satisfy the valid claims against the Debtor, and potentially, the return of value to shareholders.

---

[1] The last four digits of the Debtor's tax identification number are (7282). The Debtor's corporate office and the mailing address is 161 Washington Street, Suite 300, Conshohocken, PA 19428.
[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

## A.    The Debtor's Assets

8.    The Debtor owns all of Saladworks intellectual property, including trademarks and grants franchises for the establishment, development and operation of unique Saladworks restaurants offering a variety of salads, sandwiches, wraps, panini, soups and other breads and beverages as designated by the Debtor and prepared in accordance with specified recipes and procedures (the "System"). In addition, the Debtor owns and operates a Saladworks in Paoli, Pennsylvania (the "Store, together with the System and all of the Debtor's assets, the "Assets").

9.    The Debtor currently is a party to approximately one hundred and forty-nine (149) franchise agreements (collectively, the "Franchise Agreements") with approximately one hundred and sixty-two (162) different franchisees (the "Franchisees"). In addition, the Debtor is a party to an additional one hundred and forty-one (141) Franchise Agreements where the Franchisee has not yet opened up its Saladworks franchise. Pursuant to the Franchise Agreements, the Debtor provides Franchisees the use of the System, including its intellectual property and operating systems, operational support and coaching, training and centralization of purchasing. In return, the Franchisees pay certain fees, including initial fees and related start-up fees, a royalty fee equal to five percent (5%) of the Franchisee's net sales[3] (the "Royalty Fees"), and either one and half percent (1.5%)[4] or three percent (3%) of net sales for marketing and other brand development costs (the "Marketing Fees,[5] together with the Royalty Fees, the "Franchise Fees"). Although the Franchise Fees vary from year to year, they account for approximately seventy percent (70%) of the Debtor's revenue on an annual basis. Generally speaking, as set

---

[3] Net sales include all revenue generated from all business conducted by the Franchisee during the preceding weekly period, excluding all applicable sales tax or other related taxes, discounts and coupons.
[4] This applies only to Franchisees operating in a mall food court.
[5] The Marketing Fees are used as part of a national advertising fund for the common benefit of the Franchisees. The Debtor has the authority to use these funds in its sole discretion and such funds have historically been used to develop, produce and distribute national, regional and/or local advertising.

forth in the Franchise Agreements, all of the Franchisees record their net sales on centralized point-of-sale systems ("POS").    Generally, the Debtor has access to each Franchisee's POS system and on a weekly basis, each Franchisee provides its net sales data to the Debtor through the POS system.    Through the electronic funds transfer program established in the Franchise Agreements, the Debtor then transfers the Franchise Fees from the Franchisee's bank accounts into the Franchise Fee Account (defined below).

10.    In addition, the Debtor generates revenue from the Franchisees' purchase of certain foodstuffs and required products, such as private label products, including purchases from designated or approved suppliers.    The Debtor has established a prime supplier program with US Foods, Inc. ("US Foods") which is the exclusive supplier of the Debtor's proprietary food products and trademarked products, as well as an authorized food supply.    The Debtor receives an administrative fee equal to three and half percent (3.5%) of the total sales by U.S. Foods to the Franchisees, as well as other administrative fees from various manufacturers.    The Debtor also receives an administrative fee ranging from two percent (2%) to six percent (6%) of the total purchases from the Debtor's prime equipment vendor.    These administrative fees account for approximately twenty-seven percent (27%) of the Debtor's annual revenue.    The Debtor's other revenue is derived from the initial franchise costs, additional fees and expenses related to services provided by the Debtor, the sale of the Franchise or renewal of a Franchise Agreement.

**B.    The Debtor's Capital Structure**

11.    The Debtor's equity owners are J Scar Holdings, Inc. ("JS")[6] and JVSW LLC ("VH").[7]    Pursuant to the Amended and Restated Limited Liability Company Agreement of Saladworks, LLC (the "Operating Agreement"), dated March 9, 2008, and that certain

---

[6] JS is wholly-owned by John M. Scardapane, who is the Chairman and member of the Debtor's board of directors.

Contribution Agreement, dated March 9, 2008, JS owns a seventy (70%) interest in the Debtor through 700 Class A Membership Shares and VH owns a thirty (30%) interest in the Debtor through 300 Class C Membership Shares.  As further described below, on March 25, 2013, VH exercised its purported Put Right (defined below), which is subject to the Chancery Litigation (defined below).

12.     The Debtor has no secured bank debt.  The Debtor has no other known properly perfected secured debt obligations.[8]  The Debtor has approximately $8.02 million in outstanding unsecured debt obligations, which consist of (a) approximately $2.5 million in outstanding unsecured loan obligations to Metro Bank (now owed to WS Finance, an entity that upon information and belief may be owned or controlled by either VH or Hill), which is subject to the Pennsylvania Litigation (defined below) as further described below; (b) outstanding trade obligations of $870,000; (c) other obligations arising out of the Debtor's operations in the amount of  $476,000; and (d)  $3.1 million related to the Put Right (defined below) and $1,115,350 in outstanding Guaranteed Payments, which is subject to the Chancery Litigation (defined below) described below.

**C.      The Need for a Transaction**

13.     As explained more fully in the First Day Declaration, on March 25, 2013, VH sent a written notice (the "Put Notice") to the Debtor pursuant to Section 6.3 of the Operating

---

[7] Upon information and belief, VH is wholly-owned or controlled by Vernon W. Hill, II, ("Hill") who is a former director and chairman of executive committee.

[8] One of the Debtor's creditors, Federal Realty Investment Trust ("Federal"), has filed a UCC-1 Financial Statement seeking to perfect a note (the "Note") that was executed by the Debtor under a settlement agreement wherein the Debtor was obligated to pay Federal $180,000.  The Debtor and Federal also entered into a Security Agreement, which purported to secure the Debtor's obligations.  The purported security interest was limited to the Debtor's right to receive Royalty Fees from two of its Franchisees in an amount equal to two times the amount of the monthly payments that are due under the Note or $15,000.  As set forth above, the Royalty Fees are withdrawn from the Franchisee's account and the cash is placed in the Debtor's account.  Thus, although Federal did file UCC-1 Financial Statement, Federal has never properly perfected its interest in the Debtor's cash and only has an unsecured claim for the remaining $70,000 outstanding under the Settlement Agreement.

Agreement demanding that the Debtor repurchase all of VH's Class C Membership Shares (the "Put Right"). Pursuant to the Put Right, VH has demanded payment of $7.75 million, which is payable in 1/5 yearly installments commencing on May 25, 2013 following receipt of the Put Notice. In addition, on or about July 26, 2013, VH demanded payment of a guaranteed payment equal to the product of 1.9625% and $7.75 million (the "Guaranteed Payments"), which were due on a quarterly basis.

14.      On October 20, 2014, VH filed an action in the Court of Chancery (the "Chancery Litigation") against the Debtor, J Scar Holdings, Inc. ("JS") and Mr. Scardapane, the Debtor's chief executive officer, to which the defendants have numerous defenses and/or affirmative claims.

15.      On or about December 3, 2014, Metro Bank commenced three separate lawsuits in Pennsylvania, one civil action and two confession of judgments (the "Pennsylvania Litigation") against the Debtor seeking amounts allegedly due and owing under various term loan agreements and related documents in the aggregate amount of approximately $2.5 million (the "Metro Bank Obligations"). None of these amounts were secured by any of the Debtor's assets. In two of the cases, Metro Bank obtained default confessions of judgment against the Debtor in the amounts of $466,467.26 and $1,388,769.58, respectively (the "Confessed Judgments").[9] At some point during the Pennsylvania Litigation, WS Finance LLC ("WS Finance"), an entity that upon information and belief is wholly-owned or controlled by either VH or Hill, purchased the Metro Bank Obligations. On January 15, 2015, Counsel for WS Finance sent a writ of garnishment to the Debtor's bank – TD Bank. Since service, TD Bank has frozen this account. The Debtor is seeking to overturn the Confessed Judgments.

16.    Currently, the Debtor does not have cash available to satisfy either the Confessed Judgments, the Put Right or the Guaranteed Payments, to the extent that it is determined that these are valid obligations against the Debtor.

17.    Following the exercise of the Put Right, in May, 2013, the Debtor began exploring its strategic and financial alternatives in order to satisfy this obligation.  On May 3, 2013, the Debtor's board of directors approved the engagement of Mufson, Howe and Hunter ("MHH") as financial advisor and investment banker to seek and execute a potential transaction to satisfy the Put obligation through a sale or purchase of VH's shares.  MHH was unsuccessful it its efforts prior to its termination in March 2014.  Although certain parties have indicated interest in pursuing a transaction with the Debtor, given the Chancery Litigation and uncertainty surrounding the collection efforts of VH and Hill regarding the Put Right obligations, the Guaranteed Payments and the Metro Bank Obligations, the Debtor has been unable to move forward with any potential transaction in a material way.  Interested parties have expressed concerns that the ongoing litigation would prevent a free and clear sale or otherwise subject the purchaser to ongoing litigation or liability.  Thus, although the Debtor believes that a refinancing or sale transaction would enable it to satisfy valid claims asserted against it, it has been unable to maximize value and execute such a transaction outside the protections of a Chapter 11 proceeding.

18.    In addition, the Chancery Litigation and the Pennsylvania Litigation has had a negative impact on the Debtor's operations by impairing its ability to sell additional franchises and increase its footprint in the marketplace.  While the Debtor has executed a number of Franchise Agreements, those Franchisees have been unwilling to move forward with the opening

---

[9] Counsel to WS Finance Writ of Execution (Confessed Judgment) Garnishment Only for Case No. 2014-33000 incorrectly states that the confessed judgment was $1,388,779.58, but the actual confessed judgment was for

of their Saladworks store until these issues are resolved. This has resulted in the inability of the Debtor to capitalize on this additional revenue in the form of Facility Fees or through its administrative fees.

19.    Accordingly, the Debtor has filed this Chapter 11 case so that it can engage in an open and transparent process wherein the Debtor will either recapitalize itself so that it can satisfy its valid outstanding obligations or sell substantially all of the Assets (the "Transaction"). Given the prepetition marketing efforts, the Debtor believes that it will be able to identify a stalking horse purchaser within forty-five (45) days from the Petition Date, conduct an auction forty-five (45) days thereafter and have a sale hearing following the auction for a sale process of approximately ninety (90) days.

20.    The Debtor believes that conducting a sale process according to this timeline will produce a fair and robust auction and will provide the estate with the best opportunity to maximize the value of its Assets. At the same time, the Debtor will continue to evaluate any other strategic alternatives that may be identified.

**C.    The Debtor's Marketing Efforts Thus Far**

21.    As mentioned above, in May of 2013, the Debtor engaged MHH as its financial advisor and investment banker to seek and execute a potential transaction to satisfy the asserted Put Right through a sale or purchase of VH's shares. While MHH identified a number of interested parties, given concerns regarding the ongoing litigation, no transaction was completed prior to the end of MHH's engagement.

22.    Since then, the Debtor has continued to receive inquiries from potential acquirers. The Debtor recently engaged SSG Advisors, LLC ("SSG") to assist the Debtor with various tasks, including marketing a Transaction. SSG has worked closely with the Debtor's

$466,467.26.

management to analyze its current financial position and business operations and to prepare diligence materials and has begun to preparations to populate a digital data room for prospective purchasers interested in pursuing a Transaction with the Debtor.

23.     Despite these efforts, as of the date hereof, the Debtor has not identified an initial or "stalking horse" bidder (the "Stalking Horse Bidder") for a Transaction.   The Debtor, nevertheless, is confident that it will identify and select a Stalking Horse Bidder within forty-five (45) days, and will further secure the interest of several potential buyers before the proposed auction date approximately ninety (90) days from now.   Accordingly, the Debtor has filed this Motion while the marketing process continue to ensure that the Transaction sale process can be completed expeditiously and maximum value can be achieved for the Debtor's stakeholders.

## SUMMARY OF RELIEF REQUESTED

24.     The Debtor seeks, pursuant to Bankruptcy Code sections 105, 363, 365, 503 and 507, Bankruptcy Rules 2002, 6003, 6004, 6006, 9008 and 9014 and Local Bankruptcy Rule 6004-1, the Court's approval of: (a) the institution of certain initial bidding procedures for the solicitation and consideration of competing offers for the Debtor's Assets and/or equity (the "Stalking Horse Procedures") set forth below, (b) the institution of certain bidding, auction and notice procedures for the solicitation and consideration of competing offers for the Debtor's Assets and/or equity (collectively, the "Bidding Procedures," attached as Annex 1 to the Bidding Procedures Order (as defined below)) and (c) procedures governing the assumption and assignment of certain executory contracts and unexpired leases to the Prevailing Bidder (the "Contract Procedures").

25.     More specifically, through this Motion, the Debtor requests that the Court enter an order in the form substantially attached hereto (the "Bidding Procedures Order"), which, among other things:

(a) authorizes and approves the Stalking Horse Procedures;

(b) schedules a hearing (the "Sale Hearing") on or about May 19, 2015, subject to the Court's calendar to consider approval of a Transaction with the Prevailing Bidder (if any);

(c) authorizes and approves the Bidding Procedures, as set forth in **Annex 1** attached to the proposed Bidding Procedures Order and incorporated herein in its entirety by reference; and (ii) the form and manner of notice of these matters, including (A) notice of the Sale Hearing in the form attached as **Annex 2** to the proposed Bidding Procedures Order (the "Sale Notice") to be served on parties in interest, (B) a one-time publication version of the Sale Notice (modified as necessary or appropriate for publication); and

(d) authorizes and approves the Contract Procedures including, among other things, the notice of potential assumption and assignment of executory contracts and unexpired leases and the proposed cure amounts necessary to cure defaults related thereto (the "Cure Costs") in the form attached as **Annex 3** to the proposed Bidding Procedures Order (the "Assignment Notice").

## PROPOSED STALKING HORSE, BIDDING, NOTICE AND OTHER PROCEDURES

### A.      The Proposed Stalking Horse Procedures

26.     The Debtor has determined, in its reasonable business judgment, that seeking the relief requested herein without first entering into a "stalking horse" agreement is warranted given the facts and circumstances of these cases. The Debtor is, however, continuing its discussions with potential purchasers and is reserving its right to enter into a stalking horse agreement to and seek approval of a Break-Up Fee (defined below)) if the Debtor believes that such an agreement will further the purposes of the Auction, by among other things, enticing value maximizing bids. The Debtor proposes the following Stalking Horse Procedures:

a. Stalking Horse Timeline. Within forty (43) days of the Petition Date (the "Stalking Horse Bid Deadline"), parties who meet the qualification of a Potential Stalking Horse Bidder (defined below) and who are interested in

serving as the Debtor's stalking horse purchaser, must submit their initial highest bids (the "Stalking Horse Bids") in accordance with the requirements set forth below (the "Stalking Horse Bid Requirements").  Two (2) business days following the Stalking Horse Bid Deadline, the Debtor, in consultation with its advisors and in its sole and absolute discretion, shall select the highest or otherwise best Stalking Horse Bid and such entity shall serve as the Debtor's stalking horse purchaser (the "Stalking Horse Purchaser"). Immediately thereafter, the Debtor shall file a notice of selection of the Stalking Horse Purchaser and hold a hearing (the "Stalking Horse Hearing") upon no less than three (3) days notice to: (i) counsel to any official committees appointed in this Chapter 11 Case and (ii) the Office of the U.S. Trustee seeking approval of (i) the Stalking Horse Purchaser, (ii) any Break-Up Fee Protections (defined below) and (iii) the form asset purchase agreement or recapitalization agreement submitted by the Stalking Horse Purchaser (the "Transaction Agreement").

c.   The Stalking Horse Bid Requirements. To be eligible to participate in the Stalking Horse bidding process, each person (a "Stalking Horse Bidder,) must deliver to the Debtor an executed Confidentiality Agreement and a written offer to be received by the Stalking Horse Bid Deadline and compliant with each of the following conditions:

(i)   Is made by a person or entity that demonstrates evidence of fully committed and firm financing for each component of debt or equity in support of such Stalking Horse Bid and other ability to consummate the proposed transaction, in each case acceptable to the Debtor in its sole and absolute discretion;

(ii)   Provides written evidence that the Stalking Horse Bidder has obtained authorization and approval from its board of directors (or comparable governing body) with respect to the submission of its Stalking Horse Bid and the execution of a Transaction Agreement, or a representation that no such authorization or approval is required;

(iii)   Provides that the purchase price will be paid in cash, cash equivalents, or such other consideration acceptable to the Debtor;

(iv)   Provides by wire transfer or immediately available funds to the Debtor or an appropriate escrow agent before the Stalking Horse Bid Deadline of an earnest money deposit equal to (X) 10% of the dollar amount of the purchase price of such Stalking Horse Bid; or (Y) 10% of the value of such Stalking Horse Bid (the "Deposit");

(v)   Provides evidence satisfactory to the Debtor that the Stalking Horse Bidder is reasonably likely to obtain prompt regulatory approval, if any is required, to purchase the Assets;

(vi) Is submitted in a writing in the form of a Transaction Agreement and signed by the Stalking Horse Bidder, that:

 (1) Identifies the Stalking Horse Bidder and any members of its investor group, if applicable;

 (2) Is not subject to conditions, representations or terms that the Debtor determines to be unacceptable;

 (3) Does not contain any financing contingencies to closing of the proposed Transaction;

 (4) Does not contain any condition to closing of the Transaction relating to the receipt of any third party approvals (excluding required Bankruptcy Court approval and any required governmental and/or regulatory approval);

 (5) Expressly acknowledges and represents that the Stalking Horse Bidder: (A) has had an opportunity to conduct due diligence regarding the proposed Transaction prior to making its Stalking Horse Bid, (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and the Assets in making its Stalking Horse Bid or that of any of its legal, financial or other advisors, and (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the business of the Debtor or the Assets or the proposed Transaction, or the completeness or accuracy of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Transaction Agreement ultimately accepted and executed by the Debtor; and

(vii) Acknowledges that the Stalking Horse Bidder consents to the jurisdiction of this Bankruptcy Court to determine matters concerning the sale, their Stalking Horse Bid and otherwise with respect to the process and waive any right to any other venue.

(viii) Provides that the Stalking Horse Bidder will adhere to the Debtor's prepetition privacy policies regarding personally identifiable information.

(ix) Contains other information reasonably requested by the Debtor.

d. The Stalking Horse Protections. At the Stalking Horse Hearing, the Debtor may seek authority to offer to the Stalking Horse Purchaser, as an actual and necessary cost and expense of preserving the value of the Debtor's estate a break-up fee in an amount not to exceed 3% of the total guaranteed cash price

contained in its Stalking Horse Bid (the "Break-Up Fee") to a Stalking Horse Bidder who agrees to provide a Stalking Horse Bid for a Transaction that will serve as a "stalking horse" Bid at the Auction (defined below).   Any agreement to provide a Break-Up Fee shall be (a) approved by the Court by separate order entered on or after the Stalking Horse Hearing with such hearing be held on no less than three (3) days notice to: (i) counsel to any official committees appointed in this Chapter 11 Case and (ii) the Office of the U.S. Trustee and (b) expressly conditioned on the consummation of a Transaction to a Prevailing Bidder (defined below).  The Break-Up Fee, if any is approved, shall be an administrative expense claim against the Debtor's estate pursuant to Bankruptcy Code section 503(b).

27.    The Debtor reserves the right to modify the Stalking Horse Bid Procedures as necessary, including, without limitation, any deadlines thereunder, if such modification is determined by the Debtor, in consultation with any official committees appointed in this Chapter 11 Case, after or as it deems appropriate to maximize value for the Debtor's estate and creditors. In addition, the Debtor reserves its right to withdraw any or all Assets or equity from the sale at any time prior to the Court's approval of such sale.

28.    The Debtor believes that the Stalking Horse Procedures are fair and reasonable, and designed to maximize interest in pursuing a Transaction.  To that end, the Debtor is seeking a reservation to have certain Stalking Horse Bid Protections approved.   The Stalking Horse Bidder that might be selected as the Stalking Horse Purchaser will have expended considerable time, money and energy pursuing the Transaction and will have engaged in extended and lengthy good faith negotiations.  In particular, the Stalking Horse Bidder would have taken part of an extensive process undertaken by the Debtor and its professionals to identify and negotiate a Transaction that the Debtor believes to be the highest or best proposal in order to maximize the value realized for the benefit of the Debtor's estate and its creditors.  Accordingly, the Debtor may not be able to find a Stalking Horse Bidder willing to serve as a stalking horse without having the flexibility to offer a Break-Up Fee and obtain the Court's approval of it on shortened notice.

**B.    Proposed Bidding Procedures**

29.    The Debtor believes the proposed Bidding Procedures will maximize the realizable value of a Transaction for the benefit of the Debtor's estate, creditors and other interested parties.  The Bidding Procedures contemplate a transparent auction process pursuant to which bids for a Transaction will be subject to higher or otherwise better offers.  The Bidding Procedures primarily benefit the Debtor by creating a bidding process that ensures, among other things: (a) structure and logistical certainty to the process; (b)  the Debtor's ability to compare the relative values of competing offers, if any; (c) that potential purchasers have the financial wherewithal to timely consummate a Transaction; and (d) meaningful bidding increments.

30.    The Bidding Procedures are set forth in detail in **Annex 1** to the Bidding Procedures Order.  The Bidding Procedures describe, among other things, the requirements for prospective purchasers to participate in the bidding process, the availability and conduct of due diligence by prospective bidders, the deadline and requirements for submitting a bid, the method and criteria for bids to become "qualified," the manner in which qualified bids will be negotiated, clarified and improved, and the criteria for selecting the Prevailing Bidder, including if necessary, through a public auction.

31.    As described below and more fully in the Bidding Procedures, only Qualified Bidders who timely submit Qualified Bids will be eligible to participate in the Auction.  Specifically, the Bidding Procedures provide, in relevant part, as follows:[10]

*Participation Requirements*

Unless otherwise ordered by the Court, in order to participate in the bidding process or the Auction, a person interested in entered into a Transaction with the Debtor (a

---

[10] Capitalized terms used but not defined in this section have the meanings ascribed to them in the Bidding Procedures.  To the extent that the bidding provisions set forth below differ in any way from the terms set forth in the Bidding Procedures, the terms of the Bidding Procedures shall control.

"Potential Bidder"), other than the Stalking Horse Bidder, if any, must first deliver the following materials to the Debtor and its counsel:

(i) An executed confidentiality agreement in form and substance satisfactory to the Debtor and its counsel (the "Confidentiality Agreement"). Without limiting the foregoing sentence, the Confidentiality Agreement will provide that all non-public information about the Debtor received by a Potential Bidder, or if the bidder is qualified, a Qualified Bidder (as defined below), will be kept strictly confidential and used only in connection with analyzing a Transaction. The Confidentiality Agreement also will provide that the Debtor and its advisors will have access to information provided about a Potential Bidder by the Potential Bidder and that any confidential information received from a Potential Bidder will be used only in connection with analyzing whether the Potential Bidder will be qualified as a Qualified Bidder and a potential Transaction.

(ii) Written evidence that enables the Debtor and its advisors to determine, in its sole and absolute discretion whether the Potential Bidder has the financial and other ability to close the contemplated Transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in connection therewith.

(iii) The investment banker to the Debtor, SSG, shall provide these Bidding Procedures, together with a copy of a form Transaction Agreement to each Potential Bidder. All Potential Bidders, whether deemed Qualified Bidders (as defined below) or not, consent to the jurisdiction of this Bankruptcy Court to determine matters concerning the sale, their Bid and otherwise with respect to the process and waive any right to any other venue.

*Due Diligence*

Any Potential Bidder wishing to conduct due diligence concerning a prospective Transaction shall be granted access to all relevant information regarding the Assets, the equity and the related business of the Debtor reasonably necessary to enable a Potential Bidder to evaluate a prospective Transaction. The Debtor shall make such access available to Potential Bidders during normal business hours as soon as reasonably practicable following execution of the Confidentiality Agreement. Potential Bidders interested in conducting due diligence should contact SSG Attn: J. Scott Victor, (e-mail: jsvictor@ssgca.com). Notwithstanding the foregoing, SSG is not required to provide confidential or proprietary information to any person if the Debtor believes that such disclosure would be detrimental to the interests of the Debtor's estate. All due diligence must be completed before the Bid Deadline (as defined below). No condition(s) allowing or regarding further due diligence will be accepted or authorized after the Bid Deadline. Potential Bidders are required to exercise their own discretion before relying on any information regarding a Transaction provided by the Debtor. Neither the Debtor nor its representatives are responsible for, and will bear no liability with respect to, any information obtained by Potential Bidders pursuant hereto.

SSG shall: (i) receive and evaluate any Bids from Potential Bidders; (ii) request information from Potential Bidders, engage in discussions with Potential Bidders, and take such other actions to determine whether any Bid constitutes or could lead to a Qualified Bid (as defined below); and (iii) take any other actions contemplated under these Bidding Procedures.

*Submission of Bids*

Any Potential Bidder interested in pursuing a Transaction must submit a Bid prior to 5:00 p.m. (prevailing Eastern time) on May 15, 2015 (the "Bid Deadline"). The Debtor may extend the Bid Deadline, in its sole and absolute discretion, and shall promptly notify all Potential Bidders of any such extension. In order for such Bid to be considered, however, it must be a "Qualified Bid." The Debtor and SSG will determine if a Bid is a Qualified Bid based on the requirements herein. A Potential Bidder will be deemed to be a "Qualified Bidder" if the Debtor and SSG, in their sole and absolute discretion, in consultation with any official committee appointed in this Chapter 11 Case, determine that such Potential Bidder submitted a Qualified Bid.

*Qualified Bid Requirements*

To be eligible to participate in the bidding process, each Qualified Bidder, other than any court-approved Stalking Horse Purchaser, must deliver to the Debtor a written, irrevocable offer to be received by the Bid Deadline and compliant with each of the following criteria:

(a)     A Bid must include fully executed Transaction documents, pursuant to which the Qualified Bidder proposes to effectuate the contemplated Transaction. If the Debtor obtains approval of a Stalking Horse Purchaser and a form Transaction Agreement prior to the Bid Deadline, a Bid must be on terms that, in the Debtor's business judgment, are substantially the same or better than the terms of the Transaction Agreement. If applicable, a Bid shall include a black-lined copy of the Transaction Agreement (the "Modified Agreement") to show all changes requested by the Bidder, including those related to the Purchase Price.

(b)     If a Stalking Horse Purchaser is approved by the Court prior to the Bid Deadline, each Qualified Bidder's Bid, other than the Stalking Horse Bid, shall have an initial minimum bid requirement equal to the Stalking Horse Purchaser's Bid, plus any Break-Up Fee approved by the Court, plus $250,000 (the "Minimum Initial Bid"), in cash. If no Stalking Horse Purchaser is approved by the Court prior to the Bid Deadline, then the Minimum Initial Bid requirement shall not apply.

(c)     The Qualified Bidder's Bid must remain open and irrevocable until the earlier of (X) thirty (30) days following the date of entry of a Sale Order; (Y) the date of the closing of the Transaction pursuant to the Sale Order; or (Z) such date as the Debtor affirms in writing that it does not intend to pursue a Transaction (the "Bid Expiration Date");

(d)     Provides that the Qualified Bidder is obligated to perform as a Back-Up Bidder (as defined below) in the event such Qualified Bidder is not the Prevailing Bidder;

(e)     Is made by a person or entity that demonstrates evidence of fully committed and firm financing for each component of debt or equity in support of such Bid and other ability to consummate the proposed Transaction, in each case acceptable to the Debtor in its sole and absolute discretion;

(f)     Provides written evidence that the Qualified Bidder has obtained authorization and approval from its board of directors (or comparable governing body) with respect to the submission of its Bid and the execution of the Transaction Agreement, or a representation that no such authorization or approval is required;

(g)     Provides that the purchase price will be paid in cash, cash equivalents, or such other consideration acceptable to the Debtor;

(h)     Unless previously provided pursuant to the Stalking Horse Bid, provides by wire transfer or immediately available funds to the Debtor or an appropriate escrow agent before the Bid Deadline of an earnest money deposit equal to (X) 10% of the dollar amount of the purchase price of such Bid; or (Y) 10% of the value of such Bid, (the "Deposit");

(i)     Provides evidence satisfactory to the Debtor that the Qualified Bidder is reasonably likely to obtain prompt regulatory approval, if any is required, to purchase the Assets;

(j)     Identifies the Qualified Bidder and any members of its investor group, if applicable;

(k)     Is not subject to conditions, representations or terms that the Debtor determines to be unacceptable;

(l)     Is not conditioned upon the Bankruptcy Court's approval of any bid protections, such as a break-up fee, termination fee, expense reimbursement, working fee or similar type of payment (except with respect to the Stalking Horse Purchaser).  Further, by submitting a bid, each Qualified Bidder shall be deemed to waive its right to pursue a substantial contribution claim under Bankruptcy Code section 503 or otherwise in anyway related to the submission of its bid or these Bidding Procedures;

(m)     Does not contain any financing or due diligence contingencies to closing of the proposed Transaction;

(n)     Provides that the Qualified Bidder will adhere to the Debtor's prepetition privacy policies regarding personally identifiable information;

(o)     Does not contain any condition to closing of the Transaction relating to the receipt of any third party approvals (excluding required Bankruptcy Court approval and any required governmental and/or regulatory approval);

(p)     Expressly acknowledges and represents that the Qualified Bidder: (A) has had an opportunity to conduct any and all due diligence regarding the proposed Transaction prior to making its Bid, (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and the Assets in making its Bid or that of any of its legal, financial

or other advisors, and (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the business of the Debtor or the Assets or the proposed Transaction, or the completeness or accuracy of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Transaction Agreement ultimately accepted and executed by the Debtor;

(q)     Identifies each and every executory contract and unexpired lease that the Qualified Bidder desires the Debtor to assume and assign to the Qualified Bidder at the closing and provides evidence of such Qualified Bidder's ability to provide adequate assurance of future performance of such contracts or leases (as required by Bankruptcy Code section 365(f)(2)(B)) along with the Bid;

(r)     Pursuant to Local Rule 6004-1, each bidder participating at the Auction must confirm that it has not engaged in any collusion with respect to the Bidding or the Transaction; and

(s)     Contains other information reasonably requested by the Debtor.

A Qualified Bidder that desires to make a Bid must deliver written electronic copies of its Bid prior to the Bid Deadline to any of the following representatives of the Debtor: (i) Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington Delaware 19801, Attn: Adam G. Landis, Esq. and Kerri K. Mumford, Esq. (e-mail: landis@lrclaw.com and mumford@lrclaw.com) or (ii) SSG Capital Advisors, LLC, 300 Barr Harbor Drive, Conshohocken, Pennsylvania 19428, Attn: J. Scott Victor (e-mail: jsvictor@ssgca.com). The Debtor shall deliver copies of any such Bids to the Office of the U.S. Trustee and counsel to any official committees appointed in this Chapter 11 Case.

After the Bid Deadline, the Debtor shall determine which Qualified Bid represents the then-highest or otherwise best bid (the "Initial Highest Bid" and the entity submitting such Bid, the "Initial Highest Bidder"). Prior to or at the start of the Auction, each Qualified Bidder that timely submitted a Qualified Bid will be advised of such Initial Highest Bid and the Debtor may: (i) distribute copies of other Qualified Bids to other Qualified Bidders prior to or during the Auction; or (ii) proceed with the open or sealed bidding process set forth in the Bidding Procedures Order to the extent authorized therein.

*Due Diligence from Potential Bidders or Qualified Bidders*

Each Potential Bidder shall comply with all reasonable requests for additional information by the Debtor or its advisors regarding such Potential Bidder's financial wherewithal to consummate and perform obligations in connection with the Transaction. Failure by a Potential Bidder to comply with requests for additional information may be a basis for the Debtor to determine that a Potential Bidder is not a Qualified Bidder. Similarly, each Qualified Bidder shall comply with all reasonable requests for additional information by the Debtor or its advisors regarding such Qualified Bidder's financial wherewithal to consummate and perform obligations in connection with the Transaction as the Auction progresses. Failure by a Qualified

Bidder to comply with requests for additional information may be a basis for the Debtor to determine that the Qualified Bidder may no longer participate in the Auction.

*"As Is, Where Is"*

The Transaction shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtor, its agents or estate or any other party, except to the extent set forth in the Transaction Agreement between the Debtor and the Prevailing Bidder.  Except as otherwise provided in the Prevailing Bidder's Transaction Agreement, all of the Debtor's right, title and interest in and to the Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests therein (collectively, the "Claims") pursuant to Bankruptcy Code section 363(f), such Claims to attach to the net proceeds of the Transaction, with the same validity and priority as existed immediately prior to such sale.

*The Auction*

If more than one Qualified Bid has been submitted for a Transaction in accordance with these Bidding Procedures, the Debtor will conduct the Auction on or about May 18, 2015, at 10:00 a.m. (prevailing Eastern time), with respect to such Qualified Bids in order to determine the highest and best Bid (the "Prevailing Bid") to submit for approval by the Bankruptcy Court at the Sale Hearing (as defined below).  The Auction shall be organized and conducted by the Debtor at the offices of its counsel, Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, Delaware 19801 or such other location as may be announced prior to the Auction to all Qualified Bidders, the U.S. Trustee and any official committee appointed in this Chapter 11 Case.  The Auction will be recorded by stenographic means by an authorized court reporter.  If only the Stalking Horse Purchaser's Transaction Agreement is received by the Bid Deadline, the Auction will be deemed cancelled and the Stalking Horse Purchaser's Transaction Agreement will be deemed the Prevailing Bid, and the Debtor will seek authority to consummate the Transaction as contemplated therein.

*Auction Procedures*

The only persons or entities who will be permitted to Bid at the Auction are the authorized representatives of each Qualified Bidder, including any Stalking Horse Purchaser (the "Auction Participants").  While only the Auction Participants may make Qualified Bids at the Auction, the Auction may be attended and viewed also by the Debtor, SSG, any duly appointed official committee or creditor and their respective counsel, financial advisors, and/or other authorized representatives.  Any other person wishing to attend the Auction may do so by contacting, no later than three (3) business days prior to the start of the Auction, Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, Delaware 19801, Attn: Kimberly Brown (e-mail: brown@lrclaw.com).

(a)    The Debtor is authorized to conduct the Auction in accordance with such procedures and requirements as may be established at the sole and absolute discretion of the Debtor and its counsel, after consultation with any official committees appointed in this Chapter 11 Case, which rules may include the determination of the amount of time between Qualified

Bids, whether to adjourn the Auction at any time and from time-to-time, the conducting of multiple rounds of open or sealed bidding with notice only to the parties entitled to attend the Auction, and to declare that the Auction has ended when no further Bids are timely made or otherwise.

(b)    All Qualified bidders participating in the Auction will be required to confirm on the record that they have not engaged in any collusion with respect to any Qualified Bid or any other aspect of the proposed Transaction.

(c)    At the Auction, Qualified Bidders will be permitted to increase their bids. The first Qualified Bid at the Auction shall be deemed to have been made by the Initial Highest Bidder in the amount of the Initial Highest Bid.

(d)    The next Qualified Bid at the Auction shall be an amount equal to or greater than the Initial Highest Bid *plus* $100,000 the Minimum Bid Increment.

(e)    The Break-Up Fee, if any, shall be credited toward any additional incremental bid submitted by the Stalking Horse Purchaser, if any, for purposes of evaluating the Stalking Horse Purchaser.

(f)    Each subsequent Qualified Bid shall comply with the initial Qualified Bid requirements set for the above.

(g)    The Debtor, in consultation with its counsel, SSG, and counsel to any official committees appointed in this Chapter 11 Case, shall determine, in its sole and absolute discretion and subject to final determination by the Bankruptcy Court, whether a Qualified Bid by a Qualified Bidder at the Auction matches or is higher and better than the prior Qualified Bid.

(h)    At the conclusion of the Auction: (i) the Debtor shall in its sole and absolute discretion, after consultation with counsel to any official committees appointed in this Chapter 11 Case, select (X) the Prevailing Bid and (Y) the second highest or best offer for the Assets (the "Back-Up Bid"); (ii) the Debtor shall notify the Prevailing Bidder that such person's offer has been determined by the Debtor to be the Prevailing Bid and will be contingent only on Bankruptcy Court approval, and shall notify the person that made the Back-Up Bid (the "Back-Up Bidder") that such person's offer has been determined by the Debtor to be a Back-Up Bid and will be contingent only on the failure of the Prevailing Bid to close as set forth below and Bankruptcy Court approval; and (iii) the Debtor shall file a notice with the Bankruptcy Court announcing the Prevailing Bidder.   Prior to the commencement of the Sale Hearing, the Prevailing Bidder shall complete and sign all agreements and documents as necessary to bind the Prevailing Bidder to all of the terms and conditions contemplated by the Prevailing Bid.

(i)    The Deposit of the Prevailing Bidder or the Back-Up Bidder, as the case may be, shall be applied by the Debtor against the purchase price to be paid by the Prevailing Bidder or the Back-Up Bidder, as applicable, at the closing of the relevant transaction approved by the Bankruptcy Court.   The Prevailing Bidder's Deposit or the Back-Up Bidder's Deposit shall be held by the Debtor and forfeited to the Debtor if the Prevailing Bidder or Back-Up Bidder breaches its obligations to close under the Transaction Agreement.

(j)     The Debtor shall not be deemed to have finally accepted any Qualified Bid unless and until such Qualified Bid and the Debtor's acceptance thereof have been authorized by order of the Bankruptcy Court following the conclusion of the Sale Hearing.

### Back-Up Bidder

If for any reason the Prevailing Bidder fails to consummate the acquisition of the Assets in accordance with the Prevailing Bid, and in any event no later than ten (10) days from the entry of the Sale Order, the Debtor is authorized to proceed with the Transaction with the Back-Up Bidder in accordance with the Back-Up Bid without further order of the Bankruptcy Court. If for any reason the Back-Up Bidder fails to consummate the Transaction in accordance with the Back-Up Bid, the Back-Up Bidder's Deposit shall be forfeited to the Debtor.

### Deposit

Expect for the deposit of the Prevailing Bidder and the Back-up Bidder, the Deposit shall be returned within three (3) business days after the entry of an order approving the Transaction. No later than the third (3rd) business day after the closing of the Transaction to the Prevailing Bidder, the Debtor shall return the Back-Up Bidder's Deposit to the Back-Up Bidder. If the Prevailing Bidder or Back-Up Bidder fails to close the Transaction, the Deposit shall be a non-exclusive remedy of the Debtor and the Debtor shall be entitled to any other rights or remedies available at law or equity.

### Reservation of Rights

The Debtor, in consultation with it advisors and any official committee appointed in this Chapter 11 Case, reserves the right as it may determine in its sole and absolute discretion to: (i) determine which bidders are Qualified Bidders; (ii) determine which bids are Qualified Bids; (iii) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal, (iv) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bidding Procedures, any applicable order of the Bankruptcy Court, or the requirements of the Bankruptcy Code, or ( c) contrary to the best interests of the Debtor and its estate; (v) waive terms and conditions set forth herein with respect to all potential bidders, (vi) impose additional terms and conditions with respect to all potential bidders, (vii) extend the deadlines set forth herein, (ix) adjourn or cancel the Auction and/or the Sale Hearing in open court without further notice; and (x) modify these Bidding Procedures as it may determine to be in the best interests of its estate or to withdraw this Motion at any time with or without prejudice.

32.     The Debtor reserves the right to modify the Bidding Procedures as necessary, including, without limitation, any deadlines thereunder, if such modification is determined by the Debtor, in consultation with any official committees appointed in this Chapter 11 Case, after or as it deems appropriate to maximize value for the Debtor's estate and creditors. In addition, the

Debtor reserves its right to withdraw any or all Assets from the proposed Transaction at any time prior to the Court's approval of such sale.

33.    The Debtor will present the results of the Auction to the Court at the Sale Hearing, at which time certain findings will be sought from the Court regarding the Auction, including, among other things, that: (a) the Auction was conducted and the Prevailing Bidder was properly selected in accordance with these Bidding Procedures; (b) the Auction was fair in substance and procedure; and (c) consummation of the Asset sale by the Prevailing Bidder will provide the highest or otherwise best value for the Transaction and is in the best interests of the Debtor, its estate and creditors.

34.    The Debtor believes that the Bidding Procedures are fair and reasonable, and are not likely to dissuade any serious potential alternative purchaser from bidding on a Transaction.

**B.    Notice Procedures**

35.    The Debtor requests approval of the following notice procedures:

(a) <u>Date, Time and Place of the Sale Hearing</u>.  The Debtor proposes that the Sale Hearing be held before the Court in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor, Wilmington, Delaware 19801, on or about May 19, 2015 (prevailing Eastern time) subject to the Court's calendar, or such other date and time that the Court may direct. The Sale Hearing may be adjourned, from time to time, without further notice to creditors or parties in interest other than by announcement of the adjournment in open Court or on the Court's docket.

(b) <u>Sale Notice</u>.  Within five (5) business days after entry of the Order approving the Stalking Horse Purchaser or after the filing of a motion to approve a Transaction, whichever is later, (the "<u>Mailing Deadline</u>"), the Debtor will serve the notice of the sale (the "<u>Sale Notice</u>") by first-class mail, postage prepaid upon: (i) the U.S. Trustee; (ii) counsel to any official committees appointed in this Chapter 11 Case; (iii) all taxing authorities having jurisdiction over any of the Assets or equity, including the Internal Revenue Service; (iv) all parties that have requested notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of the entry of the Bid Procedures Order; (v) all persons or entities known to the Debtor that have or have asserted a lien on, or security interest in, all or any portion of the Assets or

equity; and (vi) any potential bidders previously identified or otherwise known to the Debtor (collectively, the "Notice Parties").

(c) Publication Notice. The Debtor also seeks authorization to publish the Sale Notice in the national edition of either the *Wall Street Journal* or *USA Today* once within three (3) business days after the Mailing Deadline.

(d) Deadline for Objection to Relief Sought in the Motion. The Debtor proposes that, to be timely and otherwise eligible for consideration by the Court, objections to the approval of the Transaction to the Prevailing Bidder – other than an objection to the proposed assumption and assignment of the Potential Designated Contracts (defined below) or to any proposed Cure Costs including, but not limited to, the sale of the Assets free and clear of Claims pursuant to Bankruptcy Code section 363(f) for all parties in interest must: (a) be in writing; (b) clearly specify the grounds for the objection; (c) conform to the Bankruptcy Rules and the Local Rules; and (d) be filed with the Court and served so as to be received by the following parties (collectively, the "Objection Notice Parties") by no later than 4:00 p.m. (ET) on the date that is seven (7) days prior to the Sale Hearing (the "Sale Objection Deadline"): (i) counsel to the Debtor, Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington Delaware 19801 (Attn: Adam G. Landis, Esq. and Kerri K. Mumford, Esq.); (ii) counsel to any official committees appointed in this Chapter 11 Case; and (iv) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Jane Leamy, Esq.).

(e) Information Provided to Interested Parties. The Sale Notice provides that any party that wishes to obtain a copy of this Motion and the Bidding Procedures Order, including all exhibits thereto, may make such a request by (a) sending a written request to (i) counsel to the Debtor, Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington Delaware 19801, Attn: Kerri K. Mumford, Esq. and Kimberly Brown, Esq. (e-mail: mumford@lrclaw.com and brown@lrclaw.com) and (ii) investment banker to the Debtor, SSG Capital Advisors, LLC, Five Tower Bridge, Suite 420, 300 Barr Harbor Drive, West Conshohocken, Pennsylvania 19428, Attn: J. Scott Victor (e-mail: jsvictor@ssgca.com) or (b) accessing the Case Website. All parties that have expressed, or may express, an interest in pursuing a Transaction or who the Debtor believes may have an interest in pursuing a Transaction, may obtain access to certain due diligence materials, subject to satisfying the conditions required to become a Qualified Bidder set forth in the Bidding Procedures below.

## D.    Proposed Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases

36.    In accordance with Bankruptcy Rule 6006(c), the Debtor must also provide notice of: (a) the potential assumption and assignment of executory contracts and unexpired leases and

rights thereunder; (b) the proposed maximum Cure Costs that the Prevailing Bidder may pay to cure all defaults, if any, under executory contracts and unexpired leases and rights thereunder that the Debtor proposes to assume and assign; and (c) the deadline to file objections to such assumption and assignment, maximum Cure Costs, the existence of any defaults, and/or adequate assurance of the future performance.

37.    The Debtor proposes the following procedures (the "Contract Procedures") to govern the assumption and assignment of the Potential Designated Contracts in connection with the sale of the Assets:[11]

(a) Forty-five (45) days after entry of the Bidding Procedures Order, the Debtor shall file with this Court and shall serve an Assignment Notice by overnight delivery service on each non-debtor counterparty to an executory contract or unexpired lease with the Debtor (each a "Non-Debtor Counterparty") that may be assumed and assigned to the Prevailing Bidder (the "Potential Designated Contracts"). The Debtor shall attach to the Assignment Notice a list identifying the Non-Debtor Counterparties to the Potential Designated Contracts and the proposed corresponding Cure Costs under the Potential Designated Contracts as of the Petition Date.

(b) For each Potential Designated Contract, on the Assignment Notice, the Debtor shall indicate the proposed Cure Costs relating to such Potential Designated Contract. The Assignment Notice also may identify any additional terms or conditions of assumption and assignment.

(c) Objections, if any, to the proposed Cure Costs, or to the proposed assumption and assignment of the Potential Designated Contracts, excluding, objections related to adequate assurance of future performance or objections relating to whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the Prevailing Bidder for purposes of Bankruptcy Code section 365(c)(1), must be in writing and filed with this Court and served on the Objection Notice Parties so as to be received no later than seven (7) days prior to the Sale Hearing (the "Cure Objection Deadline"). The Non-Debtor Counterparties shall have until the Sale Hearing to submit an objection to the Debtor's ability to assign the Potential Designated Contract to the Prevailing Bidder without the Non-Debtor Counterparty's consent or to the adequate assurance of future performance to be provided (the "Adequate Assurance Objection Deadline," and together with the Cure Objection Deadline, the "Contract Objection Deadlines").

---

[11] If requested by the Stalking Horse or Prevailing Bidder, these Contract Procedures may be modified if necessary by further order of this Court.

(d) Where a Non-Debtor Counterparty to a Potential Designated Contract files an objection meeting the requirements of subparagraph (c), objecting to the assumption by the Debtor and assignment to the Prevailing Bidder of such Potential Designated Contract (the "Disputed Designation") and/or asserting a cure amount higher than the proposed Cure Costs listed on the Assignment Notice (the "Disputed Cure Costs"), the Debtor and the Non-Debtor Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention. If the Debtor and the Non-Debtor Counterparty determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Disputed Designation and/or the amount to be paid under Bankruptcy Code section 365 with respect to the Disputed Cure Costs will be determined by the Court at the Sale Hearing, unless the Debtor and the Prevailing Bidder agree otherwise or the Court orders otherwise. If the Court determines at the Sale Hearing that the Potential Designated Contract will not be assumed and assigned, then such executory contract or unexpired lease shall no longer be considered a Potential Designated Contract. If any objection related to a Disputed Designation or Disputed Cure Costs is continued beyond the Sale Hearing, the Prevailing Bidder shall escrow the portion of the Cure Costs that is disputed pending such resolution.

(e) Any Non-Debtor Counterparty to a Potential Designated Contract who fails to timely file an objection to the proposed Cure Costs or the proposed assumption and assignment of a Potential Designated Contract by the Contract Objection Deadlines, as applicable, is deemed to have consented to such Cure Costs and the assumption and assignment of such Potential Designated Contract by the Debtor and to the Prevailing Bidder, and such party shall be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts against the Debtor, its estate or the Prevailing Bidder.

(f) If the Non-Debtor Counterparty to a Potential Designated Contract fails to timely object to the assumption and assignment of a Potential Designated Contract or the proposed Cure Cost relating thereto by the Contract Objection Deadlines, as applicable, or upon the resolution of any timely objection by agreement of the parties or order of the Court approving an assumption and assignment, such Potential Designated Contract shall be deemed to be assumed by the Debtor and assigned to the Prevailing Bidder and the proposed Cure Costs related to such Potential Designated Contract shall be established and approved in all respects, subject to the conditions set forth in subparagraph (g) below.

(g) The Debtor's decision to assume and assign the Potential Designated Contract is subject to Court approval and consummation of a Transaction with a Prevailing Bidder. Accordingly, subject to the satisfaction of conditions in subparagraph (f) above, the Debtor shall be deemed to have assumed and assigned each of the Potential Designated Contracts as of the date of and effective only upon the closing date of a Transaction with a Prevailing Bidder, and absent such closing, each of the Potential Designated Contracts shall neither be deemed assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtor under the Bankruptcy Code. Also, assumption and assignment of the Potential

Designated Contracts is subject to the Prevailing Bidder's right set forth in subparagraph **Error! Reference source not found.** above (and inclusion of any document on the list of Potential Designated Contracts shall not constitute or be deemed to be a determination or admission by the Debtor or the Prevailing Bidder that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, all rights with respect thereto being expressly reserved). The Prevailing Bidder shall have no rights in and to a particular Potential Designated Contract until such time as the particular Potential Designated Contract is assumed and assigned in accordance with the procedures set forth herein.

(h) Except as may otherwise be agreed to in a Transaction Agreement with a Prevailing Bidder or by the parties to a Potential Designated Contract, the defaults under the Potential Designated Contract that must be cured in accordance with Bankruptcy Code section 365(b) shall be cured as follows: the Prevailing Bidder shall pay all Cure Costs relating to an assumed executory contract or unexpired lease within ten (10) days after the later of (i) the closing date specified in the Transaction Agreement entered into with a Prevailing Bidder or (ii) the date on which such executory contract or unexpired lease is deemed assumed and assigned, in accordance with subparagraph (g) of these Contract Procedures.

## BASIS FOR RELIEF

### A.    Approval of the Stalking Horse Procedures and Bidding Procedures Is Appropriate and in the Best Interests of the Debtor's Estate and Its Creditors

*(1) The Stalking Horse Procedures and the Bidding Procedures Are Appropriate under the Circumstances*

38.    Maximization of proceeds received by the estate is one of the dominant goals of any proposed sale of estate property. In the hope of maximizing the value received by the estate, courts typically establish procedures that are intended to enhance competitive bidding by, among other things, setting forth the rules that will govern the auction process. See, e.g., In re Fin. News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates"); In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) (bid procedures should allow for "an open and fair public sale designed to maximize value for the estate").

39.    Although the Debtor commenced efforts to pursue a Transaction for sale prior to the Petition Date, a Stalking Horse Purchaser has not yet been identified.  Notwithstanding that, the Debtor believes that the Stalking Horse Procedures and the Bidding Procedures will help the Debtor receive the maximum value for a Transaction by establishing a transparent and competitive bidding process where potentially interested parties can step forward and bid, knowing, among other things, the quality of the title they will receive if they are the Prevailing Bidder.  In fact, prior to the Petition Date, certain parties expressed an interest in pursuing a Transaction with the Debtor, but were unwilling to consummate a Transaction outside of the protections offered by Bankruptcy Code section 363.  The Debtor believes that the Stalking Horse Procedures and the Bidding Procedures will encourage active bidding from seriously interested parties who possess the financial and operational capacity to close on a Transaction. Furthermore, the proposed Stalking Horse Procedures and Bidding Procedures will allow the Debtor to conduct an auction in a controlled, fair and competitive fashion that will serve to dispel any doubt as to the best and highest offer reasonably available for a Transaction with the Debtor. Therefore, the Debtor believes the Stalking Horse Procedures and the Bidding Procedures will confirm that they are receiving the greatest possible consideration for a Transaction with the Debtor.

40.    Procedures to dispose of assets, similar to the proposed Stalking Horse Procedures and Bidding Procedures, have been approved in other large, complex chapter 11 cases in this District.  See e.g. Tri-Valley Corp., Case No. 12-12291 (MFW) (Bankr. D. Del. Sep. 5, 2012); WP Steel Venture LLC, Case No. 12-11661 (KJC) (Bankr. D. Del. June 21, 2012) Capitol Infrastructure, LLC, Case No. 12-11362 (KG) (Bankr. D. Del. May 15, 2012); Traffic Control And Safety Corporation,, Case No. 12-11287 (KJC) (Bankr. D. Del. May 14, 2012); Contract

Research Solutions, Inc., Case No. 12-11004 (KJC) (Bankr. D. Del. April 12, 2012); Delta Petroleum Corp., Case No. 11-14006 (KJC) (Bankr. D. Del. January 11, 2012); Dallas Stars, L.P., Case No. 11-12935 (PJW) (Bankr. D. Del. September 22, 2011). In sum, the Debtor believes that the proposed Stalking Horse Procedures and Bidding Procedures provide an appropriate framework for expeditiously establishing that the Debtor is receiving the best and highest offer for a Transaction with the Debtor. Accordingly, the proposed Bidding Procedures are reasonable, appropriate and within the Debtor's sound business judgment under the circumstances.

   (2)    *The Overbid Protections Are Appropriate Under the Circumstances*

   41.    The Minimum Bid Increment is appropriate under the circumstances and will enable the Debtor to simultaneously maximize the value while limiting the chilling effect in the marketing process. This provision also is consistent with the overbid increments previously approved by courts in this District. See e.g. Tri-Valley Corp., Case No. 12-12291 (MFW) (Bankr. D. Del. Sep. 5, 2012); WP Steel Venture LLC, Case No. 12-11661 (KJC) (Bankr. D. Del. June 21, 2012); Solar Trust of America, LLC, Case No. 12-11136 (KG) (Bankr. D. Del. May 11, 2012); Contract Research Solutions, Inc., Case No. 12-11004 (KJC) (Bankr. D. Del. April 12, 2012); Delta Petroleum Corp., Case No. 11-14006 (KJC) (Bankr. D. Del. January 11, 2012).

   (3)    *The Break-Up Fee, if Approved by the Court, Is an Actual and*
          *Necessary Cost of Preserving the Debtor's Estate*

   42.    The Debtor reserves the right to seek the Court's approval, upon no less than three (3) days notice to certain parties in interest, of a Stalking Horse Purchaser to serve as a "floor bid" at any time after entry of the Bidding Procedures Order and to offer that bidder a Break-Up Fee. While such procedures are, admittedly, not always found in "naked" auctions, the Debtor

believes that, in this case, such relief is warranted to ensure the Debtor's ability to take advantage of a potentially value maximizing initial bid.

43.      Break-up fees are a vital means by which a debtor-in-possession can manage value maximization risk by setting a value floor for the assets to be sold, which is a key benefit to the Debtor and its estate and weighs heavily in favor of approving the procedures for later offering the Break-Up Fee.  Moreover, without the ability to later offer the Break-Up Fee upon shortened notice, the sale and reorganization process might be substantially impaired.  Such fees encourage the investment of time, effort and money necessary to consummate a Transaction with the Debtor, despite the possibility that the Stalking Horse Purchaser may not ultimately effectuate the Transaction.  A break-up fee is an important tool to be used to encourage bidding.

44.      The ability of the Debtor to later offer and obtain approval of the Break-Up Fee provides the incentive required to induce an otherwise Qualified Bidder to submit or increase its bid prior to the Auction.  To the extent bids can be improved prior to the Auction, a higher floor is established for further bidding.  Thus, even if the Stalking Horse Purchaser is granted the Break-Up Fee and ultimately is not the Prevailing Bidder, the Debtor and its estate will have benefited from the higher floor established by the improved bids.  The Debtor submits that the proposed procedures for later awarding the Break-Up Fee will not chill bidding – instead, it will only be offered if the Debtor receives a Bid that is worthy of such protection.

45.      Thus, the Debtor submits that the Break-Up Fee, to the extent offered by the Debtor and approved by the Court would be: (a) an actual and necessary cost of preserving the Debtor's estate within the meaning of Bankruptcy Code sections 503(b) and 507(a); (b) commensurate to the real and substantial benefit conferred on the Debtor's estate by the Stalking Horse Purchaser, and (c)  reasonable and appropriate in light of, among other things (i) the size

and nature of the Transaction contemplated and other comparable transactions, (ii) the substantial efforts that will need to be expended by the Stalking Horse Purchaser, (iii) the benefits the Stalking Horse Purchaser will have provided to the Debtor's estate, its creditors and other parties in interest, notwithstanding that the Stalking Horse Bid may be terminated by the Debtor if any higher or otherwise better transaction is identified and consummated at the conclusion of the Auction, and (d) necessary to induce the Stalking Horse Purchaser to serve as the "floor" bidder and to continue to pursue a Transaction with the Debtor.

46.    The determination of whether a break-up fee should be allowed is made based on standards established by the Third Circuit in Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy. Inc.), 181 F.3d 527 (3d Cir. 1999).  O'Brien held that while bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions in Bankruptcy Code section 503(b) govern in the bankruptcy context. Id.  To be approved, bidding incentives, such as break-up fees, must provide benefit to a debtor's estate. Id. at 533; see also In re Reliant Energy Channelview LP, 594 F.3d 200, 206 (3d Cir. 2010) ("the allowability of break-up fees, like that of other administrative expenses, depends on the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate").

47.    O'Brien identified at least two instances in which bidding incentives may provide benefit to the estate.  First, benefit may be found if "assurance of a break up fee promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would [be] limited." Id. at 537.  Second, where the availability of bidding incentives induces a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit

to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

48.    The Debtor submits that the Break-Up Fee, if agreed upon by the Debtor in the exercise of its business judgment and approved by the Court following a hearing, is consistent with the O'Brien standard and should be approved as fair and reasonable.  First, the Debtor and its professionals are negotiating with any and all bidders including any Potential Stalking Horse Bidder willing to serve as the Stalking Horse Purchaser, which dispenses of any notion of self-dealing or non-arm's-length negotiations under the circumstances.  Second, the Debtor believes, based on its reasoned business judgment, that its ability to designate a Stalking Horse Purchaser to serve as a "floor bid" would enhance its ability to maximize value without chilling bidding. The presence of the ability to later offer a Break-Up Fee, first and foremost, signifies the existence of a contractually-committed bidder at a floor price believed to be fair and reasonable. In addition, such an incentive provides the Debtor with the upside opportunity of potentially receiving a higher or otherwise better offer which, absent such a bid floor, might not otherwise be realized.    Third, the Debtor believes, based on its reasoned business judgment, that the amount of the Break-Up Fee would be reasonable and appropriate relative to the commitments made and resources expended by the Stalking Horse Purchaser.  Further, if the Break-Up Fee were to be paid, it will be because the Debtor has received a higher or otherwise superior offer. Additionally, the proposed Break-Up Fee is well within the range of such fees approved by this and other courts, as noted above.

> *(4)*     *The Proposed Sale Notice and Assignment Notice and Proposed*
> *Dates for the Sale Objection Deadlines, the Contract Objection*
> *Deadlines and the Sale Hearing Are Appropriate*

49.     Under Bankruptcy Rules 2002(a) and (c), the Debtor is required to notify its creditors of any proposed sale of its assets, including a disclosure of the time and place of the Sale Hearing, the terms and conditions of the sale and the deadline for filing any objections related thereto.  The Debtor submits that the Sale Notice fully complies with Bankruptcy Rules 2002(a) and (l) and includes adequate information to (a) enable interested parties to bid on the Assets pursuant to the Bidding Procedures and by the Bid Deadline, and (b) inform such parties of the Sale Hearing and the relevant Sale Objection Deadline related thereto (collectively, the "Notice Objectives").

50.     The Debtor submits that the proposed Sale Objection Deadline is reasonable and appropriate under the circumstances.     Parties in interest are provided adequate notice in accordance with the Bankruptcy Rules and the Local Rules.

51.     The Debtor submits that the notice to be provided via the Assignment Notice is reasonably calculated to provide all counterparties to the Potential Designated Contracts with proper notice of the potential assumption and assignment of their executory contracts or unexpired leases, any Cure Costs relating thereto and the Contract Procedures, including, but not limited to, the Contract Objection Deadlines. As such, the proposed Assignment Notice is appropriate and sufficient under the circumstances.

52.     The Debtor submits that the notice to be provided through the Sale Notice and the method of service proposed herein fully complies with the requirements set forth in Bankruptcy Rule 2002 and constitutes good and adequate notice of the Bidding Procedures and the subsequent proceedings related thereto, including the proposed dates for (a) the Bid Deadline; (b)

the Sale Objection Deadline; (c) the Contract Objection Deadlines; and (d) the Sale Hearing. Therefore, the Debtor respectfully requests this Court to approve the proposed notice procedures.

## REQUEST FOR RELIEF UNDER BANKRUPTCY RULES 6004(h) AND 6006(d)

53.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtor requests that the Bidding Procedures Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

54.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Banks. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, Collier on Bankruptcy suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy ¶ 6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the Court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

## NOTICE

55.    As of the date hereof, no trustee, examiner, or creditors' committee has been appointed in the Debtor's Chapter 11 Case. Notice of this Motion has been given to the

following parties or, in lieu thereof, to their counsel, if known: (a) the U.S. Trustee; (b) counsel to any official committee appointed in these Chapter 11 Cases, (c) all parties that have filed a request for notice pursuant to Bankruptcy Rule 2002; (d) all parties who are known by the Debtor to assert liens against the Assets or equity; (e) the United States Attorney's office; (f) all state attorneys general in states in which the Assets are located; (g) the Internal Revenue Service; and (h) for each state in which the Assets are located, the applicable taxing authorities.  In light of the nature of the relief requested, the Debtor submits that no other or further notice need be provided.

WHEREFORE, the Debtor respectfully requests that the Court: (a) enter the Bidding Procedures Order in substantially the form attached hereto, (i) approving the Stalking Horse Procedures, the Bidding Procedures and Contract Procedures in connection with the sale of substantially all of its assets or recapitalization of the Debtor by public auction; (ii) scheduling a hearing to consider the sale of assets; (iii) approving the form and manner of notice thereof; and (b) grant such other and further relief to the Debtor as the Court may deem proper.

Dated: February 17, 2015
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
Kimberly A. Brown (No. 5138)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email:  landis@lrclaw.com
       mumford@lrclaw.com
       brown@lrclaw.com

*Proposed Counsel to the Debtor*
*and Debtor-in-Possession*