IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SALADWORKS, LLC,[1] | Case No. 15-10327 (LSS) |
| Debtor. | Hearing Date: May 28, 2015 at 10:00 a.m. (ET)<br>Objection Deadline: May 21, 2015 at 4:00 p.m. (ET) |

**MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER (I) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE DEBTOR OUTSIDE THE ORDINARY COURSE OF BUSINESS, (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OR REJECTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtor and debtor-in-possession (the "Debtor"),[2] by and through its undersigned counsel, hereby moves (the "Sale Motion") for the entry of an order, pursuant to sections 105(a), 363, 365 and 503 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended or modified, the "Bankruptcy Code"), and rules 2002, 6004, 6006, 9007 and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"): (i) approving the asset purchase agreement (and any and all agreements related thereto) (collectively, the "Agreement")[3] between the Debtor and SW Acquisition Company, LLC ("SWAC") or the Prevailing Bidder (the "Buyer") and authorizing the sale of the Acquired Assets outside of the ordinary course of business; (ii) authorizing the

---

[1] The last four digits of the Debtor's tax identification number are (7282). The Debtor's corporate office and the mailing address is 161 Washington Street, Suite 300, Conshohocken, PA 19428.

[2] Terms utilized but not otherwise defined herein shall have the meanings ascribed to them in the Bid Procedures Order or the Agreement (both as defined below).

[3] A copy of the Agreement was filed as **Exhibit A** to the *Debtor's Motion for Entry of an Order Approving Selection of Stalking Horse, Bid Protections and the Form of Asset Purchase Agreement* [Docket No. 183]. A copy of the Agreement also may be obtained upon request to the undersigned counsel.

sale to the Buyer free and clear of all Liens, Claims, Encumbrances, and Interests (as defined in the attached proposed form of order) (other than Assumed Liabilities, Permitted Liens and Permitted Encumbrances) (the "Sale") of the Acquired Assets to the Buyer; (iii) authorizing the assumption and assignment of Assumed Contracts; (iv) authorizing the Debtor to change its corporate name and the caption of this Chapter 11 Case and (v) granting related relief.[4]

## JURISDICTION AND VENUE

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this Sale Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.[5]

2. The statutory predicates for the relief requested herein are sections 105, 363 and 503 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007 and 9008, and Local Rule 6004-1.

## BACKGROUND

*The Chapter 11 Case*

3. On February 17, 2015 (the "Petition Date"), the Debtor commenced the above-captioned chapter 11 case (the "Chapter 11 Case") by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the Court.

---

[4] For the avoidance of doubt, the Debtor will consider any and all Transactions, including a recapitalization Transaction, submitted in accordance with the Bid Procedures Order and the Bidding Procedures.

[5] Pursuant to Local Rule 9013-1(f), the Debtor hereby confirms its consent to entry of a final order by the Court in connection with this Motion if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4. The Debtor continues to operate its business and manage its properties as a debtor-in-possession, pursuant to Bankruptcy Code sections 1107(a) and 1108. As of the date of this Motion, no trustee or examiner has been appointed in this Chapter 11 Case.

5. On February 26, 2015, the Office of the United States Trustee (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors in the Chapter 11 Case (the "Committee").

6. On the Petition Date, the Debtor filed the *Motion of the Debtor and Debtor-In-Possession for Entry of an Order (I) Approving Stalking Horse Procedures and Bidding Procedures in Connection with a Transaction By Public Auction; (II) Scheduling a Hearing to Consider the Transaction; (III) Approving the Form and Manner of Notice Thereof and (IV) Approving Contract Procedures* [Docket No. 14], which is incorporated herein by reference.

7. On March 11, 2015, the Court entered the *Order (I) Approving Stalking Horse Procedures and Bid Procedures in Connection with a Transaction by Public Auction; (II) Scheduling a Hearing to Consider the Transaction; (III) Approving the Form and Manner of Notice Thereof and (IV) Approving Contract Procedures* [Docket No. 103] (the "Bid Procedures Order"). The Bid Procedures Order approved, among other things, the Stalking Horse Procedures, Bidding Procedures and Contracts Procedures.

8. The Stalking Horse Procedures provided for, among other things, the deadlines and procedures for the submission of Stalking Horse Bids and the selection of the Stalking Horse Purchaser. The Bidding Procedures provide for, among other things, the requirements for Qualified Bidders to submit Qualified Bids and participating in an Auction. The Contracts Procedures provide for, among other things, the deadlines and requirements for the Debtor to assume and assign Potential Designated Contracts.

9. On April 1, 2015, the Debtor filed the *Debtor's Expedited Motion for Entry of an Order Extending the Stalking Horse and Bid Deadlines* [Docket No. 144] (the "Motion to Extend") seeking an extension of the sale process to select the Stalking Horse Purchaser, and negotiate and execute a definitive Transaction Agreement with such Stalking Horse Purchaser. On April 9, 2015, the Court granted the Motion to Extend [Docket No. 154], which, among other things, extended the deadlines related to the Stalking Horse Procedures, the submission of Bids and the dates scheduled for the Auction and the Sale Hearing.

10. On April 23, 2015, the Debtor filed the *Debtor's Motion for Entry of an Order Approving Selection of Stalking Horse, Bid Protections and the Form of Asset Purchase Agreement* [Docket No. 183] (the "Stalking Horse Motion"). On May 1, 2015, the Court entered the *Order Approving Selection of Stalking Horse Bidder, Bid Protections and the Form of Asset Purchase Agreement* [Docket No. 214] (the "Stalking Horse Order") approving (i) the Debtor's selection of SWAC as Stalking Horse Purchaser, (ii) Bid Protections and (iii) the form of that certain Asset Purchase Agreement dated April 22, 2015 by and between the Debtor and SWAC (the "Agreement").

11. Additionally, in accordance with the Bid Procedures Order and the Bidding Procedures, the Debtor filed and served the (i) *Notice of Debtor's Intent to Assume and Assign Certain Unexpired Leases and Executory Contracts and Fixing of Cure Amounts* [Docket No. 182] and (ii) *Supplemental Notice of Debtor's Intent to Assume and Assign Certain Unexpired Leases and Executory Contracts and Fixing of Cure Amounts* [Docket No. 207] (together as the "Assignment Notices"). Through the Assignment Notices, the Debtor provided the Non-Debtor Counterparties to each of the Debtor's executory contracts and unexpired leases with notice of the potential assumption, assignment or rejection of their Contract and any Cure Costs relating thereto.

*The Debtor's Transaction and Marketing Process*

12.     As explained more fully in the Steck Declaration, in light of the Chancery Litigation and Pennsylvania Litigation, the Debtor, in the exercise of its reasonable business judgment, determined that the most effective way to maximize value of the Debtor's assets for all of its stakeholders was to seek bankruptcy protection in order to pursue a sale or recapitalization Transaction of the Debtor's business.

13.     The Debtor has established, with Court approval, Bidding Procedures in connection with a Transaction by public auction. These procedures are designed to maximize the value obtained from a sale of the Debtor's assets or recapitalization of its business. The Debtor has determined, in the exercise of its business judgment, that a Transaction provides the best restructuring alternative for all of its creditor constituencies and stakeholders.

14.     With the assistance of the Debtor's investment banker, SSG Advisors, LLC ("SSG"), the Debtor has run, and continues to run, an extremely thorough marketing process. On February 11, 2015, the Debtor hired SSG as its exclusive investment banker, to find a transaction party for a recapitalization or a sale of substantially all of the Debtor's assets. Upon its retention, SSG began working with the Debtor to prepare marketing materials and populate an extensive electronic data room. Since its retention, SSG has been actively soliciting interest in the Debtor's business, contacting potential acquirers for a Transaction, negotiating and sending non-disclosure agreements, and assisting potential purchasers with their due diligence.

15.     To date, the Debtor and its professionals have contacted three hundred and thirteen (313) parties regarding a potential Transaction. Seventy (70) of these parties executed non-disclosure agreements. Prior to the expiration of the Stalking Horse Bid Deadline, the Debtor received ten (10) indications of interest (the "IOIs"). The Debtor and its professionals carefully evaluated the IOIs and compared their strengths and weaknesses, with the ultimate goal

of selecting a Stalking Horse Purchaser. After multiple rounds of negotiations with several of the parties that submitted IOIs and following extensive arms-length negotiations, the Debtor entered into the Agreement and selected SWAC as the Stalking Horse Purchaser. In light of the fact the Agreement is subject to higher or otherwise better bids, the Debtor and SSG continue to market the Debtor's business in advance of the Bid Deadline.

## THE PROPOSED SALE

16. The Agreement, which remains subject to higher or otherwise better bids, provides for the purchase of substantially all of the Debtor's assets, with the exception of the assets related to the Paoli Store, to a non-insider for up to $16.9 million, consisting of (a) $15 million in cash; (b) up to $200,000 in Required Cure Costs[6] for contracts that are assumed; (c) the assumption of certain liabilities up to a maximum aggregate amount of $500,000; and (d) the funding of $1.2 million into the Brand Development Fund. *Agreement* §§ 2.3, 2.6. A summary[7] of certain provisions and/or key aspects of the Agreement, as well as any provisions required to be highlighted pursuant to Local Rule 6004-1(b)(iv) is attached hereto as **Exhibit A** and incorporated herein by reference.

## NAME CHANGE

17. The Agreement requires the Debtor to no longer use the name "Saladworks" post-Closing. *Agreement* § 5.16. Accordingly, the Debtor hereby requests the authority, upon and in connection with the Closing, to change its corporate name and the caption of this Chapter 11 Case, consistent with applicable law. The Debtor shall file a notice of change of case caption, containing the new caption and the proposed new corporate name of the Debtor, within ten (10)

---

[6] The term "Required Cure Costs" is defined in the Agreement as "the cure amounts necessary to be paid to permit the assumption and assignment of Assumed Contracts, pursuant to Sections 363 and 365 of the Bankruptcy Code." *Agreement* §1.1.

[7] This description of the Agreement is intended as a summary only. To the extent that there is any discrepancy between this summary and the Agreement, the terms of the Agreement shall govern.

business day of the Closing, and the change of case caption for this Chapter 11 Case shall be deemed effective as of the Closing.

## RELIEF REQUESTED

18. By this Sale Motion, the Debtor seeks the entry of an order (i) approving the Agreement and authorizing the Sale outside the ordinary course of business, (ii) authorizing the Sale free and clear of all Liens, Claims, Encumbrances, and Interests (other than Assumed Liabilities, Permitted Liens and Permitted Encumbrances), (iii) authorizing the assumption and assignment of certain executory contracts and unexpired leases, (iv) authorizing the Debtor to change its corporate name and the caption of this Chapter 11 Case; and (v) granting related relief.

## APPLICABLE AUTHORITY

I. **The Proposed Sale is Proper and Should Be Approved.**

19. The Debtor submits that ample authority exists for approval of the proposed Sale of the Acquired Assets pursuant to either the (i) Agreement or (ii) the Prevailing Bid, as applicable. Bankruptcy Code section 363(b)(1), which authorizes a debtor to sell assets of the estate other than in the ordinary course of business free and clear of liens, claims and encumbrances, provides, in relevant part, that a debtor-in-possession, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); *see also* Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction.").

20. Although Bankruptcy Code section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if the sale is based upon the sound business judgment of the debtor. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788

F.2d 143 (3d Cir. 1986); *see also, Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3rd Cir. 1996); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149 (3d. Cir. 1986); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D.D.C. 1991); *In re Elpida Memory, Inc.*, 2012 Bankr. LEXIS 5367, *18 (Bankr. D. Del. Nov. 16, 2012) (explaining that the "section 363(b) standard is well-settled. A debtor may sell assets outside the ordinary course of business when it has demonstrated that the sale of such assets represented the sound exercise of business judgment").

21. Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (i) whether a sound business justification exists for the sale; (ii) whether adequate and reasonable notice of the sale was given to interested parties; (iii) whether the sale will produce a fair and reasonable price for the property; and (iv) whether the parties have acted in good faith. *See In re Del. & Hudson Ry.*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987). The *Delaware & Hudson Railway* court further held that:

> Once a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser [or proposed purchaser] is proceeding in good faith.

*In re Delaware & Hudson Ry.*, 124 B.R. at 176.

22. In accordance with *Delaware & Hudson Railway*, a sound business purpose dictates the relief requested herein, which is also supported by adequate and reasonable notice, a fair and reasonable sale price and a sale negotiated in good faith.

### A. A "Sound Business Purpose" Supports the Sale

23. As set forth above and in the Steck Declaration, prior to the Petition Date, the Debtor was plagued by litigation that was deteriorating the Debtor's business value and threatened its ability to operate in the ordinary course of business. In the exercise of its reasonable business judgment, the Debtor determined that the most effective way to avoid further deterioration of its business and to maximize value of the Debtor's assets for all of its creditors and stakeholders was to seek bankruptcy protection in order to pursue a sale or recapitalization Transaction of the Debtor's business.

24. The Stalking Horse Procedures enabled the Debtor to obtain a Stalking Horse Purchaser and establish a floor price for what the Debtor anticipates will be a robust Auction. Both the Stalking Horse Procedures and the Bidding Procedures permit the Debtor to seek out higher and better offers at the Auction. This will ensure that the market sets the value for the Acquired Assets or a recapitalization, and that the Transaction will maximize the value of the Debtor's business for the benefit of all of the Debtor's creditors and stakeholders. Accordingly, the Debtor has provided a sound business purpose in pursuing the approval of the Sale.

### B. *Sufficient Notice of the Proposed Sale Has Been Provided to Interested Parties*

25. Pursuant to the Bidding Procedures and the Bid Procedures Order, the Debtor will employ various methods of notification to ensure that all interested and potentially affected parties will be informed of the Sale and to maximize exposure of a potential Transaction to interested parties. In order to generate the greatest number of bidders possible for a Transaction and to satisfy the requirements of Bankruptcy Rule 2002, the Debtor will serve the Sale Notice upon the Notice Parties and cause such notice to be published in one daily edition of either *USA Today* or *The Wall Street Journal* national editions in accordance with the requirements of the Bid Procedures Order.

26. Additionally, in accordance with the Contract Procedures and the Bid Procedures Order, the Debtor filed and served the Assignment Notices on all non-Debtor counterparties to executory contracts and unexpired leases providing them with notice of this Sale Motion, the potential assumption and assignment or rejection of their contract or lease and the Debtor's proposed Cure Costs associated therewith.

27. Finally, as explained above, the Debtor and its professionals also have reached out to over 300 parties regarding a potential Transaction. The Debtor submits that more than ample notice of a Transaction has been provided to interested parties under the facts and circumstances of this case.

### C. *The Proposed Sale is for a Fair and Reasonable Price*

28. With the assistance of SSG, the Debtor has (i) conducted a comprehensive marketing process in order to maximize value, (ii) solicited the interest of various potential strategic and financial buyers and (iii) entertained offers for *any* potential sale or recapitalization Transaction that would maximize the value of the Debtor's business. Numerous potential buyers conducted due diligence with respect to a potential Transaction and certain potential buyers provided IOIs in connection therewith.

29. Specifically, the Debtor and its professionals contacted over three hundred (300) parties regarding a potential Transaction. Seventy (70) of these parties executed non-disclosure agreements. Prior to the expiration of the Stalking Horse Bid Deadline, ten (10) submitted IOIs with respect to serving as the Debtor's Stalking Horse Purchaser. After multiple rounds of negotiations with several of the parties that submitted IOIs and following extensive arms-length negotiations, the Debtor entered into the Agreement and selected SWAC as the Stalking Horse Purchaser, which has set a floor price for any Auction.

30. In addition, the court-approved Bidding Procedures will ensure that the highest or otherwise best offer for the Debtor's business will be attained. The Debtor and its professionals continue to market a potential Transaction and several parties are still conducting diligence. The Debtor is hopeful that additional Qualified Bids will be received on or prior to the Bid Deadline. In the event Qualified Bids other than the Agreement are received, the Bid Procedures Order and the Bidding Procedures provide that an Auction will be held to determine the highest or otherwise best Bid.

31. Because the purchase price of a Transaction will be determined in accordance with the Court-approved Bidding Procedures at an Auction, it will be fair and reasonable as contemplated by Bankruptcy Code section 363. *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 149 (finding that "[g]enerally speaking, an auction may be sufficient to establish that one has paid 'value' for the assets of a bankrupt"); *In re Nat'l Health & Safety Corp.*, 1999 WL 703208, at *2 (Bankr. E.D. Pa. Sept. 2, 1999) (citing *Abbotts Dairies* for the proposition that an auction may be sufficient to establish that one has paid value for the assets of a debtor, and relying upon auction results to verify that the purchase price represented value).

32. Moreover, not only is the sale price fair and reasonable as described above, it is also sufficient to satisfy all of the Debtor's known and undisputed liabilities. As stated above and in the summary attached hereto as **Exhibit A**, the Agreement provides Cash Consideration totaling $15.2 million. While the deadline to submit proofs of claim and interests has not yet passed, based on the Debtor's books and records, the Cash Consideration is sufficient to (i) satisfy all known liabilities[8] and (ii) return value to equity holders. As such, the Debtor submits that the proposed sale price is more than fair and reasonable in this Chapter 11 Case.

---

[8] On March 19, 2015, the Debtor filed its *Schedules of Assets and Liabilities* [Docket No. 120], which was subsequently amended on March 26, 2015 [Docket No. 128] (as amended or modified, the "Schedules"). As

D.    *The Proposed Sale Has Been Negotiated at Arm's Length and in Good Faith*

33.    Bankruptcy Code section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

34.    Although the Bankruptcy Code does not define "good faith purchaser," courts construing Bankruptcy Code section 363(m) have stated that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" *Abbotts Dairies*, 788 F.2d at 147. To constitute lack of good faith, a court must find fraud or collusion between a purchaser and a debtor-in-possession, trustee or other bidders. *See Kabro Associates of West Islip v. Colony Hill Associates (In re Colony Hill Associates)*, 111 F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a [purchaser]'s good faith status at a judicial sale involves fraud, collusion between the [purchaser] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *see also 255 Park Plaza Associates. Ltd. P'shp. v. Conn. Gen. Life Ins.*, 100 F.3d 1214 (6th Cir. 1996) (citing *In re Onouli-Kona Land Co.*, 846 F.2d 1170, 1173 (9th Cir. 1988)); *Miami Ctr. Ltd. P'ship v. Bank of New York*, 838 F.2d 1547 (11th Cir. 1988); *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 56 (7th Cir. 1983); *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978); *In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *Matter of Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright-line test for good faith, the determination is based

---

disclosed in the Schedules, the Debtor's books and records reflect that the Debtor has $14,220,721.63 in liabilities – several of which are designated as contingent, unliquidated and/or disputed.

on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *Rock Indus. Mach.*, 572 F.2d at 1198).

35.   As required by Bankruptcy Code section 363(m), the Debtor and SWAC have engaged in extensive, arm's length negotiations to produce the Agreement. There has been no fraud or collusion. Furthermore, the Bidding Procedures establish a process whereby interested parties may compete to establish the market value of a Transaction. As such, the Auction will result in a bid for a Transaction that represents substantial value to the Debtor's estate because it will provide favorable terms for the disposition of such assets for a price that represents the market value of the assets. *See Abbotts Dairies*, 788 F.2d at 149. Thus, for the foregoing reasons, the Debtor respectfully requests that the Court find that the Buyer is entitled to the protections of Bankruptcy Code section 363(m).

## II.   The Sale Satisfies the Requirements of Bankruptcy Code Section 363(f)

36.   The Debtor proposes to sell the Acquired Assets pursuant to Bankruptcy Code sections 363(b) and 363(f), which, among other things, authorize a debtor to sell property outside the ordinary course of business, free and clear of any Liens, Claims, Encumbrances, and Interests (other than Assumed Liabilities, Permitted Liens and Permitted Encumbrances) of any other party, including, but not limited to, any administrative expense or priority claim asserted in this Chapter 11 Case. Specifically, Bankruptcy Code section 363(f) states that a trustee may sell property free and clear of any interest in such property of an entity other than the estate, only if:

(1)   applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)   such entity consents;

(3)   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    (4)    such interest is in bona fide dispute; or

    (5)    such entity could be compelled, in a legal or equitable proceeding to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (stating that section 363(f) is written in the disjunctive and explaining that a court may approve a sale "free and clear" so long as one of the statutory subsections is met); *In re Shary*, 152 B.R. 724, 725 (Bankr. N.D. Ohio 1993).

    37.    The Sale satisfies the criteria set forth in Bankruptcy Code section 363(f). First, there are no secured liens on the Debtor's assets other than with respect to a few thousand dollars held in certain TD Bank accounts of the Debtor that allegedly were garnished prior to the Petition Date.[9] Second, to the extent any other Liens, Claims, Encumbrances or Interests, other than Assumed Liabilities, Permitted Liens and Permitted Encumbrances, exist, either (a) such entity could be compelled, in a legal or equitable proceeding, to accept a monetary satisfaction equal to the amount of their lien, Claim, Encumbrance, or Interest or (b) or such interest is a Lien and the Acquired Asset to be sold is greater than the aggregate value of all liens on such property.

---

[9] As explained more fully in the Steck Declaration, on or about December 3, 2014, Metro Bank commenced three separate lawsuits in Pennsylvania, one civil action and two confession of judgments (the "Pennsylvania Litigation") against the Debtor seeking amounts allegedly due and owing under various term loan agreements and related documents in the aggregate amount of approximately $2.5 million (the "Metro Bank Obligations"). None of these amounts were secured by any of the Debtor's assets. In two of the cases, Metro Bank obtained default confessions of judgment against the Debtor in the amounts of $466,467.26 and $1,388,769.58, respectively (the "Confessed Judgments"). At some point during the Pennsylvania Litigation, WS Finance LLC ("WS Finance"), an entity that upon information and belief is wholly-owned or controlled by either JVSW LLC or Vernon W. Hill, II, allegedly acquired the Metro Bank Obligations, which the Debtor is currently investigating. On January 15, 2015, Counsel for WS Finance sent a writ of garnishment to TD Bank. Since service, TD Bank has frozen this account. The Debtor is seeking to overturn the Confessed Judgments. The Debtor reserves all of its rights, remedies and defenses in connection with the Confessed Judgments and the Metro Bank Obligations. Nothing herein shall be considered an admission of the validity, priority or secured status of the Metro Bank Obligations or the amounts garnished in the TD Bank accounts.

38. In addition, pursuant to the Bid Procedures Order, the Debtor will send the Sale Notice to all of the Notice Parties, including all parties who could potentially assert any Lien, Claim, Encumbrance, or Interest against the Acquired Assets. Accordingly, the Debtor submits that the Sale of the Acquired Assets free and clear of any Liens, Claims, Encumbrances, and Interests (other than Assumed Liabilities, Permitted Liens and Permitted Encumbrances) satisfies the statutory prerequisites of Bankruptcy Code section 363(f).

### III. The Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized.

39. Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g., In re Stable Mews Assoc., Inc.,* 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See Group of Institutional Investors v. Chicago M St. P. & P.R.R. Co.,* 318 U.S. 523 (1943); *Sharon Steel Corp.,* 872 F.2d 36, 39-40 (3d Cir. 1989). The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.),* 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *Stable Mews Assoc.,* 41 B.R. at 596). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, NA.,* 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to Bankruptcy Code

section 365(b)(1), for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

40. Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract. *See In re Rickel Home Centers, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

41. Bankruptcy Code section 365(f) provides, in pertinent part, that a trustee may assign an executory contract or unexpired lease of a debtor only if:

> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

42. Bankruptcy Code section 365(a) provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Moreover, Bankruptcy Code section 365(b) codifies the requirements for assuming an executory contract of a debtor. This provision provides that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> > (A) cures, or provides adequate assurance that the trustee will promptly cure, such default…;

> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

43.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *Accord In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

44.     As set forth in the Agreement (or as shall be set forth in any Qualified Bid), to the extent any defaults exist under any executory contracts or unexpired leases sought to be assumed by the Debtor and assigned to the Buyer (the "Assumed Contracts") such defaults are required to be cured as required under Bankruptcy Code section 365(b)(1).

45.     Based on information received from SWAC, the Debtor believes that SWAC has the financial capability to satisfy any and all obligations it will incur in connection with the Assumed Contracts. In addition, to be a Qualified Bid, any Qualified Bidder must also establish it has the financial capability to satisfy any and all obligations it will incur in connection with the

Assumed Contracts. Additionally, facts will be further adduced at the Sale Hearing to show the financial credibility of the Buyer, its experience in the industry and its willingness and ability to perform under the Assumed Contracts. Because the Sale Hearing will provide the Court with an opportunity to evaluate the ability of the Buyer to provide adequate assurance of future performance under the Assumed Contracts, as required by Bankruptcy Code section 365(b)(1)(C), the Debtor submits that the Court should authorize the assumption and assignment of the Assumed Contracts by the Debtor, effective upon the Closing of the proposed Sale.

46. Additionally, the Bid Procedures Order provides that all of the counterparties to executory contracts and unexpired leases with the Debtor will be given notice of this Sale Motion, informed whether or not their contract or lease is an Assigned Contract and through the Assignment Notices have been provided with notice of the potential assumption and assignment or rejection of their contract or lease and the Debtor's proposed Cure Costs associated therewith. Based on the foregoing, the Debtor respectfully submits that its assumption and assignment of the Assumed Contracts satisfies the requirements under Bankruptcy Code section 365(f)(2)(A) and (B).

## IV. Relief from the Fourteen Day Waiting Periods Under Bankruptcy Rule 6004(h) and 6006(d) is Appropriate.

47. The Debtor seeks a waiver of any stay of the effectiveness of the order approving this Sale Motion. Pursuant to Bankruptcy Rule 6004(h), "[an] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." As set forth above, the relief requested herein is essential to maximize the value of the Debtor's business for the benefit of all creditors and stakeholders...

48. Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to Bankruptcy Code section 363 are automatically

stayed for fourteen (14) days after entry of the order. *See* Fed. R. Bankr. P. 6004(h). The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. Pro. 6004(g).

49. Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to Bankruptcy code section 365(f) for fourteen (14) days, unless the court orders otherwise.

50. To preserve the value of the Acquired Assets and limit the costs of administering and preserving such assets, it is critical that the Debtor close the Sale as soon as possible after all closing conditions have been achieved or waived. Additionally, the Agreement requires the Closing to occur on or before June 15, 2015. Accordingly, the Debtor hereby requests that the Court waive the fourteen (14) day stay periods under Bankruptcy Rules 6004(h) and 6006(d)

51. Based upon the foregoing, the Debtor submits that the relief requested herein is necessary and appropriate, is in the best interests of the Debtor and its estates, and should be granted in all respects.

## NOTICE AND NO PRIOR REQUEST

52. The Debtor has provided notice of this Sale Motion to the following parties or, in lieu thereof, to their counsel, if known: (i) the U.S. Trustee; (ii) the Committee; (iii) all taxing authorities having jurisdiction over any of the Assets or equity, including the Internal Revenue Service; (iv) the United States Attorney's office; (v) all state attorneys general in states in which the Assets are located; (vi) all persons or entities known to the Debtor that have asserted a lien on, or security interest in, all or any portion of the Assets or equity; (vii) the Stalking Horse Purchaser; (viii) any potential bidders previously identified or otherwise known to the Debtor;

and (ix) all parties that have requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtor respectfully submits that no further notice is necessary

53. No previous motion for the relief requested herein has been made to this or any other court.

WHEREFORE the Debtor respectfully request that the Court enter an order: (i) approving the Agreement and authorizing the Sale of the Acquired Assets outside the ordinary course of business, (ii) authorizing the sale of assets free and clear of all Liens, Claims, Encumbrances, and Interests, (iii) authorizing the assumption and assignment or rejection of certain executory contracts and unexpired lease; (iv) authorizing the Debtor to change its corporate name and the caption of this Chapter 11 Case; and (v) granting such other and further relief as the Court deems just and proper.

Dated: May 7, 2015
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

_____
Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
Kimberly A. Brown (No. 5138)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
       mumford@lrclaw.com
       brown@lrclaw.com

*Counsel to the Debtor and Debtor-in-Possession*