## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SW LIQUIDATION, LLC,[1]<br>Debtor. | Case No. 15-10327 (LSS) |

## DISCLOSURE STATEMENT FOR THE PLAN OF LIQUIDATION OF SW LIQUIDATION, LLC PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES NOR IS IT SOLICITING AN OFFER TO BUY ANY SECURITIES. INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT.**

---

**LANDIS RATH & COBB LLP**
Adam G. Landis (No.3407)
Kerri K. Mumford (No. 4186)
Kimberly A. Brown (No. 5138)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
      mumford@lrclaw.com
      brown@lrclaw.com

Dated: July 1, 2015

*Counsel to the Debtor and Debtor-In-Possession*

---

[1] The last four digits of the Debtor's tax identification number are (7282). The Debtor's mailing address is P.O. Box 440, Gladwyne, PA 19035.

{1045.002-W0037279.}

## DISCLAIMER

THE DEBTOR IS PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN OF LIQUIDATION OF SW LIQUIDATION, LLC PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.   YOU SHOULD NOT RELY UPON OR USE THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.   THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.   THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT.  THE DEBTOR URGES EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE DISCLOSURES CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. RATHER, HOLDERS OF CLAIMS OR INTERESTS AND OTHER ENTITIES SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR POTENTIAL OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT.  THE DEBTOR OR THE LIQUIDATING TRUSTEE, AS APPLICABLE, MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS BEFORE AND AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.  THE PLAN RESERVES FOR THE LIQUIDATING TRUSTEE THE RIGHT TO BRING CAUSES OF ACTION (DEFINED IN THE PLAN) AGAINST ANY ENTITY OR PARTY IN INTEREST EXCEPT THOSE SPECIFICALLY RELEASED HEREIN OR BY SEPARATE ORDER OF THE BANKRUPTCY COURT.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTOR'S CHAPTER 11 CASE AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE.  ALTHOUGH THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  THE DEBTOR DOES NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTOR'S MANAGEMENT AND ITS ADVISORS HAVE REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTOR HAS USED ITS REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, NO ENTITY HAS AUDITED THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT.

THE DEBTOR IS MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTOR MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTOR HAS NO AFFIRMATIVE DUTY TO DO SO.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE FILING OF THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTOR AND ITS OWN ANALYSIS OF THE TERMS OF THE PLAN, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE DEBTOR HAS NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN.

THE DEBTOR URGES ALL HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.

# TABLE OF CONTENTS

**Page**

| | | | |
|---|---|---|---|
| I. | | INTRODUCTION. | 7 |
| | 1.1 | PURPOSE OF THE DISCLOSURE STATEMENT | 7 |
| | 1.2 | CONFIRMATION OF THE PLAN. | 8 |
| | 1.3 | VOTING ON THE PLAN. | 9 |
| | 1.4 | ACCEPTANCE OF THE PLAN. | 11 |
| | 1.5 | SOURCES OF INFORMATION. | 11 |
| | 1.6 | ADDITIONAL INFORMATION. | 12 |
| II. | | THE DEBTOR. | 12 |
| | 2.1 | DESCRIPTION OF THE DEBTOR AND THE DEBTOR'S BUSINESS. | 12 |
| | 2.2 | THE DEBTOR'S CAPITAL STRUCTURE. | 13 |
| | 2.3 | THE DEBTOR'S PREPETITION LITIGATION. | 14 |
| | 2.4 | EVENTS LEADING TO THE BANKRUPTCY FILING. | 15 |
| | 2.5 | THE DEBTOR'S BANKRUPTCY PROCEEDINGS. | 16 |
| | 2.6 | SECURED CLAIMS ENCUMBERING THE DEBTOR'S PROPERTY. | 18 |
| | 2.7 | ADMINISTRATIVE CLAIMS. | 18 |
| | 2.8 | UNSECURED CLAIMS AGAINST THE DEBTOR. | 19 |
| III. | | SUMMARY OF THE PLAN OF REORGANIZATION. | 19 |
| | 3.1 | IN GENERAL. | 19 |
| | 3.2 | CLASSIFICATION OF CLAIMS AND INTERESTS. | 19 |
| | 3.3 | TREATMENT OF UNIMPAIRED CLAIMS AND CLASSES. | 21 |
| | 3.4 | TREATMENT OF IMPAIRED CLASSES. | 22 |
| | 3.5 | IMPLEMENTATION OF THE PLAN. | 22 |
| | 3.6 | FUNDING AND DISBURSEMENTS. | 27 |
| | 3.7 | EXECUTORY CONTRACTS AND UNEXPIRED LEASES. | 31 |
| | 3.8 | RESOLUTION OF CLAIMS. | 32 |
| | 3.9 | SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS. | 34 |
| | 3.10 | CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN. | 39 |
| | 3.11 | MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN. | 40 |
| | 3.12 | RETENTION OF JURISDICTION. | 40 |
| | 3.13 | MISCELLANEOUS PROVISIONS. | 42 |
| IV. | | POST-CONFIRMATION ISSUES. | 44 |
| | 4.1 | THE DEBTOR'S CONTINUED EXISTENCE AFTER CONFIRMATION. | 44 |
| V. | | FEASIBILITY. | 44 |
| | 5.1 | FINANCIAL FEASIBILITY ANALYSIS. | 44 |
| VI. | | ALTERNATIVES TO THE PLAN. | 44 |
| | 6.1 | CHAPTER 7 LIQUIDATION. | 44 |
| | 6.2 | CONTINUATION OF THE BANKRUPTCY CASE. | 46 |

6.3    ALTERNATIVE PLAN(S). ................................................................................46

VII.   RISK FACTORS. ..................................................................................................... 46
      7.1    CERTAIN BANKRUPTCY CONSIDERATIONS. ...........................................46
      7.2    CLAIMS ESTIMATION. ..................................................................................46
      7.3    CERTAIN LITIGATION. ..................................................................................46

VIII.  CONCLUSION.......................................................................................................... 47

**EXHIBITS**

EXHIBIT A        Plan of Liquidation

EXHIBIT B        Liquidation Analysis

EXHIBIT C        Summary Analysis of Claims Against the Scardapane Entities

## EXECUTIVE SUMMARY

SW Liquidation, LLC (f/k/a Saladworks, LLC) ("SW" or the "Debtor") filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C §§ 101 *et seq.* (as amended or modified, the "Bankruptcy Code") on February 17, 2015 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Court").

Since the Petition Date, the Debtor has sold substantially all of its assets. The Debtor has submitted the Plan of Liquidation of SW Liquidation, LLC Pursuant to Chapter 11 of the Bankruptcy Code, dated July 1, 2015 (as amended, modified or supplemented, the "Plan"), which provides for the creation of a Liquidating Trust to oversee the distribution of assets to holders of Allowed Claims and Interests. The Debtor believes that the Liquidating Trust provides the most efficient mechanism for distributing the proceeds of the Debtor's assets, evaluating and liquidating the Debtor's remaining assets, including any Causes of Action, and resolving Claims against and Interests in the Debtor's estate.

On June 30, 2015, the Debtor, the Scardapane Entities and the Creditors' Committee executed a plan term sheet, which requires each of the signatories to support the Plan and sets forth the terms of the General Unsecured Claim Settlement and the Scardapane Settlement contained in the Plan.

The Disclosure Statement describes the terms of the Plan, including the treatment of Claims against and Interests in the Debtor. This Executive Summary is intended only to be a summary of the distribution provisions of the Plan. **FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THE DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY.** Capitalized terms used in this Executive Summary and not otherwise defined shall have the meanings ascribed to them in either the Disclosure Statement, the Plan or the Bankruptcy Code, as the case may be.

Under the Plan, Claims against and Interests in the Debtor are divided into nine (9) classes as summarized in the following table. Certain Classified Claims will be paid in full in Cash to the extent they become Allowed Claims. Allowed Non-Priority Tax Claims, Secured Claims, General Unsecured Claims, WS Finance Claims, Guaranteed Payment Claims, Tax Distribution Claims, Class C Interests and Class A Interests will receive a distribution, if any, as summarized in the following table setting forth the classification and treatment of the prepetition Claims and Interest under the Plan and the estimated percentage of recovery of Allowed Claims and Interests. The classification and treatment for all Classes is described in more detail in Section III.

Estimated Claim and Interest amounts set forth in the following table constitute the Debtor's current estimate after a preliminary review of certain proofs of claims and proofs of interests filed against the Debtor and the Debtor's books and records. The current aggregate amount of Administrative Claims, Fee Claims, Priority Tax Claims and Secured Claims filed against the Debtor, which have not been satisfied, is approximately $2.67 million. Because the claims reconciliation process is in its earliest stages in this case, the Debtor has not completed a detailed review of all the Claims to determine their validity or any possible legal or equitable

defenses, including claims of setoff and recoupment, which are available to the Estate. Nonetheless, based on a preliminary review of the Claims filed in the case, the Debtor believes that objections may be sustained to the allowance or asserted priority of numerous Claims based on the fact that these claims (i) are not administrative, priority or secured claims, (ii) have already been paid, (iii) may be properly recharacterized as Interests, or (iv) may be otherwise objectionable. Based on this preliminary reconciliation, the Debtor believes that the aggregate amount of Administrative Claims, Fee Claims, Priority Tax Claims and Secured Claims likely will be between $1.7 million and $1.8 million.

The Debtor estimates that the Estate currently has Cash in the approximate amount of $15.5 million. Because of the inherently speculative nature of estimating potential recoveries, the Debtor has not estimated the value of certain Causes of Action. **THERE CAN BE NO ASSURANCE THAT THE ACTUAL CLAIM AMOUNTS WILL NOT BE DIFFERENT, AND PERHAPS SIGNIFICANTLY DIFFERENT, FROM THE ESTIMATES SET FORTH HEREIN.** The actual distribution to holders of Allowed Claims and Interests is dependent on numerous factors, including, without limitation, (i) the success of the Causes of Action, if any, (ii) whether any Contingent or Unliquidated Claims against the Debtor becomes noncontigent or liquidated; and (iii) whether Disputed Claims are resolved in favor of the Estate. Accordingly, no representation can or is being made with respect to the realization of distributions estimated below.

The table beginning on the following page is only a summary of the classification of treatment of Claims and Interests under the Plan. Reference should be made to the entire Disclosure Statement and Plan for a complete description and understanding of the classification and treatment of Claims and Interests.

## SUMMARY OF CLASSIFICATION AND TREATMENT
## OF CLAIMS AND INTERESTS UNDER THE PLAN

| Affected Claims/Interests & Description | Estimated Allowed Claims | Treatment | Estimated Recovery |
|---|---|---|---|
| Administrative Claims (unclassified) | $321,000 | Unimpaired | Estimated Recovery Percentage: **100%** <br> Form of Recovery: Cash |
| Priority Tax Claims (unclassified) | $800 | Unimpaired | Estimated Recovery Percentage: **100%** <br> Form of Recovery: Cash in full or in installments, together with interest |
| Priority Non-Tax Claims (Class 1) | $0 | Unimpaired | Estimated Recovery Percentage: **100%** <br> Form of Recovery: Cash |
| Secured Claims (Class 2) | $0 | Unimpaired | Estimated Recovery Percentage: **100%** <br> Form of Recovery: Cash |
| General Unsecured Claims (Class 3) | $1 million to $1.8 million | Impaired | Estimated Recovery Percentage: **100%  (no interest subject to opt-out)** <br> Form of Recovery: Cash |
| WS Finance Claims (Class 4) | $0 to $2.8 million | Unimpaired | Estimated Recovery Percentage: **100%** <br> Form of Recovery: Reinstated and paid pursuant to loan documents |
| Guaranteed Payment Claim (Class 5) | $1.6 million to $1.8 million | Unimpaired | Estimated Recovery Percentage: **100%** <br> Form of Recovery: Cash |
| Tax Distribution Claim (Class 6) | $2.6 million to $4.5 million | Unimpaired | Estimated Recovery Percentage: **100%** <br> Form of Recovery: Cash |
| Class C Claims (Class 7) | $9.3 million to $9.8 million | Impaired | Estimated Recovery Percentage: **0%** <br> Form of Recovery: N/A - Disallowed |
| Class C Interests (Class 8) | N/A | Unimpaired | Estimated Recovery Percentage: **22.7%-92.7%** <br> Form of Recovery: all remaining Cash after establishment of the Reserved Funds and payment in full of all Class 1 through 6 Claims. |
| Class A Interests (Class 9) | N/A | Unimpaired | Estimated Recovery Percentage: **$0.00** <br> Form of Recovery: all remaining Cash after establishment of the Reserved Funds and payment in full of all Class 1 through 6 and Class 8 Claims. |

## I.     INTRODUCTION.

### 1.1     PURPOSE OF THE DISCLOSURE STATEMENT.

The Debtor provides this Disclosure Statement (the "Disclosure Statement") to the Office of the United States Trustee and to all of the Debtor's known Creditors and Interest Holders pursuant to Section 1125(b) of Title 11 of the United States Code (as amended or modified, the "Bankruptcy Code") for the purpose of soliciting acceptances of the *Plan of Liquidation of SW Liquidation, LLC Pursuant to Chapter 11 of the Bankruptcy Code*, dated July 1, 2015 (either in its present form or as it may be altered, amended or modified from time-to-time, and including all exhibits thereto, the "Plan"), which has been filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). A copy of the Plan is attached hereto as **"Exhibit A"**. By Order dated August [ __ ], 2015, the Disclosure Statement was approved by the Bankruptcy Court as containing "adequate information" under Bankruptcy Code section 1125.

The Debtor strongly urges you to read this Disclosure Statement in its entirety before voting to accept or reject the Plan because the Disclosure Statement contains a summary of the Plan and important information concerning the Debtor's history and operations. The Disclosure Statement also provides information as to alternatives to the Plan. Summaries of the Plan are included herein for the purpose of soliciting acceptances of the Plan and may not be relied upon for any purpose other than to make a judgment with respect to, and determine how to vote on, the Plan.

**PLEASE NOTE THAT MUCH OF THE INFORMATION CONTAINED HEREIN HAS BEEN TAKEN, IN WHOLE OR IN PART, FROM INFORMATION CONTAINED IN THE DEBTOR'S BOOKS AND RECORDS. STATEMENTS MADE IN THE DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, AND THE EXHIBITS ANNEXED TO THE PLAN, ALTHOUGH THE DEBTOR HAS ATTEMPTED TO BE ACCURATE IN ALL MATERIAL RESPECTS, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT ALL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT ERROR. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.**

Unless otherwise defined herein, capitalized terms contained in this Disclosure Statement shall have the same meanings ascribed to them in the Plan. All capitalized terms used in this Disclosure Statement and not defined herein or in the Plan, but that are defined in the Bankruptcy Code, shall have the respective meanings ascribed to them in the Bankruptcy Code. All capitalized terms used in this Disclosure Statement and not defined herein, in the Plan or in the Bankruptcy Code, but that are defined in the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), shall have the respective meanings ascribed to them therein. Holders of Claims or Interests receiving this Disclosure Statement should carefully review the Plan in conjunction with their review of this Disclosure Statement.

**PLEASE ALSO REVIEW THE PLAN IN ITS ENTIRETY IN DETAIL.**

NO REPRESENTATION CONCERNING THE DEBTOR OR THE VALUE OF THE DEBTOR'S ASSETS HAS BEEN AUTHORIZED BY THE BANKRUPTCY COURT OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. THE DEBTOR IS NOT RESPONSIBLE FOR ANY INFORMATION, REPRESENTATION OR INDUCEMENT MADE TO OBTAIN YOUR ACCEPTANCE, WHICH IS OTHER THAN, OR INCONSISTENT WITH, INFORMATION CONTAINED HEREIN AND IN THE PLAN.

The purpose of this Disclosure Statement is to provide Creditors and Interest holders with information determined by the Bankruptcy Court to be adequate to enable them to make an informed decision to vote to accept or reject the Plan.

## 1.2    CONFIRMATION OF THE PLAN.

1.2.1    **Requirements.** The requirements for Confirmation of the Plan are set forth in detail in Bankruptcy Code Section 1129. The following summarizes some of the pertinent requirements:

(a) **Acceptance by Impaired Classes.**  Except to the extent that the cram down provisions of Bankruptcy Code section 1129(b) may be invoked, each Class of Claims and each Class of Interests must either vote to accept the Plan or be deemed to accept the Plan because the Claims or Interests of such Class are not Impaired.

(b) **Feasibility.**  The Bankruptcy Court is required to find that the Plan is likely to be implemented and that parties required to perform or pay monies under the Plan will be able to do so.

(c) **The "Best Interest" Test.** The Bankruptcy Court must find that the Plan is in the "best interest" of all Creditors and Interest holders.  To satisfy this requirement, the Bankruptcy Court must determine that each holder of a Claim against, or Interest in, the Debtor: (i) has accepted the Plan; or (ii) will receive or retain under the Plan money or other property which, as of the Effective Date, has a value not less than the amount such holder would receive if the Debtor's property was liquidated under Chapter 7 of the Bankruptcy Code on such date.  As described in more detail below, in considering whether the Plan is in the best interests of Creditors and Interest holders, the Debtor and its professionals created a liquidation analysis (the "Liquidation Analysis"), a copy of which is attached hereto as **"Exhibit B"**.

(d) **"Cramdown" Provisions.** Under the circumstances which are set forth in detail in Bankruptcy Code section 1129(b), the Bankruptcy Court may confirm the Plan even though a Class of Claims or Interests has not accepted the Plan, so long as one Impaired Class of Claims has accepted the Plan, excluding the votes of insiders, if the Plan is fair and equitable and does not discriminate unfairly against such non-accepting Classes. The Debtor will invoke the "cram down" provisions of Bankruptcy Code section 1129(b) should any voting Class fail to accept the Plan.

**1.2.2  Procedure.** To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of Bankruptcy Code section 1129 (the "Confirmation Hearing"). The Bankruptcy Court has set September 16, 2015 at 10:00 a.m. (Eastern Time) for the Confirmation Hearing.

**1.2.3  Objections to Confirmation.** Any party-in-interest may object to the Confirmation of the Plan and appear at the Confirmation Hearing to pursue such objection. The Court has set September 9, 2015, at 4:00 p.m. (Eastern Time), as the deadline for filing and serving objections to Confirmation of the Plan. Objections to Confirmation must be electronically filed with the Bankruptcy Court at the following address:

> U.S. Bankruptcy Court for the District of Delaware
> 824 Market Street, Third Floor
> Wilmington, Delaware 19801

With a copy served upon Counsel for the Debtor at the following address:

> Adam G. Landis, Esq.
> Kerri K. Mumford, Esq.
> Kimberly A. Brown, Esq.
> LANDIS RATH & COBB LLP
> 919 Market Street, Suite 1800
> Wilmington, DE 19801

**1.2.4  Effect of Confirmation.** Except as otherwise provided in the Plan or in the Confirmation Order, Confirmation vests title to all property of the Debtor's Estate in the Liquidating Trust to the same extent such Assets were held by the Debtor, free and clear of all Claims, Liens, charges, encumbrances, rights and Interests of creditors and interest holders, subject to the provisions of the Plan. Confirmation serves to make the Plan binding upon the Debtor, all Creditors, Interest holders and other parties-in-interest, regardless of whether they cast a ballot ("Ballot") to accept or reject the Plan.

## 1.3   VOTING ON THE PLAN.

**1.3.1  Impaired Claims or Interests.** Pursuant to Bankruptcy Code section 1126, only the holders of Claims or Interests in Classes "Impaired" by the Plan may vote on the Plan. Pursuant to Bankruptcy Code section 1124, a Class of Claims or Interests may be "Impaired" if the Plan alters the legal, equitable or contractual rights of the holders of such Claims or Interests treated in such Class. The holders of Claims or Interests not Impaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan. The holders of Claims or Interests in any Class which will not receive any payment or distribution or retain any property pursuant to the Plan are deemed to reject the Plan and do not have the right to vote. This Disclosure Statement is being distributed for informational purposes to all Creditors, the Debtor's Interest holders and parties-in-interest without regard to any such party's right to vote.

**1.3.2  Eligibility.** In order to vote on the Plan, a Creditor or Interest holder must have timely filed or been assigned a timely filed proof of Claim or proof of Interest, unless its

Claim or Interest is scheduled by the Debtor and is not identified as disputed, unliquidated or contingent on the Debtor's Schedules of Assets and Liabilities (as amended, the "Schedules"). Creditors or Interest holders having a Claim or Interest in more than one Class that is entitled to vote may vote in each Class in which they hold a separate Claim or Interest by casting a Ballot in each Class.

       **1.3.3    Binding Effect.** Whether a Creditor or Interest holder votes on the Plan or not, such Person will be bound by the terms of the Plan if the Plan is confirmed by the Bankruptcy Court.  Absent some affirmative act constituting a vote, a Creditor or Interest holder will not be included in the vote: (i) for purposes of accepting or rejecting the Plan or (ii) for purposes of determining the number of Persons voting on the Plan.

       **1.3.4    Procedure.** Members of Class 3 (General Unsecured Claims) may vote to accept or reject the Plan.  Class 1 (Priority Non-Tax Claims), Class 2 (Secured Claims), Class 4 (WS Finance Claims), Class 5 (Guaranteed Payment Claim), Class 6 (Tax Distribution Claim), Class 8 (Class C Interests) and Class 9 (Class A Interests) are not Impaired by the Plan and are deemed, therefore, to accept the Plan. Class 7 (Class C Claims) shall neither receive nor retain any property or distribution on account of their Claims or Interests in the Debtor and are deemed to reject the Plan.  Accordingly, holders of Claims or Interests in Classes 1, 2, 4, 5, 6, 7, 8 and 9 are not entitled to vote on the Plan.  In order for your vote to count, you must complete, date, sign and properly mail the enclosed Ballot (please note that envelopes have been included with the Ballot) to:

> SW Liquidation, LLC Ballot Processing
> c/o UpShot Services LLC
> 7808 Cherry Creek South Drive, Suite 112
> Denver, CO 80231

**BALLOTS SENT BY FACSIMILE, TELECOPY, ELECTRONIC MAIL OR OTHER FORM OF ELECTRONIC TRANSMISSION ARE NOT ALLOWED AND WILL NOT BE COUNTED.**

       Pursuant to Bankruptcy Rule 3017, the Bankruptcy Court has ordered that original Ballots for the acceptance or rejection of the Plan must be received by mail or overnight delivery by UpShot Services LLC at the address set forth above on or before 11:59 p.m. (Eastern Time) on September 9, 2015.  Once you have delivered your Ballot, you may not change your vote, except for cause shown to the Bankruptcy Court after notice and hearing.

       Any Ballot received that is incomplete in anyway shall be deemed to be cast as follows:

             (a) Ballots received that do not evidence the amount or evidence an incorrect amount of such Creditor's Claim or Interest holder's Interest or shall be completed or corrected, as the case may be, based upon the Schedules filed by the Debtor if no proof of Claim or proof of Interst has been filed by such Creditor or Interest holder, or based upon timely filed proofs of Claim or proofs of Interest, and counted as a vote to accept or reject the Plan;

(b) Ballots received that do not identify the Creditor or the Interest holder, whether or not signed by the Creditor or Interest holder, shall not be counted as a vote to accept or reject the Plan;

(c) Ballots received that do not reflect in which Class such Ballot is cast or incorrectly classify such Creditor's Claim or Interest holder's Interest and that are otherwise properly completed shall be completed or corrected, as the case may be, based upon the Schedules filed by the Debtor if no proof of Claim or proof of Interest has been filed by such Creditor or Interest holder, or based upon timely filed proofs of Claim or proofs of Interest, and counted as a vote to accept or reject the Plan.

## 1.4    ACCEPTANCE OF THE PLAN.

**1.4.1    Creditor and Interest Holder Acceptance.**  As a Creditor and/or Interest holder, your acceptance of the Plan is important.  In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan, or the Plan must qualify for cramdown of any non-accepting Class of Claims pursuant to Bankruptcy Code section 1129(b).  In order for the Plan to be accepted by a Class of Interests, a two-thirds (2/3) majority in amount of the interests voting must vote to accept the Plan or the Plan must qualify for cramdown pursuant to Bankruptcy Code section 1129(b).  In any case, at least one impaired Class of Creditors or Interest holders, excluding the votes of insiders, must actually vote to accept the Plan. You are urged to complete, date, sign and promptly mail the enclosed Ballot. Please be sure to complete the Ballot properly and legibly identify the exact amount of your Claim or Interest and the name of the Creditor or Interest holder.

**1.4.2    Cramdown Election.**  If all Classes do not accept the Plan, but at least one Impaired Class votes to accept the Plan, excluding the votes of insiders, the Debtor may attempt to invoke the "cramdown" provisions.  Cramdown may be an available remedy, because the Debtor believes that, with respect to each Impaired Class, the Plan is fair and equitable within the meaning of Bankruptcy Code section 1129(b)(2) and does not discriminate unfairly.

## 1.5    SOURCES OF INFORMATION.

The information contained in this Disclosure Statement has been obtained from the Debtor's books and records and from pleadings filed by the Debtor and other parties-in-interest. Every reasonable effort has been made to present accurate information and such information is believed to be correct as of the date hereof.  Any value given as to the Assets of the Debtor is based upon an estimation of such value.  You are strongly urged to consult with your financial, legal and tax advisors to understand fully the Plan and the Disclosure Statement.

The financial information contained in this Disclosure Statement is given as of the date hereof, unless otherwise specified.  The delivery of this Disclosure Statement does not, under any circumstance, imply that there has been no change in the facts set forth herein since such date. This Disclosure Statement is intended, among other things, to summarize the Plan and must be read in conjunction with the Plan and its exhibits, if any.  If any conflicts exist between the Plan and the Disclosure Statement, the terms of the Plan shall control.

## 1.6    ADDITIONAL INFORMATION.

Should you have any questions regarding the Plan or this Disclosure Statement, or require clarification of any information presented herein, please contact one of the following attorneys for the Debtor:

> Adam G. Landis, Esq.
> Kerri K. Mumford, Esq.
> Kimberly A. Brown, Esq.
> LANDIS RATH & COBB LLP
> 919 Market Street, Suite 1800
> Wilmington, DE  19801
> (302) 467-4400

## II.    THE DEBTOR.

## 2.1    DESCRIPTION OF THE DEBTOR AND THE DEBTOR'S BUSINESS.

The Debtor was the nation's first and largest fresh-salad franchise concept.  The Debtor was developed in 1986, with the idea to provide its customers with fresh, healthy, made to order entrée-sized salads as an alternative food on the go option.  From its beginnings in the Cherry Hill Mall, the Debtor quickly expanded to twelve (12) additional locations in area malls and soon thereafter began franchising.

The Debtor is a limited liability company formed on March 7, 2008 when its predecessor Saladworks, Inc. assigned to the Debtor all of its existing franchise agreements and intellectual property.  Prior to the Sale (defined below), the Debtor owned all of Saladworks' intellectual property, including trademarks and granted franchises for the establishment, development and operation of unique Saladworks restaurants offering a variety of salads, sandwiches, wraps, panini, soups and other breads and beverages as designated by the Debtor and prepared in accordance with specified recipes and procedures (the "System").  In addition, prior to its closure following the Sale, the Debtor operated a Saladworks restaurant in Paoli, Pennsylvania (the "Paoli Store").

On the Petition Date, the Debtor was a party to one hundred and forty-nine (149) franchise agreements (collectively, the "Franchise Agreements") with one hundred and sixty-two (162) different franchisees (the "Franchisees").  In addition, the Debtor was a party to an additional one hundred and forty-one (141) Franchise Agreements where the Franchisee had not yet opened up its Saladworks franchise.  Pursuant to the Franchise Agreements, the Debtor provided Franchisees the use of the System, including its intellectual property and operating systems, operational support and coaching, training and centralization of purchasing.  In return, the Franchisees paid certain fees, including initial fees and related start-up fees, a royalty fee equal to five percent (5%) of the Franchisee's net sales[2] (the "Royalty Fees"), and either one and

---

[2] Net sales include all revenue generated from all business conducted by the Franchisee during the preceding weekly period, excluding all applicable sales tax or other related taxes, discounts and coupons.

one-half percent (1.5%) or three percent (3%) of net sales for marketing and other brand development costs (the "Marketing Fees, together with the Royalty Fees, the "Franchise Fees"). Although the Franchise Fees varied from year-to-year, they accounted for approximately seventy percent (70%) of the Debtor's revenue on an annual basis. Generally speaking, as set forth in the Franchise Agreements, all of the Franchisees recorded their net sales on centralized point-of-sale systems ("POS"). Through an electronic funds transfer program established in the Franchise Agreements, the Debtor would review the Franchisees net sales and transfer the requisite Franchise Fees from the Franchisee's bank accounts into one of the Debtor's bank accounts.

The Debtor also generated revenue from the Franchisees purchase of certain foodstuffs and required products, such as private label products, including purchases from designated or approved suppliers. The Debtor received certain administrative fees from various manufacturers, equipment vendors and suppliers. These administrative fees accounted for approximately twenty-seven percent (27%) of the Debtor's annual revenue. The Debtor's other revenue was derived from the initial franchise fees, additional fees and expenses related to services provided by the Debtor, and the transfer and/or sale of existing franchises.

## 2.2    THE DEBTOR'S CAPITAL STRUCTURE.

The Debtor's equity owners are J Scar Holdings, Inc. ("JS")[3] and JVSW LLC ("VH").[4] Pursuant to the Amended and Restated Limited Liability Company Agreement of Saladworks, LLC (the "Operating Agreement"), dated March 9, 2008, and that certain Contribution Agreement, dated March 9, 2008, JS owns a seventy percent (70%) interest in the Debtor through 700 Class A Membership Shares and VH owns a thirty percent (30%) interest in the Debtor through 300 Class C Membership Shares. As further described below, on March 25, 2013, VH sent the Put Notice (defined below) exercising its purported Put Right (defined below), which is subject to the Chancery Litigation (defined below).

The Debtor has no secured bank debt. The Debtor has no other known properly perfected secured debt obligations.

One of the Debtor's creditors, Federal Realty Investment Trust ("Federal"), filed a UCC-1 Financial Statement seeking to perfect a note (the "FRIT Note") that was executed by the Debtor under a settlement agreement wherein the Debtor was obligated to pay Federal $180,000. The Debtor and Federal also entered into a Security Agreement, which purported to secure the Debtor's obligations. The purported security interest was limited to the Debtor's right to receive Royalty Fees from two of its Franchisees in an amount equal to two times the amount of the monthly payments that are due under the FRIT Note or $15,000. As set forth above, the Royalty Fees are withdrawn from the Franchisee's account and the cash is placed in the Debtor's account. Thus, although Federal did file a UCC-1 Financial Statement, Federal has never properly perfected its interest in the Debtor's cash and only has an unsecured claim for the remaining amount outstanding under the Settlement Agreement.

---

[3] JS is wholly-owned by John M. Scardapane, who is the Chairman and member of the Debtor's board of directors.
[4] Upon information and belief, VH is wholly-owned or controlled by Vernon W. Hill, II, ("Hill") who is a former director and chairman of the executive committee.

Additionally, certain bank accounts of the Debtor were subject to writs of execution (the "Writs"), pursuant to the Pennsylvania Litigation (defined below). However, these Writs were extinguished pursuant to the Sale.

### 2.3   THE DEBTOR'S PREPETITION LITIGATION.

JS and VH are the Debtor's equity owners. Pursuant to the Contribution Agreement, VH made a capital contribution to the Debtor in the amount of $7,750,000. In exchange, VH received 300 Class C membership shares.

On March 25, 2013, VH sent a written notice (the "Put Notice") to the Debtor pursuant to Section 6.3 of the Operating Agreement demanding that the Debtor repurchase all of VH's Class C Membership Shares (the "Put Right"). Pursuant to the Put Right, VH demanded payment of $7.75 million, which was payable in 1/5 yearly installments commencing on May 25, 2013 following receipt of the Put Notice. In addition, on or about July 26, 2013, VH demanded payment of a guaranteed payment equal to the product of 1.9625% and $7.75 million (the "Guaranteed Payments"), which were due on a quarterly basis.

On October 20, 2014, VH filed an action in the Court of Chancery (the "Chancery Litigation") against the Debtor, JS and John M. Scardapane. In the Chancery Litigation, VH asserted six different counts: two direct claims: (a) failure to pay on the Put Right and (b) failure to make the Guaranteed Payments; and four derivative claims (the "Derivative Claims"): (c) fraud against Mr. Scardapane; (d) waste of company assets against Mr. Scardapane, (e) breach of fiduciary duty against Mr. Scardapane; and (f) unjust enrichment against Mr. Scardapane.

On or about December 3, 2014, Metro Bank commenced three separate lawsuits in Pennsylvania, one civil action and two confession of judgments (the "Pennsylvania Litigation") against the Debtor seeking amounts allegedly due and owing under four term loans extended to the Debtor by Metro Bank under Loan Numbers 3657695, 3798488, 3864788 and 9999992004 (collectively, the "Term Loans" and together with the Pennsylvania Litigation, the "Metro Bank Claims") in the aggregate amount of approximately $2.5 million.

Prepetition, Metro Bank obtained two confessed judgments relating to two of the Term Loans in the amounts of $466,467.26 and $1,388,769.58, respectively (the "Confessed Judgments"), which the Debtor has sought to overturn.

WS Finance LLC ("WS Finance")[5] has claimed that it is the assignee or purchaser of the amounts alleged to be due and owing under the Term Loans and the Confessed Judgments. On March 31, 2015, the Debtor filed the *Motion of the Debtor for Leave to Conduct Discovery Pursuant to Federal Rule of Bankruptcy Procedure 2004 and Local Rule 2004-1* [Docket No. 136] (the "2004 Motion") to investigate, among other things, the nature and extent of the Metro Bank Claims (in the hands of either Metro Bank or WS Finance) and the purported assignment or sale of such claims to WS Finance.

---

[5] Upon information and belief this Entity may be owned or controlled by either VH or Hill.

On or about January 29, 2015, WS Finance issued two Writs of Execution to the Sheriff of Montgomery County, Pennsylvania seeking to garnish the Debtor's bank accounts held at TD Bank to collect on the Confessed Judgments. On or about February 15, 2015, WS Finance issued one or more Writs of Execution to the Sheriff of Montgomery County, Pennsylvania seeking to garnish the Debtor's bank accounts held at M&T Bank.

Despite any purported or actual execution of the Writs, pursuant to the *Order (A) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (B) Authorizing the Continued Use of Existing Cash Management System, and (C) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(b)* [Docket No. 31] (the "Cash Management Order"), the Debtor was authorized to utilize these accounts in the ordinary course of business postpetition. As noted above, the Writs were extinguished pursuant to the Sale.

## 2.4    EVENTS LEADING TO THE BANKRUPTCY FILING.

Following the exercise of the Put Right, in May, 2013, the Debtor began exploring its strategic and financial alternatives in order to satisfy this obligation. On May 3, 2013, the Debtor's board of directors approved the engagement of Mufson, Howe and Hunter ("MHH") as financial advisor and investment banker to seek and execute a potential transaction to satisfy the Put obligation through a sale or purchase of VH's shares. MHH was unsuccessful it its efforts prior to its termination in March 2014. Although certain parties indicated interest in pursuing a transaction with the Debtor, given the Chancery and Pennsylvania Litigation and uncertainty surrounding the collection efforts of VH and Hill regarding the Put Right obligations, the Guaranteed Payments and the Metro Bank Obligations, the Debtor was unable to move forward with any potential transaction in a material way. Thus, although the Debtor believed that a refinancing or sale transaction would enable it to satisfy valid claims asserted against it, it was unable to maximize value and execute such a transaction outside the protections of a Chapter 11 proceeding.

In addition, the Chancery Litigation and the Pennsylvania Litigation had a negative impact on the Debtor's operations by impairing its ability to sell additional franchises and increase its footprint in the marketplace. While the Debtor had executed a number of Franchise Agreements, those Franchisees were unwilling to move forward with the opening of their Saladworks store until these issues were resolved. This resulted in the inability of the Debtor to capitalize on this additional revenue in the form of Franchise Fees or through its administrative fees.

WS Finance's repeated attempts to freeze the Debtor's bank accounts through the issuance of multiple writs of execution also prompted the Debtor to seek Chapter 11 relief. The Debtor's cash flow and ability to operate depended on using specific bank accounts that were capable of collecting Franchise Fees from Franchisees through electronic transfers (a "Franchise Fees Account"). Absent the protections afforded by the Bankruptcy Code, upon execution of a writ on its Franchise Fee Account, the Debtor would have had to develop an alternative means to collect the Franchise Fees. Based on state and federal banking regulations related to electronic transfers, the Debtor estimated that it would have taken approximately seven (7) weeks to complete such process and obtain the necessary authority and transferring capabilities to enable

the Debtor to transfer the Franchise Fees from the Franchisee's bank accounts to a new Debtor account, which would have severely disrupted the Debtor's cash flow and operations.

## 2.5    THE DEBTOR'S BANKRUPTCY PROCEEDINGS.

### 2.5.1    The Petition Date.
On February 17, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

### 2.5.2    The First Day Orders.
On the Petition Date, the Debtor filed several motions seeking certain relief by virtue of so-called first day orders. The first day orders assisted the Debtor in transitioning into operating as a debtor-in-possession by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior court approval. The first day orders in the Chapter 11 Case authorized, among other things:

- the continued maintenance of the Debtor's bank accounts, continued use of existing business forms and continued use of the Debtor's existing cash management system;
- the appointment of UpShot Services LLC as the noticing agent in this case;
- continued utility service during the pendency of the chapter 11 case; and
- payments to employees of accrued prepetition wages, salaries and benefits.

### 2.5.3    The Pursuit of a Sale or Recapitalization Transaction.
As explained above, the Debtor filed its Chapter 11 Case to engage in a process to either recapitalize itself or sell substantially all of its assets (a "Transaction") so that it could satisfy its valid outstanding obligations and, potentially, return value to stakeholders. To that end, on the Petition Date, the Debtor filed the *Motion of the Debtor and Debtor-In-Possession for Entry of an Order Approving Stalking Horse Procedures and Bid Procedures in Connection with a Transaction by Public Auction; (II) Scheduling a Hearing to Consider the Transaction; (III) Approving the Form and Manner of Notice Thereof; and (IV) Approving Contract Procedures* [Docket No. 14] (the "Procedures Motion"). Through the Procedures Motion, the Debtor sought entry of an order (i) approving stalking horse and bidding procedures in connection with a Transaction by public auction; (ii) scheduling a hearing to consider the Transaction; (iii) approving the form and manner of notice thereof; and (iv) approving contract procedures.

On March 11, 2015 the Court entered the *Order (I) Approving Stalking Horse Procedures and Bid Procedures in Connection with a Transaction by Public Auction; (II) Scheduling a Hearing to Consider the Transaction; (III) Approving the Form and Manner of Notice Thereof; and (IV) Approving Contract Procedures* [Docket No. 103] (the "Bid Procedures Order"). Pursuant to the Bid Procedures Order, the Debtor established stalking horse and bidding procedures in connection with a Transaction by public auction. The procedures were designed to maximize the value obtained from a sale of the Debtor's assets or recapitalization of its business.

On April 1, 2015, the Debtor filed the *Debtor's Expedited Motion for Entry of an Order Extending the Stalking Horse and Bid Deadlines* [Docket No. 144] (the "Motion to Extend") seeking an extension of the sale process to gain additional time to negotiate indications

of interests (the "IOIs"), select a stalking horse purchaser, and negotiate and execute a definitive transaction agreement. On April 9, 2015, the Court granted the Motion to Extend [Docket No. 154], which, among other things, extended the deadlines related to the Stalking Horse Procedures, the submission of Bids and the dates scheduled for the Auction and the Sale Hearing.

On April 23, 2015, the Debtor filed the *Debtor's Motion for Entry of an Order Approving Selection of Stalking Horse, Bid Protections and the Form of Asset Purchase Agreement* [Docket No. 183] (the "Stalking Horse Motion"). On May 1, 2015, the Court entered the *Order Approving Selection of Stalking Horse Bidder, Bid Protections and the Form of Asset Purchase Agreement* [Docket No. 214] (the "Stalking Horse Order") approving (i) the Debtor's selection of SW Acquisition Company, LLC ("SWAC") as the Stalking Horse Purchaser, (ii) certain bid protections and (iii) the form of that certain Asset Purchase Agreement dated April 22, 2015 by and between the Debtor and SWAC (the "Agreement").

On May 7, 2015, the Debtor filed the *Motion of the Debtor for Entry of an Order (I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of the Debtor Outside the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and Clear of all Liens, Claims, Encumbrances and Interests, (III) Authorizing the Assumption and Assignment or Rejection of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 219] (the "Sale Motion"). Through the Sale Motion, the Debtor sought Court approval of a sale of substantially all of the Debtor's assets (with the exception to those related to the Paoli Store) to SWAC (the "Sale").

With the assistance of the Debtor's investment banker, SSG Advisors, LLC, the Debtor ran a thorough and comprehensive marketing process. Prior to the Bid Deadline, the Debtor and its professionals contacted three hundred and thirteen (313) parties regarding a potential Transaction. Seventy (70) of those parties executed non-disclosure agreements. Ten (10) parties submitted non-binding indications of interest, which outlined a potential Transaction in which the party would serve as Debtor's stalking horse purchaser.

At the end of the expiration of the Bid Deadline, the only Qualified Bid received by the Debtor was that submitted by SWAC. As such, the Auction was cancelled and SWAC was deemed the Prevailing Bidder. [Docket No. 267].

On May 28, 2015, the Court entered an order approving the Sale Motion [Docket No. 280] (the "Sale Order") and, thus, authorizing the Sale of the Acquired Assets to SWAC. On June 12, 2015 (the "Closing Date"), the Sale to SWAC closed.

**2.5.4    The Bar Date Order.** On April 22, 2015, the Bankruptcy Court entered the Order [Docket No. 177] (the "Bar Date Order") granting the *Motion of the Debtor for Entry of an Order (A) Establishing Bar Dates for Filing Proofs of Claim (Including Claims Arising Under Section 503(b)(9) of the Bankruptcy Code) and Proofs of Interests; (B) Approving the Form and Manner for Filing Proofs of Claim and Proofs of Interest; and (C) Approving Notice Thereof* [Docket No. 135]. Pursuant to the Bar Date Order, each person or Entity asserting (i) a Claim against or equity Interest in the Debtor that arose (or was deemed to have arisen) before

the Petition Date and/or (ii) any right to payment constituting a cost or expense of administration of the Debtor's Chapter 11 Case under Bankruptcy Code sections 503(b) and 507(a)(2) against the Debtor that arose, accrued, or otherwise became due and payable or may have arisen, accrued or otherwise become due and payable at any time during the period from the Petition Date through and including April 30, 2015 were required to submit a proof of claim or interest form, as applicable, on or before May 29, 2015 at 4:00 p.m. (ET) (the "Bar Dates"). Additionally, pursuant to the Bar Date Order, all governmental units holding claims (whether secured, unsecured priority or unsecured non-priority) that arose (or are deemed to have arisen) before the Petition Date must file proofs of claim, including claims for unpaid taxes, whether such claims arise from prepetition tax periods or prepetition transactions to which the Debtor was a party, must file such proofs of claim so on or before August 17, 2015 at 4:00 p.m. (ET).

2.5.5    **The Committee.**    On February 26, 2015, the Office of the United States Trustee (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors in the Chapter 11 Case (the "Committee") consisting of: Sovran LLC, Eight Tower Bridge Development Associates ("Eight Tower Bridge") and Michael Bartell [Docket No. 48]. The Committee retained the law firm Klehr Harrison Harvey Branzburg LLP as its counsel. On June 17, 2015, the Committee was reconstituted based on the resignation of Eight Tower Bridge.

2.5.6    **Schedules and SOFAs.**    On March 19, 2015, the Debtor filed its *Schedule of Assets and Liabilities* [Docket No. 120] and *Statements of Financial Affairs* [Docket No. 119] (as amended or modified and together as, the "Schedules and Statements"). On March 26, 2015, the Debtor amended certain of its Schedules and Statements [Docket No. 128].

## 2.6    SECURED CLAIMS ENCUMBERING THE DEBTOR'S PROPERTY.

2.6.1    There are no Secured Claims encumbering the Debtor's property. As explained in section 2.2, the Debtor has no secured bank debt and the *de minimus* amount of property that was encumbered as of the Petition Date, which related to the Writs, was extinguished pursuant to the Sale.

## 2.7    ADMINISTRATIVE CLAIMS.

2.7.1    **Administrative Claims.**    Administrative Claims are Claims that are incurred in the ordinary course of the business during the pendency of the Debtor's case on or before the Effective Date. The Debtor estimates such Administrative Claims, excluding Fee Claims, as of the date hereof, to be approximately $321,000.

2.7.2    **Professional Fee Claims.**    General Fee Claims are Administrative Claims for the compensation of the Debtor's or the Committee's professionals or other entities for professional services rendered or expenses incurred in the Debtor's case on or before the Effective Date. All payments to Professionals for Fee Claims will be made in accordance with the procedures established in the Bankruptcy Code, the Bankruptcy Rules, the United States Trustee Guidelines and the Bankruptcy Court relating to the payment of interim and final compensation for services rendered and reimbursement of expenses. The Bankruptcy Court will review and determine all applications for compensation for services rendered and reimbursement of costs.

**2.8    UNSECURED CLAIMS AGAINST THE DEBTOR.**

**2.8.1    Unsecured Priority Claims.** According to the Debtor's Schedules, the Debtor owed, as of the Petition Date, $0.00 on account of tax Claims entitled to priority pursuant to Bankruptcy Code Section 507(a)(8). After reviewing the proofs of claim filed to date, the Debtor estimates that approximately $800.00 is owed on account of tax Claims entitled to priority treatment. In addition, the Debtor believes that there are no valid Priority Claims outstanding for employee wages and benefits.

**2.8.2    Unsecured Nonpriority Claims.** The Debtor's Schedules reflect unsecured nonpriority Claims against the Debtor in the approximate amount of $ 14,148,620.30 of which $11,402,946.11 is scheduled as contingent, unliquidated and disputed. Additionally, pursuant to the Sale, the Buyer satisfied approximately $600,000 of Claims asserted against the Debtor. In light of this and based on the Debtor's preliminary review of the remaining scheduled and Filed Claims, the Debtor estimates General Unsecured Claims total approximately $1.5 million, excluding any amounts on account of the WS Finance Claims, the Guaranteed Payment Claims, the Tax Distribution Claims and the Class C Claims.

**III.    SUMMARY OF THE PLAN OF REORGANIZATION.**

**3.1    IN GENERAL.**

The Plan provides for the liquidation and distribution of all of the Debtor's Assets to all holders of Allowed Claims and Allowed Interests pursuant to the terms of the Plan and the Liquidating Trust Agreement. The distributions contemplated under the Plan will be derived from the proceeds of the Sale.

If the Plan is confirmed by the Bankruptcy Court and consummated, Allowed Administrative Claims will be paid in full in Cash on the Effective Date or as soon thereafter as practicable. On the Distribution Date, holders of Allowed Priority Tax Claims will receive, at the option of the Debtor, either: (i) Cash in full, plus interest; (2) Cash in installment payments over a period of time not to exceed five years after the Petition Date in the total amount of such Claim, plus interest; or (3) such other treatment as may be agreed upon between the holder and the Debtor or as determined by the Bankruptcy Court. All other Allowed Claims and Allowed Interests will receive a distribution as set forth below in sections 3.2, 3.3 and 3.4.

**3.2    CLASSIFICATION OF CLAIMS AND INTERESTS.**

**3.2.1    Class 1: Priority Non-Tax Claims.** This Class consists of all Priority Non-Tax Claims, which are any Claim against the Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under Bankruptcy Code section 507(a). Class 1 is Unimpaired by the Plan, and each holder of a Class 1 Priority Non-Tax Claim is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f).

     **3.2.2**   **Class 2: Secured Claims.** This Class consists of all Secured Claims, which are either (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to Bankruptcy Code section 553, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code section 506(a) or (b) Allowed as such pursuant to the Plan. Class 2 is Unimpaired by the Plan, and each holder of a Class 2 Secured claim is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f).

     **3.2.3**   **Class 3: General Unsecured Claims.** This Class consists of all Allowed Claims that (i) are neither Secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court and (ii) are not an Administrative Claim, a Fee Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim, a WS Finance Claim, a Guaranty Payment Claim, a Tax Payment Claim or a Class C Claim. Class 3 is Impaired by the Plan and the General Unsecured Claim Settlement.

     **3.2.4**   **Class 4: WS Finance Claims.** This Class consists of all Claims related to or arising under claim number 38 filed by WS Finance, as may be amended, supplemented or superseded, or any other claim filed related to amounts alleged to be due and owing under the Term Loans. Class 4 is Unimpaired by the Plan, and each holder of an Allowed WS Finance Claim is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f).

     **3.2.5**   **Class 5: Guaranteed Payment Claims.** This Class consists of all Claims relating to a Guaranteed Payment as defined in the Operating Agreement. Class 5 is Unimpaired by the Plan, and each holder of an Allowed Guaranteed Payment Claim is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f).

     **3.2.6**   **Class 6: Tax Distribution Claims.** This Class consists of all Claims relating to a Tax Distribution as defined in the Operating Agreement. Class 6 is Unimpaired by the Plan, and each holder of an Allowed Tax Distribution Claim is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f).

     **3.2.7**   **Class 7: Class C Claims.** This Class consists of any claim asserted by any Entity arising under or relating to Class C Interests. Class 7 is Impaired and the Holders of Class C Claims are deemed to reject the Plan.

     **3.2.8**   **Class 8: Class C Interests.** This Class consists of interests related to Class C Membership Shares, as defined in the Operating Agreement. Class 8 is Unimpaired by the Plan, and each holder of an Allowed Class C Interest is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f).

     **3.2.9**   **Class 9: Class A Interests.** This Class consists of interests related to Class A Membership Shares, as defined in the Operating Agreement. Class 9 is Unimpaired by the Plan, and each holder of an Allowed Class A Interest is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f).

### 3.3     TREATMENT OF UNIMPAIRED CLAIMS AND CLASSES.

**3.3.1    Administrative Claims.**  Except with respect to Administrative Claims that are Fee Claims and except to the extent that a holder of an Allowed Administrative Claim and the Debtor agree to less favorable treatment with respect to such holder, each holder of an Allowed Administrative Claim shall be paid in full in Cash.  Such Claims shall be paid on the earlier of (a) the Effective Date if such Administrative Claim is Allowed as of the Effective Date if such Administrative Claim is Allowed or (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed, if such Administrative Claim is not Allowed as of the Effective Date.

**3.3.2    Priority Tax Claims.**  Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the Debtor, one of the following treatments: (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus interest at the rate determined under applicable non-bankruptcy law and to the extent provided for by Bankruptcy Code section 511; (2) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to Bankruptcy Code section 1129(a)(9)(C), plus interest at the rate determined under applicable non-bankruptcy law and to the extent provided for by Bankruptcy Code section 511; or (3) such other treatment as may be agreed upon by such holder and the Debtor or otherwise determined upon an order of the Bankruptcy Court.

**3.3.3    Class 1: Priority Non-Tax Claims.**  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Non-Tax Claim, each holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash.  Allowed Priority Non-Tax Claim shall be paid on or as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Non-Tax Claim against the Debtor becomes an Allowed Priority Non-Tax Claim or (iii) such other date as may be ordered by the Bankruptcy Court.

**3.3.4    Class 2: Secured Claims.**  Except to the extent that a holder of an Allowed Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Secured Claim, each holder of an Allowed Secured Claim shall either (a) be paid in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim; (b) receive all Collateral in possession of the Debtor securing the respective holder's Allowed Secure Claim; or (c) such other treatment as the Liquidating Trustee or Debtor and such Creditor agree to in writing.

**3.3.5    Class 4: WS Finance Claims.**     To the extent Allowed by a Final Order of the Bankruptcy Court, Class 4 Claims will be Reinstated pursuant to Bankruptcy Code section 1142(2) and paid pursuant to the terms of the loan documents underlying the Allowed WS Finance Claims, if any.

**3.3.6    Class 5: Guaranteed Payment Claims.**  To the extent Allowed by a Final Order of the Bankruptcy Court and after payment in full of all Allowed Administrative Claims, Priority Claims, Priority Non-Tax Claims, Secured Claims, WS Finance Claims and General Unsecured Claims and the establishment of all Reserved Funds, Guaranteed Payment Claims shall be paid *pari passu* with all Allowed Tax Distribution Claims on the later of the Effective Date or the date such date such Guaranteed Payment Claims becomes an Allowed Claim.

**3.3.7    Class 6: Tax Distribution Claims.**  After payment in full of all Allowed Administrative Claims, Priority Claims, Priority Non-Tax Claims, Secured Claims, WS Finance Claims and General Unsecured Claims and the establishment of all Reserved Funds, all Allowed Tax Distribution Claims shall be paid *pari passu* with all Allowed Guaranteed Payment Claims on the Effective Date or with respect to the 2015 Tax Claim, within fifteen (15) days of filing of the Debtor's 2015 tax returns.

**3.3.8    Class 8: Class C Interests.**  Class C Interests shall receive all remaining Cash after establishment of the Reserved Funds, and payment in full of all Class 1 through 6 Claims.

**3.3.9    Class 9: Class A Interests.**  Class A Interests shall receive all remaining Cash after establishment of the Reserved Funds, and payment in full of all Class 1 through 6 and Class 8 Interests.

**3.4    TREATMENT OF IMPAIRED CLASSES.**

**3.4.1    Class 3: General Unsecured Claims.**  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed General Unsecured Claim, each holder of such Allowed General Unsecured Claim shall be paid in full in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Claim.  As part of the General Unsecured Claim Settlement, each holder of an Allowed General Unsecured Claim that votes in favor of the Plan, and does not opt-out on the Class 3 ballot, shall waive its right to interest on its Allowed General Unsecured Claim and affirmatively consent to the Scardapane Release.

**3.4.2    Class 7: Class C Claims.**  On the Effective Date, Class 7 Class C Claims shall be deemed Disallowed pursuant to Bankruptcy Code section 510(b) and the treatment of Class C Interests.  Class C Claims shall not be entitled to receive or retain any property or interest on account of such claims.

**3.5    IMPLEMENTATION OF THE PLAN.**

**3.5.1    Liquidating Trust.**

**(a) Creation of Liquidating Trust.**  On the Effective Date, the Liquidating Trust shall be created in accordance with the Liquidating Trust Agreement and funded by the Debtor's transfer to the Liquidating Trust of all Assets of the Debtor's Estate.  The Liquidating Trust shall be a newly-formed Delaware trust with no prior assets or liabilities.  The Liquidating Trustee shall serve as the trustee of the Liquidating Trust.

**(b) Transfers to the Liquidating Trust.** On the Effective Date, the Debtor and its Estate shall transfer and shall be deemed to have irrevocably transferred to the Liquidating Trust, all Assets of the Estate, which transfer shall be free and clear of Claims and Liens and contractually imposed restrictions.

**(c) The Liquidating Trustee.** From and after the Effective Date, a Person appointed by the Debtor shall serve as the Liquidating Trustee pursuant to the Liquidating Trust Agreement, Plan, and Confirmation Order, until death, resignation or discharge and the appointment of a successor Liquidating Trustee in accordance with the terms of the Liquidating Trust Agreement. The Liquidating Trustee shall be the exclusive trustee of the Debtor's Estate under Title 11 for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 601(b)(3).

**(d) Responsibilities of the Liquidating Trustee.** The responsibilities of the Liquidating Trustee under the Liquidating Trust Agreement and the Plan shall include those set forth in the Liquidating Trust Agreement, including, without limitation, the following (a) the receipt of the Assets; (b) the establishment and maintenance of such operating, reserve and trust account(s) as are necessary and appropriate to carry out the terms of the Liquidating Trust; (c) the investment of Cash; (d) the pursuit of objections to, estimation of and settlements of Claims and Interests, regardless of whether such Claim or Interest is listed on the Debtor's Schedule; (e) the prosecution of any cause of action of the Debtor's Estate not otherwise released under the Plan; (f) the calculation and distribution of all distributions to be made under the Plan to holders of Allowed Claims and Interests; (g) the filing of all required tax returns and operating reports and paying of taxes and all other obligations on behalf of the Liquidating Trust, if any; (h) the payment of fees pursuant to 28 U.S.C. § 1930 incurred after the Effective Date until the closing of the Chapter 11 Case; (i) to respond to reasonable requests for information regarding the administration of the Liquidating Trust made by parties in interest; and (j) such other responsibilities as may be vested in the Liquidating Trustee pursuant to the Plan, the Liquidating Trust Agreement, the Confirmation, other Bankruptcy Court Orders, or as otherwise may be necessary and proper to carry out the provisions of the Plan.

**(e) Powers of Liquidating Trustee.** The powers of the Liquidating Trustee, as set forth in the Liquidating Trust Agreement shall include, without limitation and without further Bankruptcy Court approval, each of the following:

      i.    To exercise all power and authority that may be or could have been exercised, commence all proceedings that may be or could have been commenced and take all actions that may be or could have been taken by any member, officer, director or shareholder of the Debtor with like effect as if authorized, exercised and taken by unanimous action of such officers, directors and shareholders, including, without limitation, amendment of the Operating Agreement and the dissolution of the Debtor;

      ii.    To maintain accounts, to make distributions to holders of Allowed Claims and Interests provided for or contemplated in the Plan; and take other actions consistent with the Plan and the implementation thereof, including the establishment, re-evaluation, adjustment and maintenance of appropriate reserves, in the name of the Liquidating Trustee;

iii.     To object to any Claims or Interests, to compromise or settle any Claims or Interests prior to objection without supervision or approval of the Bankruptcy Court, free of any restriction of the Bankruptcy Code, the Bankruptcy Rules, the local rules of the Bankruptcy Court, and the guidelines and requirements of the United States Trustee, other than those restrictions expressly imposed by the Plan, the Confirmation Order or the Liquidating Trust Agreement;

iv.     To make decisions, without further Bankruptcy Court approval, regarding the retention or engagement of professionals, employees and consultants by the Liquidating Trust, the Liquidating Trustee on the Estate's behalf and to pay the fees and charges incurred by the Liquidating Trustee on the Liquidating Trust's behalf on or after the Effective Date for fees and expenses of professionals (including those retained by the Liquidating Trustee), disbursements, expenses or related support services relating to the winding down of the Debtor and implementation of the Plan without application to the Bankruptcy Court;

v.     To (i) seek a determination of tax liability under Bankruptcy Code section 505, (ii) pay taxes, if any, related to the Debtor or the sale of non-Cash Assets of the Debtor, (iii) file, if necessary, any and all tax and information returns required with respect to the Liquidating Trust as a grantor trust pursuant to Treas. Reg. 1.671-4(a) or otherwise, (iv) make tax elections by and on behalf of the Liquidating Trust and (v) pay taxes, if any, payable by the Liquidating Trust;

vi.     To take all other actions not inconsistent with the provisions of the Plan which the Liquidating Trustee deems reasonably necessary or desirable with respect to administering the Plan;

vii.     To invest Cash as deemed appropriate by the Liquidating Trustee, as further set forth in the Liquidating Trust Agreement;

viii.     To collect any accounts receivable or other claims of the Debtor or Estate not otherwise disposed of pursuant to the Plan or the Confirmation Order;

ix.     To implement and/or enforce all provisions of the Plan, including entering into any agreement or executing any document required by or consistent with the Plan, the Confirmation Order and the Liquidating Trust Agreement, and perform all of the Debtor's obligations thereunder;

x.     To abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization of tis choice, any assets if the Liquidating Trustee concludes they are no benefit to the Estate;

xi.     To prosecute and/or settle Claims or Interests, without approval of the Bankruptcy Court, including Causes of Action and exercise, participate in or initiate any proceeding before the Bankruptcy Court or any other court of appropriate jurisdiction and participate as a party or otherwise in any administrative, arbitrative or other nonjudicial proceeding and pursue to settlement or judgment such actions;

        xii.    To purchase or create and carry all insurance policies and pay all insurance premiums and costs the Liquidating Trustee deems necessary or advisable;

        xiii.    To collect and liquidate and/or distribute all Assets of the Estate pursuant to the Plan, the Confirmation Order and the Liquidating Trust Agreement and administer the winding down of the Debtor's affairs;

        xiv.    To hold any legal title to any and all of the Assets;

        xv.    If any of the Assets are situated in any state or other jurisdiction in which the Liquidating Trustee is not qualified to act as trustee, to nominate and appoint a Person duly qualified to act as trustee in such state or jurisdiction and require from each such trustee such security as may be designated by the Liquidating Trustee in its discretion; confer upon such trustee all the rights, powers, privileges and duties of the Liquidating Trustee hereunder, subject to the conditions and limitations of the Liquidating Trust Agreement, except as modified or limited by the Liquidating Trustee and except where the conditions and limitations may be modified by the laws of such state or other jurisdiction (in which case, the laws or the state or jurisdiction in which the trustee is action shall prevail to the extent necessary); require such trustee to be answerable to the Liquidating Trustee for all monies, assets and other property that may be received in connection with the administration of all property; and remove such trustee, with or without cause, and appoint a successor trustee at any time by the execution by the Liquidating Trustee of a written instrument declared such trustee removed from office, and specifying the effective date and time of removal;

        xvi.    Retain any and all Insurance Policies of the Debtor providing coverage with respect to Claims; and

        xvii.    Exercise such other powers as may be vested in or assumed by the Liquidating Trustee pursuant to the Plan, the Liquidating Trust Agreement, the Confirmation Order, other orders of the Bankruptcy Court, or as may be necessary and proper to carry out the provisions of the Plan.

The Liquidating Trustee shall stand in the same position as the Debtor with respect to any claim the Debtor may have to an attorney-client privilege, the work-product doctrine, or any other privilege, and the Liquidating Trustee shall succeed to all of the Debtor's rights to preserve, assert or waive any such privilege.

        **(f)  Unclaimed Property of the Liquidating Trust.**  The Liquidating Trustee shall establish the Unclaimed Property Reserve for all Unclaimed Property.  Such Unclaimed Property shall be in held in a reserve, for a period of fifteen (15) days, for the recipients of the beneficial interests in the Liquidating Trust entitled thereto under the terms of the Plan and confirmation Order.  Once the distribution to Creditors or Equity Interest holders becomes Unclaimed Property, the Liquidating Trustee shall, subject to the limitations set forth herein, (a) hold such Unclaimed Property in the Unclaimed Property Reserve solely for the benefit of such holder or holders which have failed to claim such Unclaimed Property; and (b) release the Unclaimed Property from the Unclaimed Property Reserve and deliver to the holder entitled thereto upon presentation of proper proof by such holder of its entitlement thereto.  After the

expiration of fifteen (15) days, the holders of Allowed Claims or Allowed Interest theretofore entitled to such Unclaimed Property shall cease to be entitled thereto and shall be entitled to no further distribution under the Plan, and such Claims or Interests shall be deemed disallowed and expunged in their entirety and the funds shall be redistributed to the other holders of Allowed Claims and Interests in accordance with the terms of the Plan, Confirmation Order and Liquidating Trust Agreement. Such funds shall not be subject to the escheat laws of any state.

(g) **Compensation of the Liquidating Trustee.** The Liquidating Trustee shall be compensated as agreed upon by the Liquidating Trustee and the Debtor, pursuant to the terms of the Liquidating Trust Agreement. Any professionals retained by the Liquidating Trustee shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred, subject to approval by the Liquidating Trustee. The payment of fees and expenses of the Liquidating Trustee and its professionals shall be made in the ordinary course of business and shall not be subject to Bankruptcy Court approval.

(h) **Sale Free and Clear of Liens.** The sale or other disposition of any Assets by the Liquidating Trustee in accordance with the Plan and the Liquidating Trust Agreement shall be free and clear of any and all liens, claims, interests and encumbrances pursuant to Bankruptcy Code section 363(f).

(i) **Transfer Taxes.** Any transfer of all or any portion of the Assets pursuant to the Plan shall constitute a "transfer under a plan" within the purview of Bankruptcy Code section 1146(c) and shall not be subject to any stamp tax or similar tax.

(j) **Causes of Action.** The Liquidating Trustee shall have the sole right to pursue any existing or potential Cause of Action, except those previously waived or released by the Debtor, by informal demand and/or commencement of litigation.

(k) **Effective Date.** On the Effective Date, the Liquidating Trustee shall have the rights and powers set forth herein in order to carry out and implement the purposes and intent of the Plan.

(l) **Records.** On or prior to the Effective Date, the Debtor shall transfer to the Liquidating Trust all originals and/or copies of available documents and business records of the Debtor, to the extent they exist and are in the Debtor's possession. The Liquidating Trust shall maintain such records until the earlier of: (a) the entry of a Final Decree; or (b) five years from the filing of the Debtor's final tax returns. Thereafter, said records may be destroyed or otherwise disposed of. If the Liquidating Trustee seeks to destroy or otherwise dispose of any records of the Debtor's Estate prior to the time periods set forth herein, the Liquidating Trustee shall be entitled to do so upon Final Order of the Bankruptcy Court after notice and a hearing.

(m) **Resignation of Officers and Directors.** On the Effective Date, the members of the board of directors and officers of the Debtor shall be deemed to have resigned.

### 3.5.2    Cancellation of Existing Securities.

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan, on the Effective Date, the obligations of the Debtor pursuant,

relating or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtor (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligations of the Debtor that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, however, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the holder of a Claim against any Debtor shall continue in effect solely for purposes of enabling holders of Allowed Claims to receive distributions under the Plan as provided herein; *provided, further, however,* that the preceding provision shall not affect the discharge of Claims against or Interests in any Debtor pursuant to the Bankruptcy Code, the Confirmation Order or the Plan or result in any expense or liability to the Debtor, except to the extent set forth in or provided for under the Plan.

### 3.5.3    Preservation of Causes of Action.

In accordance with Bankruptcy Code section 1123(b), the Liquidating Trustee may pursue the Causes of Action in its discretion. The Liquidating Trustee expressly reserves all rights to prosecute any and all Trust Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Debtor and the Liquidating Trust expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to the Causes of Action upon, after or as a consequence of the Confirmation or Consummation. In accordance with Bankruptcy Code section 1123(b)(3), the Liquidating Trustee may exclusively enforce any and all Causes of Action. The Liquidating Trustee shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any Cause of Action and to decline to do any of the foregoing without further notice to or action, order or approval of the Bankruptcy Court.

### 3.5.4    Vesting of Assets.

Except as otherwise explicitly provided in the Plan, on the Effective Date all property comprising the Debtor's Estate shall vest in the Liquidating Trust to the same extent such Assets were held by the Debtor, free and clear of all Claims, Liens, charges, encumbrances, rights and Interests of creditors and interest holders. As of the Effective Date, the Liquidating Trustee may use, acquire and dispose of property and settle and compromise Claims and Interests subject only to the restrictions expressly imposed by the Plan, the Liquidating Trust Agreement and the Confirmation Order.

## 3.6    FUNDING AND DISBURSEMENTS.

### 3.6.1    No Disbursing Agent. The Liquidating Trustee, pursuant to the Liquidating Trust Agreement, shall make all distributions under the Plan on account of Allowed Claims against, and Allowed Interests in, the Debtor. On the Effective Date, or as soon thereafter

as practicable, the Liquidating Trustee shall make distributions on required pursuant to the Plan. All other distributions or payments under the Plan shall be made by the Liquidating Trustee pursuant to the terms of the Plan, Confirmation Order and the Liquidating Trust Agreement.

**3.6.2    Reserves - Payment of Disputed Claims.** The Reserved Funds shall be segregated and held by the Liquidating Trustee on and after the Effective Date for the payment of Allowed Claims or Disputed Claims.  If a Claim for which allowance is pending becomes an Allowed Claim, such Claim shall be paid from the Reserved Funds pursuant to the terms of the Plan within ten (10) days following a Final Order allowing such Claim.

**3.6.3    Cash Payments.** Cash payments made pursuant to the Plan shall be in U.S. funds, by the means agreed to by the payor and payee, including by check or wire transfer or, in the absence of an agreement, such commercially reasonable manner as the Liquidating Trustee shall determine in his sole discretion.

**3.6.4    Distribution for Allowed Claims and Allowed Interests.** Except as otherwise provided in the Plan or the Confirmation Order, or as otherwise ordered by the Bankruptcy Court, distributions to Allowed Claims or Allowed Interests shall be made on the Distribution Date, or as soon after as practicable.

No holder of a Disputed Claim shall have any Claim against the applicable Reserved Funds, the Liquidating Trustee, the Liquidating Trust, the Debtor or the Estate with respect to such Disputed Claim until such Disputed Claim becomes an Allowed Claim, and no holder of a Disputed Claim shall have any right to interest on such Disputed Claim except as provided in the Plan.

**3.6.5    Interest and Charges.** Other than with respect to the General Unsecured Claim Settlement and the Scardapane Settlement, interest shall accrue and be paid on Allowed Claims.  Unless otherwise set forth in any applicable contract, interest shall be the Federal Judgment Rate.  All interest earned on the funds held by the Liquidating Trust in any account shall be distributed with the distributions provided in the Plan.

**3.6.6    Compliance with Tax Requirements.** In connection with the Plan, to the extent applicable, the Liquidating Trust shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Liquidating Trust shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Liquidating Trust reserves the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

To the extent a holder of an Allowed Claim or Allowed Interest does not timely provide the Liquidating Trust all necessary documentation necessary to determine all tax withholding and reporting requirements for such Allowed Claim or Allowed Interest, the Liquidating Trust shall not be required to make a distribution on such Allowed Claim or Allowed Interest.

**3.6.7    Allocations.**  Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

**3.6.8    Fractional Dollars: *De Minimis* Distributions.**  Notwithstanding any other provision of the Plan, the Liquidating Trustee shall not be required to make distributions or payments of fractions of dollars, and whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made shall reflect a rounding down of such fraction to the nearest whole dollar.  In addition, the Liquidating Trustee shall not be required to make any distribution in an amount less than $50.00.  To the extent that such a distribution shall be called for as part of any interim distribution, the Liquidating Trustee shall establish a reserve for all distributions in the amount of less than $50.00 and shall, when and if the holder of a Claim or Interest is entitled to a distribution of $50.00 or more, make such distribution at such time.  The Liquidating Trustee shall not be required to make any Final Distribution of less than $50.00 and all monies otherwise payable in such amount shall be paid to the other holders of Allowed Claims and Interests, in accordance with the terms of the Plan, the Confirmation Order and the Liquidating Trust Agreement.

**3.6.9    Delivery of Distributions to Holders of Allowed Claims and Interests.**  Distributions to holders of Allowed Claims and Allowed Interests shall be made at the address set forth in the Schedules unless such addresses are superseded by proofs of claim or interest or transfers of claims filed pursuant to Bankruptcy Rule 3001 or at the last known address of such holders if the Liquidating Trustee has been notified in writing of a change of address.  If the distribution to any holder of an Allowed Claim or Interest is returned to the Liquidating Trustee as undeliverable or otherwise unclaimed, such Unclaimed Property shall be held in a reserve as set forth in Section IV.6 of the Plan.

If there are any residual Unclaimed Distributions at the time of the dissolution of the Liquidating Trust, such residual Unclaimed Distributions shall be available for a subsequent Distribution or donated to a charitable organization at the sole discretion of the Liquidating Trustee.

**3.6.10   No Penalty Claims.**  Unless otherwise specifically provided for in the Plan or the Confirmation Order, no holder of any Claim will be entitled to allowance of, or to receive any payment on account of, any penalty arising with respect to or in connection with such Claim and any such penalty shall be deemed disallowed and expunged.

**3.6.11   Setoffs and Recoupment.**  The Liquidating Trust may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtor may have against the claimant pursuant to Bankruptcy Code section 558 or otherwise, but neither

the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or the Liquidating Trust of any such Claim it may have against the holder of such Claim.

Unless otherwise authorized by a Final Order, any holder of a Claim, other than a holder of a Governmental Claim, must assert any setoff rights against a Claim by the Debtor against such Entity by filing an appropriate motion seeking authority to setoff on or before the Confirmation Date or will be deemed to have waived and be forever barred from asserting any right to setoff against a Claim by a Debtor or Liquidating Trust, notwithstanding any statement to the contrary in a Proof of Claim or any other pleading or document Filed with the Bankruptcy Court or delivered to the Debtor.

**3.6.12 Distributions by the Liquidating Trust.** The Liquidating Trustee shall not be obligated to make a distribution that would impair the ability of the Liquidating Trust to pay the expenses incurred by the Liquidating Trust.

### 3.6.13 Claims Paid or Payable by Third Parties.

**(a)    Claims Paid by Third Parties.** The Liquidating Trust shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtor or Liquidating Trust. Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtor or Liquidating Trust on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the Liquidating Trust, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the Liquidating Trust annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

**(b)    Claims Payable by Third Parties.** No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant the Debtor's Insurance Policies until the holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtor's insurers agrees to satisfy in full or in part a Claim, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

**(c)    Applicability of Insurance Policies.** Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy.

### 3.7    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

**3.7.1    Assumption and Rejection of Executory Contracts and Unexpired Leases.** On the Effective Date, and except for Insurance Policies assumed hereunder, all Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease: (i) was assumed or rejected previously by the Debtor; (ii) previously expired or terminated pursuant to its own terms; or (iii) is the subject of a motion to assume Filed on or before the Effective Date.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejection of such Executory Contracts or Unexpired Leases pursuant to Bankruptcy Code sections 365(a) and 1123. Unless otherwise indicated, rejection of Executory Contracts and Unexpired Leases pursuant to the Plan shall be effective as of the Effective Date.

**3.7.2    Claims Based on Rejection of Executory Contracts or Unexpired Leases.** Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtor, the Debtor's Estate, its property or Liquidating Trust without the need for any objection by the Liquidating Trust or further notice to, or action, order or approval of the Bankruptcy Court. Claims arising from the rejection of the Debtor's Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Class 3 of the Plan.

**Rejection Claims for which a Proof of Claim is not timely Filed will be forever barred from assertion against the Debtor, its Estate, its property and the Liquidating Trust unless otherwise ordered by the Bankruptcy Court. Such Rejection Claims shall, as of the Effective Date, be subject to the discharge and permanent injunction.**

**3.7.3    Insurance Policies.** All of the Debtor's Insurance Policies and any agreements, documents or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtor shall be deemed to have assumed all Insurance Policies and any agreements, documents and instruments related thereto and assigned them to the Liquidating Trust.

**3.7.4    Indemnification Obligations.** Except as otherwise provided in the Plan, the Confirmation Order or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, any and all Indemnification Obligations that the Debtor has pursuant to a contract, instrument, agreement, certificate of incorporation, by-law, comparable organizational document, including the Operating Agreement, or other document or applicable law shall be rejected as of the Effective Date of the Plan, to the extent necessary.

## 3.8    RESOLUTION OF CLAIMS.

3.8.1    **Allowance of Claims and Interests.**    After the Effective Date, the Liquidating Trust shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately before the Effective Date.

3.8.2    **Claims Administration Responsibilities.**    Except as otherwise specifically provided in the Plan, after the Effective Date, the Liquidating Trust shall have the sole authority: (i) to File, withdraw or litigate to judgment objections to (i) Claims and Interests; (ii) to settle or compromise any Claim or Interest, that is a Disputed Claim or Interest without any further notice to or action, order or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court.

3.8.3    **Estimation of Claims.**    Before or after the Effective Date, the Debtor or Liquidating Trust, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to Bankruptcy Code section 502(c) for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the Liquidating Trust may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

3.8.4    **Adjustment to Claims or Interests Without Objection.**    Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan), or any Claim or Interest whose treatment has been deemed modified by the Plan, may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Liquidating Trust, without a Claims objection or any other notice or motion having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

3.8.5    **Time to File Objections to Claims.**    Any objection to Claims against the Debtor shall be Filed on or before the Claims Objection Deadline.

3.8.6    **Disallowance of Claims.**    Except as provided herein or otherwise agreed, any and all Proofs of Claim or Interest Filed after the Claims Bar Date or Administrative Claims Bar Dates, as applicable, shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.

**3.8.7    Disallowance of Class C Claims.**  Pursuant to Bankruptcy Code section 510(b) and the treatment of Class C Interests, all Class C Claims shall be deemed disallowed in their entirety.

**3.8.8    Amendments to Claims.**  On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Liquidating Trust, unless the proposed amended Claim is for a lesser amount than the original Claim.  Absent such authorization, any new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

**3.8.9    Alternative Claim Resolution Procedures.**  The Debtor may file, as part of the Plan Supplement, alternative dispute resolution-based claim resolution procedures applicable to certain contingent, unliquidated or disputed claims (which are disputed on grounds other than the amount of the Claim), which shall become part of the Plan and effective on the Effective Date.

**3.8.10    Tax Implications for Recipients of Distributions.**  Notwithstanding any other provision of the Plan, each Entity receiving a distribution of Cash or other consideration pursuant to the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any Governmental Unit on account of the distribution, including income, withholding and other tax obligations.

**3.8.11    No Levy.**  Except as otherwise provided herein, distributions under the Plan on account of Allowed Claims or Allowed Interests shall not be subject to levy, garnishment, attachment or like legal process, so that each holder of an Allowed Claim or Allowed Interest shall have and receive the benefit of the distributions in the manner set forth in the Plan.

**3.8.12    Offer of Judgment.**  The Liquidating Trust is authorized to serve upon a holder of a Claim or Interest an offer to allow judgment to be taken on account of such Claim, and pursuant to Bankruptcy Rule 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment.  To the extent the holder of a Claim must pay the costs of the Liquidating Trust, after making of such offer, the Liquidating Trust is entitled to setoff such amounts against the amount of any distribution to be paid to such holder without any further notice or action, order or approval of the Bankruptcy Court.

**3.8.13    Release of Liens Securing Disputed Claims.**  If a Secured Claim is a Disputed Claim, the holder of such claim shall be deemed to have released any Lien on its collateral, if any, pending determination of its Allowed Secured Claim, upon: (i) payment to the holder of such Disputed Claim the undisputed portion of such Secured Claim; and (ii) the placement of the disputed portion thereof into escrow.

**3.8.14    No Distributions Pending Allowance.**  If an objection to a Claim or Interest or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest or portion thereof unless and until such Disputed Claim becomes an Allowed Claim or Allowed Interest.

        **3.8.15** **Distributions After Allowance.**  To the extent that a Disputed Claim or Disputed Interest ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Interest in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Liquidating Trust shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.

     **3.9**     **SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS.**

        **3.9.1** **Compromise and Settlement of Claims, Interests and Controversies.** Pursuant to Bankruptcy Code sections 363 and 1123 and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim against or Interest in any Debtor may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and holders, and is fair, equitable and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Code section 363 and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Liquidating Trust may compromise and settle Claims against them any Causes of Action against Entities that are Retained Causes of Action.

        **3.9.2** **Scardapane Entities Settlement.**  Pursuant to Bankruptcy Code sections 363 and 1123 and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of the Scardapane Potential Litigation.  The Scardapane Potential Litigation refers to the Claims filed by the Scardapane Entities against the Debtor and the Claims and Causes of Action that the Debtor possesses or may possess against the Scardapane Entities.

        **(a)**    **Claims Asserted by the Scardapane Entities.**  The Scardapane Entities have filed various administrative and unsecured proofs of claims against the Debtor in the aggregate amount of $2,083,844, including estimated liquidated amounts, and excluding the Tax Payment Claims and the Advancement.  The Scardapane Entities' Claims may be viewed by accessing the Debtor's claims register at: www.upshotservices.com/saladworks.  Additionally, the Debtor has been advised that one or more of the Scardapane Entities is prepared to assert Claims in connection with the assignment of leases held by Saladworks Development, Inc. and Saladworks Holdings NJ, LLC to SWAC, which was a condition to closing of the Sale.  Such Claims could be based on the net sales of the stores subject to the underlying leases or on a percentage that such stores contributed to the total enterprise.  Regardless of how they are calculated, such Claims have the potential to be substantial.  These unfiled Claims are resolved as part of the Scardapane Settlement.

(b)    **Potential Claims Against the Scardapane Entities.**  The Debtor and, separately, its independent board members, have reviewed the Derivative Claims asserted in the Chancery Litigation and assessed the existence and viability of other potential Claims and Causes of Action that may exist against the Scardapane Entities. Such claims are generally described on the chart annexed hereto as "Exhibit C."[6]

(c)    **Terms of the Scardapane Settlement.**    After extensive negotiations among the Debtor, the Creditors' Committee and the Scardapane Entities, the parties reached an agreement resolving the Scardapane Potential Litigation, approval of which is being sought pursuant to the Plan.  The terms of the Scardapane Settlement are as follows:

- The Scardapane Claims, other than the Tax Payment Claims, shall be subordinated to the holders of all Allowed Class 3 Claims and reduced and Allowed in the amount of $550,000 (the "Allowed Scardapane Entities General Unsecured Claims").

- The Tax Distribution Claims shall be Allowed in the amount of (a) $1,277,349.00 (estimated) for 2013 taxes; (b) $0.00 (estimated) for 2014 taxes; and (c) an amount to be determined by the Debtor's retained tax professional, St. Clair CPAs, P.C. for 2015 taxes (the "2015 Tax Claim").

- The claims of any of the Scardapane Entities for indemnification and advancement under the Operating Agreement ("Advancement Claims"), including amounts incurred by Cole Schotz P.C., shall be an Allowed General Unsecured Claim, provided, however, that prior to an entry of an order confirming the Plan, the Debtor shall only pay up to $150,000 in Advancement Claims.  Upon the Effective Date, and following the establishment of the Reserved Funds and the payment of all holders of Allowed General Unsecured Claims, there shall be no cap on the Advancement Claims and such Allowed Advancement Claims, including any Advancement Claims in excess of the $150,000 incurred prior to or after the entry of an order confirming the Plan, shall be paid to Cole Schotz P.C. on the Effective Date or as soon as practicable thereafter and upon being earned if after the Effective Date.

- The Scardapane Entities will continue their efforts to facilitate the sale of the Debtor's assets, including using their best efforts to obtain landlord consents to the assignment of Saladworks Development, Inc. and Saladworks Holdings NJ, LLC Leases.

---

[6] The description of the potential Claims set forth herein and in Exhibit C has been outlined only generally so as not to prejudice the Debtor's ability to prosecute such claims in the event the Scardapane Entities Settlement is not approved as contemplated by the Plan.  For the same reason, the Debtor has not set forth in detail its analysis of potential defenses to any such Claims.

- The Debtor and Eatnic, LLC shall agree to enter into a consensual order resolving the proposed rejection of sublease dated July 7, 2014 (the "Sublease") between Eatnic, LLC and the Debtor, that will provide for, *inter alia*, (a) an agreed effective date for rejection or assignment of the Sublease to Eatnic, LLC; (b) an agreed allowed amount of a lease rejection damages claim, which shall be included as part of the Allowed Scardapane Entities General Unsecured Claims; and (c) the as is, where is transfer (without representation or warranties of any kind and for consideration to be negotiated by the Debtor and Eatnic, LLC at arm's length and in good faith and included in the order rejecting the Sublease) of the Debtor's right, title and interest in all of the equipment at the Debtor's location at 231 West Lancaster Avenue, Paoli, PA, together with all rights, claims and defenses of the Debtor under that certain Lease Agreement by and between the Debtor and HSS Leasing, LLC, dated as of October 11, 2011 and any amendments and addenda thereto.

- The Scardapane Entities will vote in favor and take all actions necessary to support the Plan.

- Upon the Effective Date of the Plan, all of the Scardapane Potential Litigation shall be deemed resolved pursuant to the Plan and the parties shall exchange mutual releases as set forth in Article VIII.H of the Plan.

- The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of the Scardapane Entities Settlement, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtor, its Estate and stakeholders, and is fair, equitable and reasonable.

The Debtor believes that the Scardapane Settlement embodied in the Plan is fair and reasonable and in the best interests of the Debtor's estate. It is the product of extensive, arms' length negotiations between the Debtor, the Committee and the Scardapane Entities. The Plan takes into account the impact litigation would be expected to have on the value of the Debtor's estate and Claim and Interest holders' recoveries. Unbounded litigation on all conceivable claims would necessarily expand the scope of such litigation, and with it the costs, complexities and delay attendant thereto. In light of the Debtor and the Scardapane Entities' view of the litigation uncertainties and the clear and substantial savings in terms of cost and time value of money that will be realized for the estate and ultimately its creditors through a prompt resolution of the issues, the Debtor has concluded that the Scardapane Settlement is in the best interests of all parties in interest in this Chapter 11 Case. Accordingly, the Debtor submits that the Scardapane Settlement, embraced by the Committee, embodies a fair and reasonable compromise that will mitigate these potential negative effects and speed-up recoveries to Creditors and Interest holders.

  **3.9.3** **General Unsecured Claims Settlement.** Pursuant to Bankruptcy Code sections 363 and 1123 and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good

faith compromise of the issues related to the allowance and distribution of General Unsecured Claims. In consideration for the waiver of interest, as approved by the holder of such Allowed General Unsecured Claim pursuant to a vote in favor of the Plan, all Allowed General Unsecured Claims shall be paid on the Effective Date and all holders of such Allowed General Unsecured Claims agree to waive interest on payment of such Allowed General Unsecured Claims. In addition, for each holder of an Allowed General Unsecured Claim who votes in favor of the Plan, (a) the Claims Objection Deadline shall be thirty (30) days after the Effective Date and (b) all Causes of Action against holders of General Unsecured Claims, other than the Hill Entities, shall be waived. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of this compromise and settlement, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtor, its Estate and stakeholders, and is fair, equitable and reasonable.

   **3.9.4  Binding Effect.** The Plan shall be binding upon and inure to the benefit of the Debtor, all present and former holders of Claims and Interests, and their respective successors and assigns.

   **3.9.5  Release of Liens.** Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

   **3.9.6  Liabilities to, and Rights of Governmental Units.** Nothing in the Plan or Confirmation Order shall discharge, release, or preclude: (1) any liability to a Governmental Unit that is not a Claim; (2) any Claim of a Governmental Unit arising on or after the Confirmation Date; (3) any liability to a Governmental Unit on the part of any Entity other than the Debtor or Liquidating Trust; (4) any valid right of setoff or recoupment by a Governmental Unit; or (5) any criminal liability. Nothing in the Plan or Confirmation Order shall enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence. The Plan and Confirmation Order are not intended and shall not be construed to bar any Governmental Unit from, after the Confirmation Date, pursuing any police or regulatory action.

   **3.9.7  Exculpation.** None of the Exculpated Persons shall have or incur any liability to any holder of a Claim or Interest for any Exculpated Claim, except for actual fraud, willfull misconduct or gross negligence, and in all respects, the Exculpated Person shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

   *3.9.8  Releases.*

   *(a)  Releases by the Debtor.  On the Effective Date and effective simultaneously with the effectiveness of the Plan, the Debtor and the Liquidating Trustee, on its own behalf and as a representative of its Estate release unconditionally and are hereby*

deemed to release unconditionally, each and all of the Scardapane Entities of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action and liabilities of any nature whatsoever (including the Scardapane Litigation), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the Effective Date that are in connection with the Debtor, its Estate, its Assets, the Chapter 11 Case or the Plan, the Disclosure Statement or the Liquidating Trust Agreement.

       (b)    _Releases by Holders of Claims and Interests_. Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date and effective simultaneously with the effectiveness of the Plan, each Person (a) that has voted to accept the Plan and has not opted out from granting the releases contained herein, (b) that has voted to reject the Plan but has not opted out from granting the releases contained herein, (c) that is deemed to accept the Plan or (d) who otherwise agrees to provide the releases set forth herein, shall be deemed to have unconditionally released each and all of the Released Parties of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action and liabilities of any nature whatsoever (including the Scardapane Litigation), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the Effective Date that are in connection with the Debtor, its Estate, its Assets, the Chapter 11 Case, the Plan, the Disclosure Statement or the Liquidating Trust Agreement.

       (c)    _Releases by the Scardapane Entities_. As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Scardapane Entities shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, Causes of Action and liabilities of any nature whatsoever, whether direct or derivative, in connection with or related to the Debtor, the Chapter 11 Case, or the Plan, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the Effective Date against (i) the Debtor; (ii) the Debtor's current and former officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case in their capacity as such; (iii) the Liquidating Trust; (iv) the Liquidating Trustee and (v) the Liquidating Trust's agents, financial advisors, attorneys, accountants, consultants, representatives and other professionals, in each case in their capacity as such.

       3.9.9  _Injunction_. Except as otherwise provided in the Plan or the Confirmation Order, as of the Confirmation Date, all Entities that have held, hold or may hold a Claim or other debt or liability against the Debtor or Interest in the Debtor are (a) permanently enjoined from taking any of the following actions against the Debtor or the Liquidating Trust or any of their property on account of such Claims or Interests and (b)

*preliminarily enjoined from taking any of the following actions against the Debtor or the Liquidating Trust, or their property on account of such Claims or Interests: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor; and (c) commencing or continuing in any manner or in any place, any action that does not comply with or is inconsistent with the provision.*

        **3.9.10  Term of Injunctions or Stays.**  Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to Bankruptcy Code section 105 or 362 or any order of the Bankruptcy Court, and existent on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

     **3.10**    **CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN.**

        **3.10.1  Conditions Precedent to Confirmation.**  The following are conditions precedent to the occurrence of Confirmation: (a) all provisions, terms and conditions of the Plan are approved in the Confirmation Order and (b) prior to the Confirmation Hearing, the Debtor shall have on hand Cash sufficient to satisfy the reasonably estimated, (i) Allowed Administrative Expenses Claims, (ii) Allowed Fee Claims, (iii) Allowed Priority Tax Claims, (iv) Allowed Priority Non-Tax Claims, and (iv) Allowed Secured Claims in an aggregate amount determined by the Debtor or set forth in the Confirmation Order.

        **3.10.2  Conditions Precedent to the Effective Date.**  The following are conditions precedent to the occurrence of the Effective Date, each of which must be waived or satisfied in accordance with Section IX of the Plan: (i) the Confirmation Order shall have been duly entered and be a Final Order and shall be in form and substance otherwise acceptable to the Debtor and (ii) all actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws.

        **3.10.3  Waiver of Conditions.**  The conditions to Confirmation and to the Effective Date set forth above may be waived by the Debtor, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan, provided, however, that the Debtor shall not waive the condition in Article IX.B of the Plan without the consent of the Scardapane Entities.

        **3.10.4  Effect of Failure of Conditions.**  If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtor, any holders or any other Entity; (2) prejudice in any manner the rights of the Debtor, any holders or

any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtor, any holder of any Claim or any other Entity in any respect.

### 3.11    MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN.

   **3.11.1 Modification and Amendments.** Except as otherwise specifically provided in the Plan, the Debtor reserves the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in Bankruptcy Code section 1127 and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtor expressly reserves its right to revoke or withdraw, to alter, amend or modify the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such manners as may be necessary to carry out the purposes and intent of the Plan.

   **3.11.2 Effect of Confirmation on Modifications.** Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to Bankruptcy Code section 1127(a) and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

   **3.11.3 Revocation or Withdrawal of Plan.** The Debtor reserves the right to revoke or withdraw the Plan before the Confirmation Date and to file a subsequent plan. If the Debtor revokes or withdraws the Plan, or if Confirmation or Consummation does not occur, then: (l) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claim or Interest; (b) prejudice in any manner the rights of, any holder or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor, any holder or any other Entity.

### 3.12    RETENTION OF JURISDICTION.

   Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to Bankruptcy Code sections 105(a) and 1142, including jurisdiction to:

   a.  allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount or allowance of Claims or Interests;

b.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals (including Fee Claims) authorized pursuant to the Bankruptcy Code or the Plan;

c.    resolve any matters related to: (a) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to the Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Debtor amending, modifying or supplementing, after the Effective Date, the Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired or terminated;

d.    ensure that distributions to holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

e.    adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

f.    adjudicate, decide or resolve any and all matters related to Bankruptcy Code section 1141;

g.    enter and implement such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Plan Supplement or the Disclosure Statement;

h.    enter and enforce any order for the sale of property pursuant to Bankruptcy Code sections 363, 1123 or 1146(a);

i.    resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

j.    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

k.    resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions, and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

l.    resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interests for amounts not timely repaid;

m.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

n.      determine any other matters that may arise in connection with or related to the Plan, the Disclosure Statement or the Confirmation Order;

o.      enter an order or Final Decree concluding or closing the Chapter 11 Case;

p.      adjudicate any and all disputes arising from or relating to distributions under the Plan;

q.      consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

r.      determine requests for the payment of Claims entitled to priority pursuant to Bankruptcy Code section 507;

s.      hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

t.      hear and determine matters concerning state, local and federal taxes in accordance with Bankruptcy Code sections 346, 505 and 1146;

u.      hear and determine all disputes involving the existence, nature, scope or enforcement of any exculpations, discharges, injunctions and releases granted in connection with and under the Plan;

v.      enforce all orders previously entered by the Bankruptcy Court; and

w.      the Bankruptcy Court shall retain non-exclusive jurisdiction to hear any other matter not inconsistent with the Bankruptcy Code.

### 3.13    MISCELLANEOUS PROVISIONS.

**3.13.1 Payment of U.S. Trustee's Fees.** All fees payable pursuant to 28 U.S.C. Section 1930 incurred after the Effective Date shall be paid by the Liquidating Trust when due until the closing of the Chapter 11 Case.

**3.13.2 Statutory Committee and Cessation of Fee and Expense Payment.** On the Effective Date, the Creditors' Committee shall dissolve and all of its members, Professionals and agents shall be deemed released of their duties, responsibilities and obligations, and shall be without further duties, responsibilities and authority in connection with the Debtor, the Chapter 11 Case, the Plan or its implementation, except with respect applications for Fee Claims. Except with respect to the unpaid portion of any Allowed Fee Claim, the Liquidating Trust shall not be responsible for paying any fees or expenses incurred by the Creditors' Committee after the Effective Date.

**3.13.3  Reservation of Rights.**  Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan or the taking of any action by the Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the holders of Claims and Interests before the Effective Date.

**3.13.4  Votes Solicited in Good Faith.**  Upon entry of the Confirmation Order, the Debtor will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to Bankruptcy Code section 1125(e), the Debtor and its agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale and purchase of Securities offered and sold under the Plan and any previous plan and, therefore, no such parties, individuals or the Debtor will have any liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale or purchase of the Securities offered and sold under the Plan or any previous plan.

**3.13.5  Closing of Chapter 11 Case.**  The Liquidating Trustee shall promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Case that has been fully administered.

**3.13.6  No Admission Against Interest.**  Neither the filing of the Plan, the Disclosure Statement, nor any statement contained therein, is or shall be deemed an admission against interest.  In the event that the Plan is not consummated, neither the Plan, the Disclosure Statement nor any statement contained therein may be used or relied upon in any manner in any suit, action, proceeding or controversy within or outside the Bankruptcy Court involving the Debtor or any of its former or present officers, directors or Interest holders.

**3.13.7  No Waiver.**  Except as otherwise specifically provide herein, nothing set forth in the Plan or this Disclosure Statement shall be deemed a waiver or release of any claims, rights or Causes of Action against any Person other than the Debtor.

**3.13.8  Headings.**  The article and section headings used in the Plan are inserted for convenience and reference only and neither constitutes a part of the Plan nor any manner affects the terms, provisions or interpretation of the Plan.

**3.13.9  Governing Law.**  Except to the extent the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent otherwise provided in the Plan, the rights and obligations arising under the Plan, shall be governed by, and construed and enforced in accordance with the laws of Delaware, without giving any effect to the principles of conflicts of law or such jurisdiction.

**3.13.10    Conflicts.**  Except as set forth in the Plan, to the extent that any provisions of the Disclosure Statement, the Plan Supplement or any other order (other than the

Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Confirmation Order shall govern and control.

## IV.    POST-CONFIRMATION ISSUES.

### 4.1    THE DEBTOR'S CONTINUED EXISTENCE AFTER CONFIRMATION.

4.1.1    **Wind-Up of Affairs.**  Upon the Effective Date, the Liquidating Trust shall wind-up the affairs of the Debtor, including, without limitation, making distributions pursuant to the Plan and consummating the terms of the Plan.  The Debtor shall not exist for the purpose of continuing business except insofar as necessary for the winding up of such company.

4.1.2    **Role of the Creditors' Committee.** From and after the Effective Date, as set forth above, the Creditors' Committee will be disbanded and the appointment of its members will be terminated.

## V.    FEASIBILITY.

### 5.1    FINANCIAL FEASIBILITY ANALYSIS.

5.1.1    **The Bankruptcy Code Standard.** The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must find that Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor unless contemplated by the Plan.

5.1.2    **No Need for Further Reorganization of the Debtor.**  The Plan provides for the liquidation or distribution of all of the Debtor's Assets.  Accordingly, the Debtor believes that all Plan obligations will be satisfied without the need for further reorganization of the Debtor.

## VI.    ALTERNATIVES TO THE PLAN.

### 6.1    CHAPTER 7 LIQUIDATION.

6.1.1    **The Bankruptcy Code Standard.** Notwithstanding acceptance of the Plan by the requisite number of Creditors and Interest holders of any Class, the Bankruptcy Court must still independently determine that the Plan provides each member of each Impaired Class of Claims and Interests a recovery that has a value at least equal to the value of the distribution that each such Person would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

In chapter 7 liquidation cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior Class receiving any payments until all amounts due to senior Classes have been paid fully or any such payment is provided for: (i) Secured creditors (to the extent of the value of their collateral); (ii)

Administrative and other priority creditors; (iii) Unsecured creditors; (iv) Debt expressly subordinated by its terms or by order of the Bankruptcy Court; and (v) Interest holders.

**6.1.2    The Plan is in the Best Interests of Creditors.**    The Debtor believes that the Plan satisfies this standard because the Plan provides for an orderly liquidation of the Debtor's Assets.    Furthermore, the Debtor believes that the Plan also provides Creditors with a degree of certainty that would not exist if the Debtor's Assets were subject to liquidation outside of the Plan and eliminates all risks and expenses of the marketplace and continual administration of the Debtor.    In this regard, in the event of liquidation under Chapter 7, it is unlikely that Creditors will receive as great and as prompt payment of their Allowed Claims as they would under the Plan and the following is likely to occur: (i) additional administrative expenses, including trustee's commissions, fees for the trustee's accountant, attorneys and other professionals likely to be retained, would be incurred with priority over general unsecured claims under Bankruptcy Code section 507(a)(1) and (ii) final distribution of the Assets would likely be substantially delayed.    Accordingly, the Debtor believes that the Plan is in the best interests of Creditors.

**6.1.3    Liquidation Analysis.**    As noted above, in considering whether the Plan is in the best interests of Creditors and Interest holders, the Debtor and its professionals created a Liquidation Analysis, a copy of which is attached hereto as **"Exhibit C"**.    The Debtor believes its Liquidation Analysis, and the conclusions set forth herein are fair and accurate, and represent the Debtor's best judgment with regard to the results of a chapter 7 liquidation of the Debtor. The Liquidation Analysis was prepared by the Debtor with the assistance of EisnerAmper LLP and is based on the Debtor's unaudited balance sheets as of June 12, 2015 and projected available cash.

The Liquidation Analysis reflects the estimated cash proceeds, net of liquidation-related costs, which would be available to the Debtor's creditors if they were to be liquidated in a chapter 7 case.    Underlying the Liquidation Analysis are a number of estimates and assumptions regarding liquidation proceeds that, although developed and considered reasonable by the Debtor's management and professionals, are inherently subject to significant business, economic and competitive uncertainties, and contingencies beyond the control of the Debtor and its management.

THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTOR WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

THE STATEMENTS IN THE LIQUIDATION ANALYSIS, INCLUDING ESTIMATES OF ALLOWED CLAIMS, WERE PREPARED SOLELY TO ASSIST THE BANKRUPTCY COURT IN MAKING THE FINDINGS REQUIRED UNDER SECTION 1129(a)(7) AND THEY MAY NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE.

### 6.2     CONTINUATION OF THE BANKRUPTCY CASE.

If the Debtor remains in Chapter 11, it can continue to operate its business and manage its property as a debtor-in-possession, but it would remain subject to the restrictions imposed by the Bankruptcy Code. The Debtor is not a going concern.

### 6.3     ALTERNATIVE PLAN(S).

If the Plan is not confirmed, the Debtor or other Persons could attempt to formulate and propose a different plan. The Debtor believes that the Plan, as described herein, enables holders of Claims or Interests to realize the greatest possible value under the circumstances, and that is compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

## VII.     RISK FACTORS.

**Holders of Claims or Interests who are entitled to vote on the Plan should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement, before deciding whether to vote to accept or reject the Plan.**

### 7.1     CERTAIN BANKRUPTCY CONSIDERATIONS.

Even if all Impaired voting classes vote to accept the Plan, and with respect to any Impaired Class deemed to have rejected the Plan, the requirements for "cramdown" are met; the Court may exercise substantial discretion and may choose not to confirm the Plan. Bankruptcy Code section 1129 requires, among other things, that the value of distributions to dissenting holders of Claims or Interest may not be less than the value such holders would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. Although the Debtor believes that the Plan will meet such requirement, there can be no assurance that the Court will reach the same conclusion.

### 7.2     CLAIMS ESTIMATION.

There can be no assurance that the estimated amount of Claims and Interests set forth herein are correct, and the actual allowed amounts of Claims and Interests may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties and assumptions, including, without limitation, that the Bankruptcy Court finds that the Subordinated Claims should not be subordinated and that the Scardapane Claims related to advancement costs and indemnification should be treated as Priority Non-Tax Claims.

### 7.3     CERTAIN LITIGATION.

The Liquidating Trust is retaining the right to pursue any existing or potential Cause of Action, except those previously waived or released by the Debtor, by informal demand and/or commencement of litigation. If the Liquidating Trust is unsuccessful in prosecuting such Causes of Action, the Liquidating Trust may not recover related assets for distribution under the Plan. Litigation is inherently uncertain and there can be no guarantee of any outcome. The Liquidating

Trustee, pursuant to the terms of the Liquidating Trust Agreement, may decide to settle Causes of Action and such settlements may be significantly less than the damages which were caused and/or the transfers to be recovered. Additionally, there also are other claims, lawsuits, disputes with third parties, investigations and administrative proceedings against the Debtor relating to matters in the ordinary course of its business which could materially adversely affect the Debtor's liquidation.

**THE DEBTOR RECOMMENDS THAT YOU VOTE IN FAVOR OF THE PLAN.**

## VIII.   <u>CONCLUSION.</u>

It is important that you exercise your right to vote on the Plan. It is the Debtor's belief and recommendation that the Plan fairly and equitably provides for the treatment of all Claims against the Debtor.